# IN THE DISTRICT COURT OF THE UNITED STATES

## For the Western District of New York

March 2004 Grand Jury
(Empaneled March 16, 2004)

05-CR-6116-CJS

| | |
|---|---|
| The United States of America | **SEALED INDICTMENT** |
| -vs- | Violations: |
| VIOLETTE GAIL ELDRIDGE a/k/a GAIL VIOLETTE ELDRIDGE, MELVIN RAY LYTTLE, PAUL E. KNIGHT, and JOHN L. MONTANA, Jr. | 18 U.S.C. § 371<br>18 U.S.C. § 1341<br>18 U.S.C. § 1343<br>18 U.S.C. § 1956(A)(1)(a)(i)<br>18 U.S.C. § 1956(h)<br>18 U.S.C. § 982(a)(1)<br>18 U.S.C. § 2<br>21 U.S.C. § 853(p) |

## COUNT I

The Grand Jury Charges:

(Title 18, U.S.C. Sec. 371 - Conspiracy)

### THE RELEVANT PARTIES AND ENTITIES

1. Except as otherwise noted, at all times relevant to this Indictment:

   a. Defendant MELVIN RAY LYTTLE was a resident of Aurora, Indiana. Defendant LYTTLE controlled First National Equity LLC, a/k/a First National Equity LTD.,

3

a/k/a SCCP Corporation d/b/a First National Equity (hereinafter referred to as "First National Equity") out of his home. Defendant LYTTLE also controlled Industrial Hardwoods Corporation (hereinafter "Industrial Hardwoods"), an entity located in Osgood, Indiana. The B.E.R.J. Trust was an entity located at defendant LYTTLE's home. Defendant LYTTLE's spouse was listed as this trust's trustee and defendant LYTTLE's children were identified as the trust's beneficiaries.

   b. Defendant PAUL E. KNIGHT was a resident of Kodak, Tennessee. Defendant KNIGHT controlled P.K. Trust and Holding Company (hereinafter "P.K. Trust"), which defendant KNIGHT operated out of his home.

   c. Defendant VIOLETTE GAIL ELDRIDGE a/k/a GAIL VIOLETTE ELDRIDGE was a resident of Woodstock, Georgia, and New York, New York. Defendant ELDRIDGE was President of United Tribes of the Americas (hereinafter the "UTA"), a not-for-profit corporation which was located in Woodstock, Georgia, and New York, New York. Defendant Eldridge also controlled the UTA-BVI LLC, a/k/a the UTA-BVI Trust (hereinafter "UTA-BVI"). Defendant ELDRIDGE also controlled UTA Financial Development Incorporated, a company associated with the UTA and located in New York, New York. Defendant Eldridge also controlled The Executive Bureau of Research and Recovery, a/k/a The Executive Bureau of Research Agency, a/k/a The Executive Research and Recovery Agency, Inc., which she operated out of her Georgia residence. Defendant ELDRIDGE also controlled First Chase Holdings, LLC, a/k/a/ First Chase Holdings, Inc., which she operated out of New York, New York.

   d. Defendant JOHN L. MONTANA, JR., was a resident of Staten Island, New York. Defendant MONTANA controlled Worldwide T & P, which defendant MONTANA operated out of his home.

2

### THE CONSPIRACY

2. From in or about the Summer of 1999 through in or about July 5, 2001, in the Western District of New York, and elsewhere, defendants

VIOLETTE GAIL ELDRIDGE,
MELVIN RAY LYTTLE,
PAUL E. KNIGHT, and
JOHN L. MONTANA JR.

did knowingly and willfully conspire and agree with each other and others to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and knowingly used and caused to be used the United States Postal Service and private and commercial interstate carriers to further the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341, and to transmit and cause to be transmitted writings and sounds by means of wire communications in interstate and foreign commerce for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3. The defendants offered to the public investments in fraudulent high yield investment programs through First National Equity and P.K. Trust (the "investment programs").

4. The defendants required a minimum investment of $1 million.

5. As part of the conspiracy, the defendants: a) solicited and received investment funds of more than $30 million; b) returned approximately $20 million to those investors who complained about their losses or threatened legal action; c) paid the complaining investors from funds

3

received from later investors; and d) caused victim investors to sustain a loss in excess of $10 million.

