**Expert Report**

**In the District Court of the United States
For the Western District of New York**

**The United States of America vs. Violette Gail Eldridge a/k/a Gail Violette Eldridge,
Melvin Ray Lyttle, Paul E. Knight and John L. Montana, Jr.**

I am a Special Agent employed by the Federal Bureau of Investigation, (FBI), specializing in White Collar Crime Investigations. Which entail those illegal acts characterized by deceit, concealment, violation of trust, and not dependent upon the application or threat of physical force or violence. These crimes are committed to obtain, money, property or services or to secure personal or business advantage.

I have been employed by the FBI for approximately four years. Prior to my employment in federal law enforcement, I was employed for approximately five years as an Certified Public Accountant (CPA) conducting auditing and due diligence work in a public accounting firm located in Cleveland, Ohio.

In 1995, I received a bachelor degree in Business Administration, specialization in Accounting and in 2000 received a Masters of Business Administration with a specialization in Finance.

I am a Certified Public Accountant (CPA), my license is currently on voluntary inactive status in Ohio.

Included in the realm of White Collar Crime are schemes such as Prime Bank Fraud and Money Laundering.

A Prime Bank Fraud, also known as a High Yield Investment Fraud involves:

The purported sale of a financial instruments typically offered with one or more of the following alleged characteristics:

  (a) Extremely high and/or guaranteed rates of return;

  (b) Claims of a secret market;

  (c) Risk free;

EXHIBIT P

(d) Purportedly approved and/or sanctioned by the Federal Reserve, World Bank, International Monetary Fund or other known international organization; and

(e) The financial instruments may be offered as bank notes, guarantees, letters of credit, debentures, bills of exchange, roll/trading programs, foreign currency trading programs blocked funds certificates, railroad bonds, or real estate/mortgage deed transactions.

All of the above representations are false and used to entice investors.

Money laundering is concealing the actual source of money by transferring it through one or more intermediaries.

## Overview

In 2003, I began an investigation into an alleged investment program offered by John L. Montana, Melvin Lyttle, Paul Knight and Gail Eldridge (hereafter referred to as defendants) along with other unindicted (unnamed) co-conspirators. During this investigation multiple interviews were conducted of victims, unindicted co-conspirators and various associates of the defendants. In addition documentation was obtained detailing the alleged investment program, communications between the defendants and victims as well as multiple financial records detailing the transactions involved.

Interviews and program documentation revealed that the defendants offered an alleged investment program promising a secret trading programs involving the world's largest banks, rates of return in excess of 30% per week, guaranteed the security of the investment by placing the principal in a segregated account invested in Treasury Bills and no risk to the investors.

The financial records reveal that the defendants received over $30 million from 26 victim investors (Exhibit A). The funds were traced from the victim's financial institution (bank or stock brokerage account) to Defendant Lyttle's bank account at either Chase Bank or Texas Capital Bank (TCB) or Defendant Eldridge's accounts at Donaldson, Lufkin and Jenrette (DLJ), a former stock brokerage firm. Pursuant to the terms of the investment contract the victim investors wire transferred their money to Defendant Lyttle's or Eldridge's account "for further benefit" of the named victim. In no instance was a segregated account established for the victim, in the victim's name, or for the victim's benefit.

## Money Laundering

Once the funds were received they were under the discretionary authority of Defendants

2

Lyttle and Eldridge. Defendants Lyttle and Eldridge then transferred the victim investor's funds through over 45 bank accounts at various financial institutions located domestically and internationally. A listing of the defendants bank accounts is located at Exhibit B. A flow chart depicting the defendants accounts and overview of the flow of monies through these accounts is located at Exhibit C. In my opinion the transfer of funds through multiple accounts was designed to conceal that the original source of the funds was from victim investors.

From August 1999 through at least June 2001, the victim investors waited for the alleged investment to begin. I reviewed documentation and interviews conducted at my direction which indicated the many excuses the victims received explaining why the investment program had not started; however, the victims were reassured that their funds were secure and it was just a matter of time until the program began. During this time period defendants Lyttle, Knight and Eldridge used the victim's funds at their discretion and for their benefit.

**Concealing the Assets**

In a money laundering scheme, the perpetrator accumulates funds from an unlawful activity (i.e. Prime Bank Scheme) and then conceals the criminal origin through various means such as the purchase of assets, transferring the funds through a legitimate business or through another individual removed from the unlawful activity and sending the funds to other bank accounts including foreign accounts or converting the proceeds to cash.