### The Conspirators' Roles

6. During the conspiracy, the defendants assumed the following primary roles:

   a. defendant ELDRIDGE received and disbursed funds received from investors;

   b. defendant LYTTLE offered the investment programs to investors, directly received investor funds, and transferred investor funds to defendants ELDRIDGE and KNIGHT;

   c. defendant KNIGHT solicited investors to participate in the investment programs, communicated with investors and directed investors to transfer funds to defendant ELDRIDGE; and

   d. defendant MONTANA communicated with investors, provided investors with investment program documents and directed investors to transfer funds to defendant LYTTLE.

### The Conspirators' False Representations and Material Omissions

7. The defendants falsely represented to investors that the investment programs were secret trading programs involving the world's largest banks.

8. The defendants falsely represented to investors that the investment programs would provide the investors with yields as high as 30 percent a week.

9. The defendants falsely represented to investors that their investment programs were risk free because the investors' funds would be invested in U.S. Treasury securities during the term of the investment and would not be subject to loss or depletion.

10. The defendants falsely represented to investors that investment funds would be placed into segregated accounts which would require the investors' signatures prior to the removal of funds from those accounts.

4

EXHIBIT A 1-4

11. The defendants falsely represented to investors that their funds would be insured.

12. The defendants falsely represented to investors that defendants LYTTLE and KNIGHT had been successful in prior investment programs involving investments similar to the ones they offered through First National Equity and P.K. Trust.

13. The defendants falsely represented to investors that defendant LYTTLE had access to hundreds of millions of dollars in Russia for use in the investment programs.

14. The defendants falsely represented to investors that their funds would be pooled with funds from Russia traded by defendant LYTTLE in order to reach the overall minimum trade amount of $100,000,000.

15. Defendants LYTTLE and MONTANA falsely represented to investors that each investor would receive a monthly accounting of their investment.

16. The defendants made, or caused to be made, various false statements to lull complaining investors into maintaining their investments with the defendants and to prevent these investors from complaining to law enforcement authorities.

The Conspirators' Concealment of Their Scheme

17. The defendants told the investors not to disclose the investment programs to anyone other than their legal or financial advisors or their employees.

18. The defendants required investors to sign a document indicating that their investments were strictly by private placement and were in no way relying upon or relating to the "United States Securities Act of 1933" or related regulations and would not involve the sale or purchase of securities.

19. The defendants required investors to sign an agreement acknowledging that unauthorized disclosure of the investments being offered by First National Equity or P.K. Trust

5

would subject the investor to: a) damages of $5 million, b) a fine; or ) imprisonment.

20. The defendants told investors that they would be permanently barred from participation in high yield investment programs purportedly operated by the Federal Reserve or the banking community if they disclosed the investment programs to others.

OVERT ACTS

In furtherance of the conspiracy and to accomplish its unlawful objects, the defendants committed the following overt acts within the Western District of New York and elsewhere:

Receipt and Transfer of Investors' Funds

21. On or about August 12, 1999, defendant MONTANA caused investor G.C. to wire transfer $1 million from Vineland, New Jersey to a First National Equity account at a bank in Dallas, Texas.

22. On or about August 12, 1999, defendant MONTANA caused investor A.Fra. to wire transfer $999,985 from a financial institution located in Geneva, Switzerland to a First National Equity account at a bank in Dallas, Texas.

23. On or about August 12, 1999, defendant MONTANA caused investor P.K. to wire transfer $1 million from Bradenton, Florida to a First National Equity account at a bank in Dallas, Texas.

24. On or about August 12, 1999, defendant MONTANA caused investor D.P. to wire transfer $1 million from Kansas City, Missouri to a First National Equity account at a bank in Dallas, Texas.

25. On or about August 12, 1999, defendant MONTANA caused investor R.P. to wire transfer $1.2 million from Haddon Township, New Jersey to a First National Equity account at a bank in Dallas, Texas.

6

26. On or about August 13, 1999, defendant MONTANA caused investor D.O. to wire transfer $1.5 million from Huntsville, Alabama to a First National Equity account at a bank in Dallas, Texas.

27. On or about August 13, 1999, defendant MONTANA caused investor B.T. to wire transfer $1 million from New Orleans, Louisiana to a First National Equity account at a bank in Dallas, Texas.

28. On or about August 13, 1999, defendant MONTANA caused investor S.T. to wire transfer $1 million from Cleveland Heights, Ohio to a First National Equity account at a bank in Dallas, Texas.

29. On or about August 18, 1999, defendant LYTTLE caused the withdrawal of funds from First National Equity's account at a bank in Dallas, Texas and purchased eight cashier's checks totaling $8,619,985.