Legitimate ways to accumulate wealth such as through the net income of a corporation/ partnership, salary, bonus, pensions, disability payments, among others are reported to the Internal Revenue Service (IRS) and are disclosed on the tax return of the individual (IRS Tax Form 1040), partnership (Tax Form K-1) or corporation (IRS Tax Form 1120). The entity (i.e. a corporation including a non-profit organization) has the responsibility of reporting to the IRS the corporation's financial earnings, along with reporting the salary, bonus, and other benefits paid by or issued by the corporation to each individual employee.

In an attempt to further conceal illegal proceeds, perpetrators accumulating wealth through an unlawful activity typically do not report such income to the IRS. Generally, if the income from an unlawful activity is reported it only because it is laundered (i.e. run through a legitimate business) to conceal its true criminal origination.

I analyzed and reviewed the tax returns of Defendants Lyttle, Knight, Eldridge and Montana. I determined that the individuals failed to report the funds received from this investment scheme on their tax returns for the years 1999 through 2001. The failure to disclose the receipts of income to the IRS further concealed that the funds received were from an unlawful activity.

**Defendants Sources of Cash**

From August 1999 through at least July 2001, the defendants accumulated approximately $32.87 million dollars from investors and over the period December 7, 1999 through December 22, 2000 returned approximately $19.25 million (Exhibit D) to investors causing a loss to investors exceeding $13.6 million (Exhibit A).

I determined that Defendant Lyttle also received income from Andrew Hudson. In 2003, Hudson wired money into the account of Suzan Lyttle at the Merchants Capital Bank. These wires vary in amounts from $250 to $900. Hudson is a business associate of defendant Lyttle and is a signatory on the Texas Capital Bank (TCB) account with defendant Lyttle. The TCB account directly received victim funds which were thereafter transferred by Defendant Lyttle.

After a review of Defendant Knight's bank accounts I determined Knight received monthly deposits under $1,225 from the United States Government. Defendant Knight has no other significant sources of income.

Defendant Eldridge received $69,407.50 into the account of Robert and Gail Eldridge at First Union Bank. The amounts represent payment made to Defendant Eldridge for a $30,000 settlement on a bodily injury claim and a $39,407.50 payment from Tricare Claims Administrator. The payments appear to be insurance claims and not a regular source of income for Defendant Eldridge.

My financial analysis indicates that the UTA did earn a small amount of income, based upon the small size of the transactions appears to be from the UTA store in Woodstock, Georgia. Such funds were received into the First Union Bank account of the UTA totaling approximately $13,700 during the period September 1999 through July 2000.

Other non-criminal sources of funds for the defendants pale in comparison to the victims funds received by the defendants ($13.6 Million in total).

**Defendants Uses of Cash**

*Defendant Lyttle*

Defendant Lyttle personally received approximately $6.9 million from the criminal scheme (Exhibit E). Defendant Lyttle transfers money into his accounts at: 1) Texas Capital Bank; 2)Peoples Federal Savings Bank; 3) ABN AMRO in Budapest Hungary; 4) his daughter's account at Fifth Third Bank; 5) an account held by Neil Comer (Comer) of Comer Day and Ertel at the Integra Savings Bank and 6) an account held in by Industrial Hardwoods Corporation (IHC) to which Defendant Lyttle was the sole shareholder. Additionally Defendant Lyttle transfers $250,000 to the Media Artist Group (MAG)and demands the funds be returned.

Defendant Lyttle fraudulently uses the investor victim's funds to make major purchases to including the following: (Exhibit F).

| **Description** | **Amount (rounded)** |
|---|---|
| **Personal Items** | |
| Cash Withdrawals or related party checks | $538,600 |
| Automobiles (six vehicles purchased) | 171,300 |
| Credit Cards | 13,400 |
| College Education for Child | 10,000 |
| Baldwin Piano | 27,000 |
| Gazebo | 6,800 |
| Pool | 3,000 |
| Roof for Residence | 19,500 |
| Lawn Mower | 17,000 |
| Recreational Vehicle | 12,000 |
| **Total Personal Items** | **$818,600** |
| | |
| **Business Interests** | |
| Industrial Hardwoods Corporation (IHC) | $4,173,800 |
| Media Artist Group (MAG) | 250,000 |
| **Total Business Interests** | **$4,423,800** |
| | |
| **Real Estate Purchases** | |
| Residential Real Property (net sales proceeds)[1] | $249,400 |
| Commercial Real Property (net sales proceeds) | 575,000 |
| Dubois Grain | 325,000 |
| **Total Real Estate Purchases** | **$1,149,400** |
| *Grand Total* | **$6,391,800** |

[1] The term sales proceeds is used as a general term and includes proceeds from loans entered into by Suzan Lyttle, whereby the real property was used as collateral for the loan.