30. On or about August 26, 1999, defendant MONTANA caused investor W.Z. to wire transfer $1 million from Toledo, Ohio to a First National Equity account at a bank in Dallas, Texas.

31. On or about September 1, 1999, defendant MONTANA caused investor M.D. to wire transfer $1 million from Abilene, Texas to a First National Equity account at a bank in Dallas, Texas.

32. On or about September 2, 1999, defendant MONTANA caused investor S.E. to wire transfer $1 million from Germany to a First National Equity account at a bank in Dallas, Texas.

33. On or about September 10, 1999, defendant MONTANA caused investors E.&J.T. to wire transfer $1 million from Fort Myers, Florida to a First National Equity account at a bank in Dallas, Texas.

7

34. On or about September 14, 1999, defendant MONTANA caused investor R.J. to wire transfer $1 million from Abilene, Texas to a First National Equity account at a bank in Dallas, Texas.

35. On or about September 30, 1999, defendant KNIGHT caused investor F.M. to wire transfer $1 million from Grand Rapids, Michigan to the UTA-BVI account at a financial institution located in New York, New York.

36. On or about October 1, 1999, defendant KNIGHT caused investor D.C. to wire transfer $1 million from Portland, Oregon to the UTA-BVI account at a financial institution located in New York, New York.

37. On or about October 5, 1999, defendant MONTANA caused investor D.S. to wire transfer $1,300,000 from Rochester, New York to a First National Equity account at a bank in Dallas, Texas.

38. On or about October 6, 1999, defendant KNIGHT caused investor N.R. to wire transfer $1 million from Portland, Oregon to the UTA-BVI account at a financial institution located in New York, New York.

39. On or about October 29, 1999, defendant MONTANA caused investor K.S. to wire transfer $1.5 million from Charlotte, North Carolina to a First National Equity account at a bank in Dallas, Texas.

40. On or about November 4, 1999, defendant MONTANA caused investor A.L. to wire transfer $1 million from Salt Lake City, Utah to a First National Equity account at a bank in Dallas, Texas.

EXHIBIT
B-1

A5-1

41. On or about November 8, 1999, defendant MONTANA caused investor J.T. to wire transfer $1.3 million from Long Beach, California to a First National Equity account at a bank in Dallas, Texas.

42. On or about November 10, 1999, defendant KNIGHT caused investor P.G. to wire transfer $1 million from Tulsa, Oklahoma to the UTA-BVI account at a financial institution located in New York, New York.

43. On or about November 10, 1999, defendant KNIGHT caused investor P.G. to make a second wire transfer of $1 million from Tulsa, Oklahoma to the UTA-BVI account at a financial institution located in New York, New York.

44. On or about November 10, 1999, defendant MONTANA caused investor R.F. to wire transfer $2 million from Spartanburg, South Carolina to a First National Equity account at a bank in Dallas, Texas.

45. On or about December 1, 1999, defendant KNIGHT caused investor F.M. to wire transfer a second $1 million investment from Grand Rapids, Michigan to the UTA-BVI account at a financial institution located in New York, New York.

46. On or about December 2, 1999, defendant MONTANA caused investor A.Fre. to wire transfer $1 million from Tempe, Arizona to a First National Equity account at a bank in Dallas, Texas.

47. On or about December 13, 1999, defendant MONTANA caused investor S.W. to wire transfer $1,070,000 from San Francisco, California to a First National Equity account at a bank in Dallas, Texas.

48. On or about December 15, 1999, defendant MONTANA caused investor F.C. to wire transfer $1 million from Houston, Texas to a First National Equity account at a bank in Dallas, Texas.

49. On or about March 6, 2000, defendant KNIGHT caused investor K.S. to make a second wire transfer of $500,000 from Charlotte, North Carolina to the UTA-BVI account at a financial institution located in New York, New York.

50. On or about March 17, 2000, defendant KNIGHT caused investor J.S. to wire transfer $1.5 million from Palm Beach, Florida to the UTA-BVI account at a financial institution located in New York, New York.

51. On or about July 5, 2001, defendant ELDRIDGE caused the wire transfer of $403,762 from the UTA-BVI stock brokerage account located in New York, New York to the trust account of an attorney located in Conway, Washington.

Foreign Transfer of Investor Funds

52. On or about October 21, 1999, defendant LYTTLE caused the wire transfer of $1 million from the First National Equity account at a bank in Dallas, Texas, to a First National Equity account at a bank in the nation of Hungary.