5

The investment into IHC was <u>not</u> for the benefit of the victims, but rather for defendant Lyttle as the he was the sole shareholder. The transfers/investments into Dubois Grain and MAG were made in Defendant Lyttle's name, however; all the residential and commercial property was either put into the name of Suzan Lyttle (Lyttle's Spouse) or into the BERJ Trust, managed by Suzan Lyttle.

The BERJ trust was established by Defendant Lyttle; named Suzan Lyttle as the Trustee and Lyttle's children as the beneficiaries; and was funded with real property purchased with investor funds. A copy of the BERJ Trust Agreement is located at Exhibit G.

A description of the property transactions is located at Exhibit H. One of these properties, 705 Ridge Avenue Defendant Lyttle's residence, was transferred to Tony Gregory from Suzan Lyttle. Gregory loaned Suzan Lyttle $125,000 in exchange for the title to the property as collateral with a repurchase option for $165,000. During the period Gregory had title to this property, the Lyttles resided there and paid rent to Gregory. In April 2005, Gregory sold this property to Andrew Hudson, a business associate of Lyttle, for $335,000. Lyttle and his family are currently residing in this property that is titled to Hudson.

A significant amount of the major purchases, identified above, were made out of Defendant Lyttle's personal account at the Peoples Federal Savings Bank or by Neil Comer at Defendant Lyttle's direction. Neil Comer used his lawfirm's bank account, (the Offices of Comer, Day and Ertel) to receive and disburse funds at Defendant Lyttle's discretion, including generating currency for Defendant Lyttle's use. Comer provided an itemized accounting of the sources and disbursements of cash directed by Lyttle (Exhibit I).

Defendant Lyttle also used the victims funds for daily living expenses and to create cash for further untraceable dispositions.

Defendant Lyttle engaged in the following actions to disguise the nature of the funds received from investors and their criminal origin:

-Transferred $1,250,000 over seas to Budapest, Hungary of which approximately $100,000 was transferred back to his daughter's account, and approximately $646,500 was transferred to Defendant Lyttle's personal bank account at the Peoples Federal Savings Bank.

- Disbursed funds in excess of $3.0 Million to his attorney Neil Comer. Defendant Lyttle directs Comer to disburse funds on his behalf.

- Directed the disbursement of funds to purchase residential and commercial real property, further having the property titled outside of defendant Lyttle's name but rather in the name of his wife Suzan Lyttle or the BERJ Trust.

- Directed the disbursement of funds to invest in IHC, Dubois Grain and MAG.

- Purchased vehicles with cashiers checks or check drawn on his accounts.

- Withdrew cash directly or disburse checks/funds to Defendant Lyttle's family members.

- Withdrew investor funds through cashiers checks.

- Failed to report on his tax returns the funds utilized on his behalf.

*Defendant Eldridge*

Defendant Eldridge receives approximately $4.9 million from the criminal scheme (Exhibit E). Defendant Eldridge receives individual victim investor funds directly into her accounts at DLJ $8,000,000 (Exhibit A). Additionally, Defendant Eldridge receives victim investor funds indirectly from defendant Lyttle through cashiers checks ($8.699 Million) or through wire transfers from Defendant Lyttle's TCB account ($8.5 Million) (Exhibit C).

While the victim investor's funds are held at DLJ they are traded on margin creating interest expense for the period December 1999 through July 2000 in excess of $800,000 (Exhibit J).

Defendant Eldridge establishes 20 separate accounts at DLJ, which are not in the names of individual investors. Rather the accounts are titled in the name of entities related to Defendant Eldridge including UTA (BVI) Ltd., UTA BVT (BTO), UTA Financial Development, Inc., Executive Bureau of Research (EBR) and Violette G. Eldridge.