Communications with Investors

53. On or about September 15, 1999, defendant MONTANA faxed prototype investment documents for participation in the First National Equity investment program to investor D.S. in Hilton, New York.

54. On or about September 17, 1999, defendant MONTANA signed a "Joint Venture Agreement" with investor D.S.

55. On or about October 2, 1999, D.S. sent First National Equity investment documents from Hilton, New York through use of a private interstate commercial carrier to defendant MONTANA in Staten Island, New York.

56. On or about October 3, 1999, defendant MONTANA sent a facsimile to D.S. in Hilton, New York explaining why the First National Equity investment program had failed to start.

57. On or about October 27, 1999, defendant MONTANA sent a facsimile to D.S. in Hilton, New York explaining why the First National Equity investment program had failed to start.

58. On or about December 14, 1999, defendant MONTANA sent a facsimile to D.S. in Hilton, New York explaining why the First National Equity investment program had failed to start.

59. On or about January 26, 2000, defendant MONTANA sent a facsimile to D.S. in Hilton, New York explaining why the First National Equity investment program had failed to start.

60. On or about January 28, 2000, D.S. sent investment program documents from Hilton, New York through use of a private interstate commercial carrier to defendant MONTANA in Staten Island, New York.

61. On or about February 8, 2000, D.S. sent investment program documents from Hilton, New York through use of a private interstate commercial carrier to defendant MONTANA in Staten Island, New York.

62. On or about February 24, 2000, defendant KNIGHT had a telephone conversation with D.S., located in Hilton, New York, during which defendant KNIGHT refused to discuss the investment program over the telephone and offered to meet D.S. in person.

63. On or about February 24, 2000, defendant KNIGHT sent an email from Kodak, Tennessee, to D.S. in Hilton, New York, confirming a meeting with D.S. in Tennessee.

64. On or about February 25, 2000, defendant KNIGHT caused D.S. to travel from Rochester, New York, to Knoxville, Tennessee to meet regarding D.S.'s continued participation in the investment program.

65. On or about February 25, 2000, defendant KNIGHT met with D.S. in Knoxville, Tennessee. During the meeting, defendant KNIGHT: a) confirmed that KNIGHT had D.S.'s funds of $1.3 million; b) offered D.S. the chance to transfer his investment from the First National Equity investment program to an investment program being offered by defendant KNIGHT through P.K. Trust; c) offered to return all of D.S.'s funds or, in the alternative, $300,000, which would allow D.S. to continue in the program with a minimum investment of $1 million; d) falsely stated that there was 100 percent security for the investment; and e) assured D.S. that the investment program would be completed and that he would receive profits.

66. On or about March 1, 2000, defendant KNIGHT sent a letter to D.S. in Hilton, New York in which he acknowledged that P.K. Trust had possession of D.S.'s funds. Defendant KNIGHT also falsely represented to D.S. in the letter that: a) D.S.'s funds were secure and placed in U.S. Treasury bills; and b) he was waiting for authorization from the federal government to begin the program.

67. On or about March 6, 2000, defendant KNIGHT sent an email transmission from Kodak, Tennessee, to D.S. in Hilton, New York relating to the return of $300,000 to D.S.

EXHIBIT A

9-12

68. On or about March 17, 2000, defendant KNIGHT used the United States Postal Service to send a receipt for $1 million and executed investment program documents from Kodak, Tennessee to D.S. in Hilton, New York.

69. On or about April 8, 2000, defendant KNIGHT met in Knoxville, Tennessee with D.S. to persuade D.S. to continue his investment with P.K. Trust.

70. In or around June, 2000, defendant KNIGHT again met with D.S. in Knoxville, Tennessee to persuade D.S. to continue his investment with P.K. Trust.

71. On or about May 16, 2001, in Hilton, New York, D.S. received in the U.S. Mail a promissory note for $1 million signed by defendant LYTTLE on behalf of First National Equity.

All in violation of Title 18, United States Code, Section 371.

## COUNTS II THROUGH VI

The Grand Jury Further Charges:

(Title 18, U.S.C. Sec. 1341 - Mail Fraud)

72. The allegations set forth in paragraphs 1 and 3 through 71 of Count I of this Indictment are realleged and incorporated as though set forth in full herein.

73. From at least as early as May 1999 and continuing to at least July 5, 2001, in the Western District of New York, and elsewhere, the defendants

VIOLETTE GAIL ELDRIDGE,
MELVIN RAY LYTTLE,
PAUL E. KNIGHT, and
JOHN L. MONTANA JR.

and others did knowingly and willfully devise and intend to devise a scheme and artifice to defraud investors and to obtain money from those investors by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice was in substance as set forth in paragraphs 1 and 3 through 71 of Count 1 of this Indictment.