Three of the above mentioned 20 DLJ accounts were originally opened by Marc Robinson and titled in the name of First Chase Holdings and Pinnacle Risk Management. After Robinson was arrested in February 2000, Defendant Eldridge takes control of any remaining funds in these accounts and transfers them to other accounts under her personal control.

Defendant Eldridge transfers money from the DLJ accounts into other accounts she establishes in the name of the UTA, EBR, personal account, or an account held by an New York attorney, Michael Bach, who is holding on her behalf and disbursing money on her request. See Exhibit K, for authorization of these transfers.

From the period August 1999 through July 2001, Defendant Eldridge established bank accounts at a minimum of 10 separate financial and brokerage institutions creating over 30 individual accounts.

7

Defendant Eldridge fraudulently uses the investor victim's funds to make major purchases to including the following: (Exhibit L).

| Description | Amount (rounded) |
|---|---|
| Credit Card and Debit Card Purchases | $208,800 |
| Cash or checks payable to Defendant Eldridge | 155,000 |
| Rent Expense | 447,800 |
| Furniture | 78,200 |
| Limousine Services | 59,800 |
| Attorney | 246,000 |
| Associates (Includes $55,500 to Catherine Crase) | 115,400 |
| Hotel | 29,700 |
| Investment in Personal Business Venture (after the Marc Robinson is incarcerated). | 1,500,000 |
| Overseas Transfer | 235,500 |
| *Total* | 3,076,200 |

Defendant Eldridge engaged in the following actions to disguise the nature of the funds received from investors and their criminal origin:

- Establishment of accounts at various financial institutions under the names of entities Defendant Eldridge does business as (i.e. UTA, EBR). The main source of funds in these accounts is from the victim's funds.

- Continually transfers funds through accounts Defendant Eldridge controls and makes disbursements for her personal interest and benefit.

- Use of debit cards and credit cards to purchase items for her own personal interest and benefit. These debit and credit card bills are paid through one of her entities (i.e. UTA or EBR), using investor funds.

- Wire transfers of investor funds to accounts held by various attorney's (i.e. Michael Bach and TRG Wolff). Defendant Eldridge further directs the disbursement of funds.

- Withdrawal of cash or checks payable to Defendant Eldridge or a related party.

- Failed to report on her tax returns the funds utilized on her behalf.

*Defendant Knight*

Defendant Knight receives approximately $1.8 million from the criminal scheme (Exhibit E). Defendant Knight utilizes the victims funds to purchase two vehicles totaling $60,600, for personal living expenses and to wire funds ($2.5 Million) to Michael Fine, an attorney. Of the money wired to Fine $1,450,000 is sent overseas to Singapore.

Defendant Knight received victims money through transfer from both Defendant Lyttle and Eldridge. Defendant Knight receives approximately 99% of the $1.8 million after Defendant Knight corresponds with Defendant Lyttle in an fax dated June 29, 2000. In this fax Defendant Knight demonstrates that he is aware that investors funds have not been returned yet he still transfers the funds for his own benefit and to the investors detriment (Exhibit M).

Defendant Knight engaged in the following actions to disguise the nature of the funds received from investors and their criminal origin:

- Purchase of automobiles.

- Withdrawal of currency.

- Transfer funds to the account of Marilyn Rush, Defendant Knight's live in girlfriend, from which Rush disburses funds on Defendant Knight's behalf.

- Transferring funds to a foreign account.

- Failed to report on his tax returns the funds utilized on his behalf.

*Defendant Montana*

Defendant Montana did not receive any funds directly from this criminal scheme however, he was responsible for soliciting funds from investors which were returned by the other defendants. In July 2000, Defendant Montana re-solicits investors who received a return of their funds from this scheme. Defendant Montana received $2.0 million from two investors in this new scheme he (Montana) directed. One of these victims received the return of their funds; however, the second victim did not. This $1.0 Million is used by Defendant Montana to pay for personal expenses, transfers to unindicted co-conspirators and is transferred to an account held in his wife's maiden name.

Defendant Montana engaged in the following actions to disguise the nature of the funds received from investors and their criminal origin:

- Purchase of cashiers checks which are deposited into other financial institutions and bank accounts of Defendant Montana.

- Use of accounts held in the name a company Montana does business as, T&P Worldwide, to act as a legitimate business entity.

- Withdrawals of currency.

- Payments to an account held under his wife's maiden name.

- Failed to report on his tax returns the funds utilized on his behalf.