74. On or about the dates listed for each count below, for the purpose of executing the above scheme and artifice to defraud and attempting to do so, the defendants placed and caused to be placed in a post office and authorized depository for mail matter, and placed and caused to be placed with private and commercial interstate carriers the following items to be sent and delivered according to the directions thereon:

| COUNT | DATE | NATURE OF MAILINGS |
|---|---|---|
| II | 10/2/99 | Delivery by a private and commercial interstate carrier of First National Equity investment documents sent from D.S. in Hilton, New York, to defendant MONTANA in Staten Island, New York |
| III | 1/28/00 | Delivery by a private and commercial interstate carrier of investment program documents from D.S. in Hilton, New York, to defendant MONTANA in Staten Island, New York |
| IV | 2/8/00 | Delivery by a private and commercial interstate carrier of investment program documents from D.S. in Hilton, New York, to defendant MONTANA in Staten Island, New York |
| V | 3/17/00 | Delivery by the United States Postal Service of a receipt for $1 million and executed investment program documents sent from defendant KNIGHT in Kodak, Tennessee to D.S. in Hilton, New York. |
| VI | 5/16/01 | Delivery by the United States Postal Service of a promissory note for $1 million sent by defendant LYTTLE to D.S. in Hilton, New York |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS VII THROUGH IX

The Grand Jury Further Charges:

(Title 18, U.S.C. Sec. 1343 - Wire Fraud)

75. The allegations contained in paragraphs 1 and 3 through 71 of Count 1 of this Indictment are realleged and incorporated as though set forth in full herein.

76. From at least as early as May 1999, and continuing to at least July 5, 2001, in the Western District of New York, and elsewhere, the defendants

VIOLETTE GAIL ELDRIDGE,
MELVIN RAY LYTTLE,
PAUL E. KNIGHT, and
JOHN L. MONTANA JR.

and others did knowingly and willfully devise and intend to devise a scheme and artifice to defraud investors and to obtain money from those investors by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice was in substance as set forth in paragraphs 1 and 3 through 71 of Count 1 of this Indictment.

77. On or about the dates listed for each count below, for the purpose of executing the above scheme and artifice to defraud and attempting to do so, the defendants knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals and sounds as follows:

Case 6:05-cr-06116-CJS   Document 1   Filed 08/18/2005   Page 17 of 27
Case 6:05-cr-06116-CJS   Document 52-3   Filed 02/20/07   Page 5 of 7
Case 6:05-cr-06116-CJS   Document 1   Filed 08/18/2005   Page 18 of 27

| COUNT | DATE | NATURE OF WIRE COMMUNICATION |
|---|---|---|
| VII | 10/5/99 | Wire transfer of $1.3 million from a financial institution in Rochester, New York to a financial institution in Dallas, Texas |
| VIII | 2/24/00 | Internet email transmission containing airline arrival information sent from D.S. in Hilton, New York to defendant KNIGHT in Tennessee |
| IX | 3/06/00 | Internet email transmission relating to the return of $300,000 in investment funds sent from defendant KNIGHT in Tennessee to D.S. in Hilton, New York |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT X

**The Grand Jury Further Charges:**

(Title 18, U.S.C. Sec. 1956(h) - Money Laundering Conspiracy)

78. The allegations contained in Paragraphs 1 and 3 through 71 of Count I of this Indictment are realleged and incorporated herein as if set forth in full.

79. Beginning in or about May 1999, and continuing to at least July 5, 2001, in the Western District of New York, and elsewhere, defendants

VIOLETTE GAIL ELDRIDGE;
MELVIN RAY LYTTLE; and
PAUL E. KNIGHT

did knowingly and willfully conspire and agree with each other and with others to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, specifically, to knowingly conduct and attempt to conduct financial transactions affecting

17

interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is: Mail Fraud, in violation of Title 18, United States Code, Section 1341; and Wire Fraud, in violation of Title 18, United States Code, Section 1343, with the intent to:(1) promote the carrying on of such specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity; and 2) to knowingly engage in monetary transactions in criminally derived property of a value greater than $10,000, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1957.