**Overt Acts Engaging in Monetary Transactions in Criminal Proceeds Greater than $10,000**

The indictment identifies the defendants with committing Overt Acts during the charged Money Laundering Conspiracy by engaging in transactions involving Criminal Proceeds Greater than $10,000.

My analysis determined that the overt acts identified in the criminal indictment were transfers or purchases made with victim investor funds. These overt acts were transactions engaged in by the defendants to launder money received in the prime bank scheme. These monetary transactions include:

| Date | Purpose | Exhibit | Amount (rounded) |
|---|---|---|---|
| **Defendant Lyttle** | | | |
| 9/17/1999 | Purchase real property 615 West Franklin Street | (I,N) | $10,000 |
| 9/17/1999 | Purchase real property 615 West Franklin Street | (I,N) | 216,000 |
| 9/24/1999 | Purchase real property 705 Ridge Avenue | (I,N) | 118,300 |
| 9/27/1999 | Transfer to Industrial Hardwoods Corporation | (I,N) | 25,000 |
| 10/25/1999 | Purchase real property 618 West Eckert | (I,N) | 90,000 |
| 11/16/1999 | Purchase real property 703 Ridge Avenue | (I,N) | 144,600 |
| 11/19/1999 | Deposit on real property 891 Rudolf Way | (I,N) | 15,000 |

| Date | Purpose | Exhibits | Amount (rounded) |
|---|---|---|---|
| **Defendant Lyttle Continued** | | | |
| 12/20/1999 | Deposit on real property 891 Rudolf Way | (I,N) | $35,000 |
| 11/20/1999 | Purchase of Baldwin Piano | (N) | 26,900 |
| 1/26/2000 | Purchase real property 20 Tebbs Avenue | (I,N) | 57,700 |
| 1/26/2000 | Purchase real property 20 Tebbs Avenue | (I,N) | 90,600 |
| 1/31/2000 | Purchase real property 891 Rudolf Way | (I,N) | 984,600 |
| 1/31/2000 | Purchase cashiers check paid to Industrial Hardwood Corporation | (I,N) | 750,000 |
| 2/8/2000 | Purchase cashiers check for an automobile | (I,N) | 32,000 |
| 2/11/2000 | Transfer to Industrial Hardwoods Corporation | (I,N) | 175,000 |
| 4/20/2000 | Cash | (I,N) | 12,000 |
| 4/25/2000 | Cash | (I,N) | 13,500 |
| 7/7/2000 | Transfer to Industrial Hardwoods Corporation | (I,N) | 11,000 |
| **Defendant Eldridge** | | | |
| 11/29/1999 | Purchase home furnishing | (O) | $16,700 |
| 12/8/1999 | Payment on personal charge | (O) | 15,000 |
| 12/3/1999 | Wire transfer to Industrial Hardwoods Corporation | (O) | 1,750,000 |
| 3/29/2000 | Wire transfer to Industrial Hardwoods Corporation | (O) | 1,300,000 |
| **Defendant Knight** | | | |
| 7/10/2000 | Purchase vehicle | (P) | $23,900 |
| 7/28/2000 | Purchase vehicle | (P) | 35,800 |

**Conclusion:**

My tracing of the investor funds from the victims through the accounts of the defendants indicated that the transfers were made for the benefit of the defendants and not as represented in the investment documentation. Accounts are not established in the name of the investors with Treasury Bills purchased and placed into these accounts to secure the victims investment. The investor's funds are never invested in the manner described in the First National Equity Exclusive Asset Management Agreement or the PK Trust Private Placement Agreement.

Instead my analysis detected the investor's funds were used to directly benefit the defendants and at a substantial risk of loss for the investors. Throughout this process, the defendants take active steps to conceal the origin of the funds through the use of multiple accounts (including foreign accounts) titled in the name of a third party or business, purchase assets, purchase cashiers checks, conversion of the funds to currency, checks made payable to the defendants and/or related parties.

Based upon my investigation and analysis of the financial documentation, it is my opinion:

1) The defendants obtained investor's funds under fraudulent pretenses, used investor's funds for their own personal benefit and placed the investor's funds at substantial risk.

2) The defendants made financial transfers to disguise the origin and nature of the funds obtained through a High Yield Investment Program Criminal Scheme in an attempt to conceal the true nature of the funds.

*Jeffrey P. Kassouf*
Special Agent FBI