### THE CONSPIRACY

80. The defendants and their coconspirators promoted the investment fraud described above by conducting financial transactions involving the proceeds of the investment fraud scheme which they knew were the proceeds of unlawful activity by:

   a. using criminally derived proceeds obtained from new investors to make payments to prior investors for the purpose of preventing or delaying investors' complaints to regulatory and law enforcement authorities;

   b. using criminally derived proceeds received from new investors to return a portion of the investors' funds to lull investors into continuing their participation in the investment program with their remaining funds; and

   c. using criminally derived proceeds to pay operating expenses for the offices maintained by the United Tribes of the Americas in New York, New York.

81. The defendants and their coconspirators, knowingly engaged in monetary transactions in criminally derived property obtained through the investment fraud scheme described above with value greater than $10,000 by:

18

   a. using criminally derived proceeds in excess of $10,000 to purchase real property; and

   b. using criminal proceeds in excess of $10,000 to purchase personal property, including automobiles.

### OVERT ACTS OF THE MONEY LAUNDERING CONSPIRACY

#### Overt Acts to Promote the Carrying on of Specified Unlawful Activity

82. On or about December 7, 1999, defendant LYTTLE caused a wire transfer of $1.5 million from a bank in Dallas, Texas, to investor D.O.'s bank account in Alabama, which represented the total return of an investment in the First National Equity program.

83. On or about December 23, 1999, defendant LYTTLE caused a wire transfer of $1 million from a bank account in Dallas, Texas, to investor M.D.'s bank account at a Texas bank which represented the total return of an investment in the First National Equity program.

84. On or about December 23, 1999, defendant LYTTLE caused a wire transfer of $1.3 million from a bank account in Dallas, Texas, to investor J.T.'s bank account in San Francisco, California, which represented the total return of an investment in the First National Equity program.

85. On or about March 14, 2000, defendant ELDRIDGE caused a wire transfer of $1 million from a financial institution located in Chicago, Illinois, to investor D.P.'s bank account in Kansas City, Missouri, which represented the total return of an investment in the First National Equity program.

86. On or about March 24, 2000, defendant ELDRIDGE caused a wire transfer of $2 million from a financial institution located in Chicago, Illinois, to investor R.F.'s bank account in Spartansburg, South Carolina, which represented the total return of an investment in the First National Equity program.

19

87. On or about April 4, 2000, defendant ELDRIDGE caused a wire transfer of $1.5 million from a financial institution located in Chicago, Illinois, to investor K.S.'s bank account in Dallas, Texas, which represented a partial return of an investment in the First National Equity program.

88. On or about April 4, 2000, defendant ELDRIDGE caused a wire transfer of $500,000 from a financial institution located in Chicago, Illinois, to investor K.S.'s bank account in Dallas, Texas, which represented the total return of an investment in the First National Equity program.

89. On or about April 17, 2000, defendant ELDRIDGE caused a wire transfer of $1 million from a financial institution located in Chicago, Illinois, to investor P.G.'s bank account in Tulsa, Oklahoma, which represented the total return of an investment in the First National Equity program.

90. On or about April 17, 2000, defendant ELDRIDGE caused a second wire transfer of $1 million from a financial institution located in Chicago, Illinois, to investor P.G.'s bank account in Tulsa, Oklahoma, which represented the total return of an investment in the First National Equity program.

91. On or about April 24, 2000, defendant ELDRIDGE caused a wire transfer of $500,000 from a financial institution located in Chicago, Illinois, to investor B.T.'s bank account in New Orleans, Louisiana, which represented a partial return of an investment in the First National Equity program.

92. On or about April 24, 2000, defendant ELDRIDGE caused a wire transfer of $1 million from a financial institution located in Chicago, Illinois, to investor F.C.'s bank in Kingwood, Texas, which represented the total return of an investment in the First National Equity program.

20

Case 6:05-cr-06116-CJS   Document 1   Filed 08/18/2005   Page 21 of 27
Case 6:05-cr-06116-CJS   Document 1   Filed 08/18/2005   Page 22 of 27
Case 6:05-cr-06116-CJS   Document 52-3   Filed 02/20/07   Page 6 of 7

93. On or about May 4, 2000, defendant ELDRIDGE caused a wire transfer of $1,070,000 from a financial institution located in Chicago, Illinois, to investor S.W.'s bank account in Napa, California, which represented the total return of an investment in the First National Equity program.

94. On or about May 25, 2000, defendant ELDRIDGE caused a wire transfer of $1 million from a financial institution located in Chicago, Illinois, to investor S.T.'s bank account in Cleveland, Ohio, which represented the total return of an investment in the First National Equity program.

95. On or about July 11, 2000, defendant LYTTLE caused a wire transfer of $1 million from a bank account in Dallas, Texas, to investor E.&J.T.'s bank account in Florida, which represented the total return of an investment in the First National Equity program.

96. On or about September 13, 2000, defendant LYTTLE caused the purchase of a bank check for $1 million from a bank in Dallas, Texas, for the benefit of investor P.K., which represented the total return of an investment in the First National Equity program.

Overt Acts Engaging in Monetary Transactions in Criminal Proceeds Greater Than $10,000

97. On or about September 17, 1999, defendant LYTTLE caused the withdrawal of $10,003 from an attorney trust bank account in Osgood, Indiana, for the purchase deposit on real property located at 615 West Franklin Street, Osgood, Indiana, by the B.E.R.J. Trust.

98. On or about September 17, 1999, defendant LYTTLE caused the withdrawal of $216,011.45 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property at 615 West Franklin Street, Osgood, Indiana, by the B.E.R.J. Trust.

99. On or about September 24, 1999, defendant LYTTLE caused the withdrawal of $118,326.06 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property located at 705 Ridge Avenue, Lawrenceburg, Indiana.

21

100. On or about September 27, 1999, defendant LYTTLE caused the transfer of $25,000 from an attorney trust bank account in Osgood, Indiana, to Industrial Hardwoods.

101. On or about October 25, 1999, defendant LYTTLE caused the withdrawal of $90,000 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property at 618 West Eckert Street, Osgood, Indiana.

102. On or about November 16, 1999, defendant LYTTLE caused the withdrawal of $144,576.75 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property located at 703 Ridge Avenue, Greendale, Indiana.

103. On or about November 19, 1999, defendant LYTTLE caused the check withdrawal of $15,000 from an attorney trust bank account in Osgood, Indiana, for a purchase deposit on real property located at 891 Rudolf Way, Greendale, Indiana.

104. On or about December 20, 1999, defendant LYTTLE caused the check withdrawal of $35,000 from an attorney trust bank account in Osgood, Indiana, for a purchase deposit on real property located at 891 Rudolf Way, Greendale, Indiana.

105. On or about November 20, 1999, defendant LYTTLE caused the withdrawal of $26,920 from a bank account in Aurora, Indiana, and the purchase of a bank check which he used to purchase a Baldwin piano.

106. On or about November 29, 1999, defendant ELDRIDGE caused a check to be issued on the UTA-BVI stock account for $16,722.25 for the purchase of home furnishings.

107. On or about December 3, 1999, defendant ELDRIDGE caused a wire transfer of $1,750,000 from a financial institution in Chicago, Illinois, to a bank located in Osgood, Indiana, for the benefit of Industrial Hardwoods.

22

108. On or about December 8, 1999, defendant ELDRIDGE caused a check for $15,000 to be issued on an account of the Executive Research and Recovery Agency at a Woodstock, Georgia bank which she used for payment on a personal charge account.

109. On or about January 26, 2000, defendant LYTTLE caused the check withdrawal of $57,696.81 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property at 20 Tebbs Avenue, Lawrenceburg, Indiana.

110. On or about January 26, 2000, defendant LYTTLE caused the transfer of $90,600 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property located at 20 Tebbs Avenue, Lawrenceburg, Indiana.

111. On or about January 31, 2000, defendant LYTTLE caused the check withdrawal of $984,615 from an attorney trust bank account in Osgood, Indiana, for the purchase of real property located at 891 Rudolf Way, Greendale, Indiana.

112. On or about January 31, 2000, defendant LYTTLE caused the withdrawal of $750,003 from an attorney trust bank account in Osgood, Indiana, for the purchase of a cashiers check made payable to Industrial Hardwoods.

113. On or about February 8, 2000, defendant LYTTLE caused $32,000 to be withdrawn from an attorney trust account in Osgood, Indiana which he used to purchase a cashiers check made payable to a car dealership for the purchase of an automobile.

114. On or about February 11, 2000, defendant LYTTLE caused the check withdrawal of $175,000 from an attorney trust bank account in Osgood, Indiana, for the benefit of Industrial Hardwoods.

115. On or about March 29, 2000, defendant ELDRIDGE caused a wire transfer of $1,300,000 originating from a financial institution in Chicago, Illinois, to a bank in Osgood, Indiana, for the benefit of Industrial Hardwoods.

23

116. On or about April 20, 2000, defendant LYTTLE caused the check withdrawal of $12,000 from an attorney trust bank account in Osgood, Indiana, to provide cash to defendant LYTTLE.

117. On or about April 25, 2000, defendant LYTTLE caused the check withdrawal of $13,500 from an attorney trust bank account in Osgood, Indiana, to provide cash to defendant LYTTLE.

118. On or about July 7, 2000, defendant LYTTLE caused the check transfer of $11,000 from an attorney trust bank account in Osgood, Indiana, to Industrial Hardwoods.

119. On or about July 10, 2000 the defendant KNIGHT caused the check transfer of $23,892.13 from a bank account in Pigeon Forge, Tennessee, to a car dealership which he used to purchase an automobile.

120. On or about July 28, 2000 the defendant KNIGHT caused the check transfer of $35,753.11 from a bank account in Pigeon Forge, Tennessee, to a car dealership which he used to purchase an automobile.

All in violation of Title 18, United States Code, Section 1956(h).

**COUNTS XI THROUGH XIII**

**The Grand Jury Further Charges:**

(Title 18, U.S.C. Sec. 1956(a)(1)(A)(i) - Money Laundering)

121. The factual allegations contained in Paragraphs 1 and 3 through 71 of Count 1 and paragraphs 80 through 120 of Count 10 of this Indictment are incorporated herein as if set forth in full.

122. On or about the dates listed below, within the Western District of New York and elsewhere, knowing that the property detailed below represented the proceeds of some form of

24

unlawful activity, defendants GAIL VIOLETTE ELDRIDGE, MELVIN RAY LYTTLE, and PAUL KNIGHT and others known and unknown to the grand jury, knowingly conducted and attempted to conduct the below listed financial transactions affecting interstate and foreign commerce which involved the proceeds of specified unlawful activity, that is mail fraud and wire fraud, with the intent to promote the carrying on of said specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| XI | 03/06/00 | Wire transfer of $300,000 from a stock brokerage account held by the United Tribes of the Americas maintained at a financial institution in Chicago, Illinois, to a financial institution in Rochester, New York. |
| XII | 08/02/00 | Wire transfer of $50,000 from a bank account controlled by defendant KNIGHT in a financial institution in Kodak, Tennessee to a financial institution in Rochester, New York. |
| XIII | 12/22/00 | Wire transfer of $6,500 from a bank account controlled by defendant KNIGHT in a financial institution in Kodak, Tennessee, to a financial institution in Rochester, New York. |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNT XIV

(Forfeiture Allegation)

The Grand Jury Further Charges That:

Between May 1999 and a date unknown by the grand jury but until at least July 5, 2001, defendants VIOLETTE GAIL ELDRIDGE, MELVIN RAY LYTTLE, and PAUL E. KNIGHT did knowingly commit violations of Title 18, United States Code, Section 1956, as alleged in

25

Counts 10 through 13 of this Indictment, which are incorporated by reference herein as if fully set forth below.

Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction the defendants shall forfeit to the United States all right, title, and interest in any and all property involved in said transactions in violation of Title 18, United States Code, Section 1956, and all property traceable to such property, including the following: (1) all money or other property that was the subject of each transaction; (2) all property used in any manner or part to commit or to facilitate the commission of those violations; as to which properties the said defendants are jointly and severally liable.

The United States intends to forfeit property of the defendants, including, but not limited to, the following:

a. For each defendant, a monetary sum of approximately twenty-two million, six hundred seventy-five thousand, one hundred nineteen dollars and fifty-six cents ($22,675,119.56) United States currency or any property involved in the offenses of conviction set forth in Counts 10 through 13 of this Indictment; and

b. For each defendant, all property of the defendant, up to the value of any property described in subparagraph (a) above, if by any act or omission of the defendant said property, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty in which case such other property shall be substituted and forfeited to the United States pursuant to Title 21, United States Code, Section 853(p), as

26

incorporated by Title 18, United States Code, Section 982(b), including, but not limited to the real property and premises located at 1123 Washington Avenue, Woodstock, Georgia.

In violation of Title 18, United States Code, Section 982(a)(1).

DATED:   Rochester, New York, August 18, 2005.

KATHLEEN M. MEHLTRETTER
Acting United States Attorney

BY: *Bradley E. Tyler*
BRADLEY E. TYLER
Assistant United States Attorney
United States Attorney's Office
Western District of New York
620 Federal Building
100 State Street
Rochester, New York 14614
(585) 263-6760 ext. 2231
bradley.tyler@usdoj.gov

A TRUE BILL:

*Wendy Adams*
FOREPERSON

27