UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

                                                    05-CR-6116CJS

          v.


VIOLETTE GAIL ELDRIDGE, et. al


                    Defendants.
_____




**CORRECTED
GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANTS' OMNIBUS PRETRIAL MOTIONS**

**INDEX**

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

GENERAL RESPONSE TO DEFENSE MOTIONS . . . . . . . . . . . 1

A. DISMISSAL OF INDICTMENT . . . . . . . . . . . . . . . 2

    1.  PROSECUTION BARRED BY THE STATUTE OF LIMITATIONS . . . 2

    2.  VENUE . . . . . . . . . . . . . . . . . . . . . . 7

    3.  RES JUDICATA AND COLLATERAL ESTOPPEL . . . . . . . . 11

    4.  CONSPIRACY TO COMMIT FRAUD AND CONSPIRACY TO LAUNDER
        MONEY ARE NOT DUPLICITOUS . . . . . . . . . . . . 13

B.  DISCOVERY AND INSPECTION . . . . . . . . . . . . . . 15

    1.  DEFENDANTS' STATEMENTS . . . . . . . . . . . . . 15

    2.  STATEMENTS OF CO-CONSPIRATORS, CO-DEFENDANTS AND
        THIRD PARTIES . . . . . . . . . . . . . . . . . 17

    3.  DEFENDANTS' CRIMINAL RECORDS . . . . . . . . . . . 18

    4.  DOCUMENTS AND TANGIBLE OBJECTS . . . . . . . . . . 18

    5.  INVESTIGATIVE FILES AND WITNESS LISTS . . . . . . . 19

    6.  JENCKS ACT MATERIAL . . . . . . . . . . . . . . . 21

C.  DISCLOSURE OF 404(b); 608(B), AND 609 MATERIALS . . . . . 21

D.  BRADY . . . . . . . . . . . . . . . . . . . . . . 24

E.  DISCLOSURE OF INFORMANT INFORMATION . . . . . . . . . . 26

F.  EXPERT WITNESSES . . . . . . . . . . . . . . . . . . 29

G.  DEMAND FOR BILL OF PARTICULARS . . . . . . . . . . . . 41

H.  MOTIONS FOR SEVERANCE . . . . . . . . . . . . . . . . 44

I.  MOTION FOR HEARINGS ON COCONSPIRATOR STATEMENTS . . . . . 48

J.   DISCLOSURE OF RECORD OF GRAND JURY PROCEEDINGS . . . . . 49

K.   REQUEST FOR RULE 15 CRIMINAL DEPOSITIONS AND
     SUBPOENA DUCES TECUM . . . . . . . . . . . . . . . . . 52

L.   EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS AND TITLE III
     INTERCEPTS . . . . . . . . . . . . . . . . . . . . . . 54

M.   PRESERVATION OF ROUGH NOTES AND OTHER EVIDENCE . . . . . 54

N.   JOINDER WITH AND RESERVATION OF MOTIONS . . . . . . . . 54

O.   GOVERNMENT'S RULE 12(b)(4)PRELIMINARY NOTICE OF INTENT TO
     USE EVIDENCE . . . . . . . . . . . . . . . . . . . . . 55

P.   GOVERNMENT'S REQUEST FOR RECIPROCAL DISCOVERY . . . . . 55

The United States of America, through its attorneys, Terrance P. Flynn, United States Attorney for the Western District of New York, William H. Bowne, Trial Attorney, Department of Justice, Criminal Division Fraud Section and Richard A. Resnick, Assistant United States Attorney, of counsel, hereby files its response to the pre-trial motions of Violet Gail Eldridge, Melvin Ray Lyttle, Paul Eugene Knight, and John L. Montana, Jr.

## INTRODUCTION

On August 18, 2005 a grand jury sitting in the Western District of New York at Rochester returned a 14 count indictment charging all defendants with one count of conspiracy to commit mail and wire fraud; five counts of mail fraud and three counts of wire fraud.  The indictment further charged defendants Eldridge, Lyttle and Knight with one count of conspiracy to commit money laundering, three substantive money laundering offenses and one count of criminal forfeiture.  The defendants are alleged to have promoted a fraudulent high yield investment program during the period from 1999 through 2001 which received over $33 million of investors' funds and caused over $13 million in investor losses.

## GENERAL RESPONSE TO DEFENSE MOTIONS

Rather than redundantly respond to individual defendant

-1-

Motions which jointly raise many of the same issues, the government has consolidated its response and addresses each claim by subject matter realizing that some overlap is inevitable. Individual defendant claims are addressed during the general response to similar subject matter.

**A.   DISMISSAL OF THE INDICTMENT**

The defendants raise several arguments requesting dismissal of the outstanding indictment against all of which lack merit and should be denied.

**1.   Prosecution barred by the Statute of Limitations**

The defendants argue that the majority of the substantive counts of the indictment are time barred from prosecution because they relate to alleged conduct which occurred over five years prior to the date the indictment was returned.[1]  However, the defendants received notice that the standard five year statute of limitations was suspended prior to its expiration (<u>see</u> <u>infra</u>) and remained suspended at the time the indictment was returned by the grand jury.[2]

In the present case, the five year statute of limitations was suspended by the Honorable Michael A. Telesca under Title 18, United States Code, Section 3292, from August 26, 2004 until

---

[1] Defendant Eldridge argues that all counts should be dismissed as untimely.

[2] At the time of the defendants' arraignments or shortly thereafter, defense counsel were provided with a copy of Judge Telesca' Suspension Order.

August 18, 2005, the date the indictment was returned, to allow
the government to obtain foreign evidence from Hungary.  A copy
of the Order is attached as <u>Exhibit 1</u>.  Title 18, United States
Code, Section 3292 titled "Suspension of limitations to permit
United States to obtain foreign evidence," states:

> (a)(1) Upon application of the United States,
> filed before return of an indictment,
> indicating that evidence of an offense is in
> a foreign country, the district court before
> which a grand jury is impaneled to
> investigate the offense shall suspend the
> running of the statute of limitations for the
> offense if the court finds by a preponderance
> of the evidence that an official request has
> been made for such evidence and that it
> reasonably appears, or reasonably appeared at
> the time the request was made, that such
> evidence is, or was, in such foreign country.
>
> (b) Except as provided in subsection c of
> this section, a period of suspension under
> this section shall begin on the date on which
> the official request is made and end on the
> date on which the foreign court or authority
> takes final action on the request.
>
> (c) The total of all periods of suspension
> under this section with respect to an
> offense:
>
> (1)  shall not exceed three years; and
>
> (2)  shall not extend a period within which a
>      criminal case must be initiated for more
>      than six months if all foreign
>      authorities take final action before
>      such period would expire without regard
>      to this section.

As indicated by Judge Telesca's order, the court made the
statutorily required findings based upon evidence provided by the

government demonstrating that the United States had filed a
request under a Mutual Legal Assistance Treaty (MLAT) with
Hungary for foreign evidence and it reasonably appeared that such
evidence was in Hungary.  Judge Telesca ordered the suspension of
the statute of limitations from the date the official request was
made to the foreign government, August 26, 2004 until the date
final action was taken by the foreign authority up to a maximum
of three years.  When the grand jury returned its indictment, the
Hungarian request for foreign evidence was still outstanding and
no final action had yet occurred.  Final action by Hungarian
authorities did not occur until February 16, 2006, see Exhibit 2
(a letter from the Hungarian authorities documenting final
action).[3]

Based upon the court's suspension the statute of
limitations, all crimes charged in the indictment are timely if
the conduct charged occurred after August 26, 1999, (five years
prior to the government's MLAT request to Hungary dated August
26, 2004), which is the case for all counts.

The defendants request the opportunity to review the
government's application to suspend the statute of limitations
for potential deficiencies including its being filed under seal

---

[3] Although the transmittal letter from the Hungarian authority indicating final action is
dated February 16, 2006, the associated documents indicate that the letter was not translated by
Hungarian authorities until March 27, 2006 and the foreign materials were not received by the
prosecutor until on or about May 5, 2006 at which time they were made available for discovery.

citing United States v. Neill, 952 F. Supp. 881, (D.D.C. 1996) as
authority.  The court in Neill did not address the filing of the
application under seal but rather addressed the nature and scope
of a suspension order.  That court held that the suspension is
offense not person specific and that the request for evidence
must be reasonably specific in order to elicit evidence of the
alleged violations under investigation by the grand jury.  United
States v. Neill, 952 F. Supp. at 832, 833.

The government's application was appropriately filed ex
parte and under seal since it related to an ongoing grand jury
investigation and included grand jury information.  The Ninth
Circuit ruled in DeGeorge v. U.S. Dist. Ct. For Cent. Dist. of
Cal., that there is no basis to require notice when the
government makes an application to suspend the statute of
limitations to obtain foreign evidence based on a plain reading
of the statute and to [require notice] would be to ignore the
traditionally non-adversarial and secret nature of grand jury
investigations. 219 F.3d. 931, 937 (2000), cert. denied 127 S.Ct.
738 (2006) (citing United States v. Calandra, 414 U.S. 338, 343-
44, 94 S.Ct. 613, 38 L.Ed.2d.561 (1974)).  Other courts have also
held that a notice requirement under this provision would be
inconsistent with the concept of grand jury secrecy.  United
States v. Ratti, 365 F. Supp. 649, 655 (D.M.D. 2005) (citing
United States v. Wood, 2000 WL 362026 (W.D.N.Y 2000); and

DeGeorge supra.)  But see In re Grand Jury Investigation, 3 F. Supp.2d 82 (D. Mass. 1998) (denying a section 3292 application because it was ex parte).

Defendant Lyttle asserts that the government filed its application to suspend the statute of limitations in "bad faith" arguing that defendant Lyttle had produced the requested bank information to the SEC and therefore, the government lacked a reason to require the production of evidence through the Hungarian authorities.

This allegation of bad faith is baseless.  The government cannot abdicate its obligations to identify and trace all foreign bank transactions involved in a criminal scheme and to search for the potential recovery of investors' funds by relying on a defendant, who is being investigated for fraud, to make a complete production of all relevant financial records to the SEC. The government was attempting to obtain additional information from Hungarian officials concerning the account revealed by defendant Lyttle to the SEC including the source and disposition of all deposits to and withdrawals from that account as well as the identity of any additional accounts used by the defendants at the same financial institution or at other financial institutions.  Clearly, the government acted in good faith in filing its Application to suspend the statute of limitations.

The United States will leave it to the Court to decide whether it is now appropriate to unseal the government's Application and provide copies to the defendants.

**2.  Venue**

Defendants allege that the Western District of New York represents improper venue for the defendants based on the lack of individual defendants having either physically entered the district or having directly caused an act to occur in the district.  Defendants' claims are totally without merit, ignore the well established law in establishing venue for the crime of conspiracy, and should be denied.  Venue is proper in any district where (1) the defendant [or a coconspirator] intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue.  United States v. Svoboda, 347 F.3d. 471, 482-483 (2d Cir. 2003) (quoting, in part, United States v. Cabrales, 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d.1 (1998) (quotation marks omitted)).

The indictment charges defendants Eldridge, Lyttle, Knight and Montana with one count of conspiracy to commit mail and wire fraud as well as five counts of mail fraud and three counts of wire fraud all of which are identified as overt acts committed in the Western District of New York in furtherance of the

conspiracy.  The indictment further charges defendants Eldridge, Lyttle and Knight with one count of conspiracy to commit money laundering and three substantive counts of money laundering offenses all of which occurred in the Western District of New York.

Individual defendants claim that the indictment fails to identify that they specifically caused the alleged criminal conduct and therefore, this district lacks venue as to them. However this is not the proper test for venue.  In a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the conspirators.  United States v. Geibel, 369 F.2d. 682, 696 (2d Cir. 2004).  See also Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (if done in execution of the [criminal] enterprise, the overt act of one partner in crime is attributable to all).  Thus, all defendants are criminally liable for the acts of coconspirators committed during and in furtherance of the conspiracy.  The indictment clearly charges all defendants with conspiracy to commit mail and wire fraud under Title 18, United States Code, Section 371, and clearly identifies overt acts committed in the Western District of New York by at least one conspirator in furtherance of the conspiracy thereby establishing proper venue for all defendants as coconspirators.

-8-

Defendants Knight, Lyttle and Eldridge argue that the Western District of New York lacks venue in the money laundering conspiracy because no overt acts are identified as having occurred within this district.  The Supreme Court addressed the elements of money laundering conspiracy in <u>Whitefield v. United States</u> and held "[b]ecause § 1956(h)'s test does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction."  543 U.S. 209, 214, 125 S.Ct. 687, 691 (2005).  Clearly, if the government need not prove an overt act in order to perfect a conviction under this statute, it cannot be required to allege one in the indictment.  The Supreme Court also recognized that venue under Title 18, United States Code, Section 1956(i) authorizes alternative venues for money laundering conspiracy prosecutions one of which is in the district in which venue would lie if the completed substantive money laundering offense had been accomplished.  <u>Id</u> at 218.  Counts 11 through 13 of the indictment specifically allege monetary transfers either originating from, or terminating  within the Western District of New York as substantive offenses committed during the course of the money laundering conspiracy.  The indictment before the Court provides adequate notice to the defendants of acts occurring in the Western District of New York which if proven, will demonstrate the promotion of the investment fraud scheme through

-9-

the use of criminal proceeds, an object of the alleged money laundering conspiracy. Therefore venue for Count Ten properly lies in the Western District of New York and should not be dismissed.

Defendant Eldridge raises the additional argument that even if venue is proper, it should be changed for the convenience of the parties. The facts demonstrate that there is no venue that would be convenient to all parties and the current forum is more convenient than any other location for the criminal trial. In this matter, all of the defendants live in different states; one of the victims who will testify at trial lives within this district; the conduct charged in the indictment has a direct nexus with the Western District of New York; and all defendants have local counsel three of whom have been involved in discovery and trial preparation since the arraignments in September of 2005. The facts demonstrate that there is no more convenient venue than the current venue and defendant Eldridge's request for a change of venue should be denied.

Defendant Eldridge suggests the alternate venue of the Southern District of New York as appropriate. The government maintains that such venue would be equally inconvenient for all defendants, mandate new defense counsel, be more costly and delay justice without providing any benefit.

3.    **Res Judicata and Collateral Estoppel**

Defendant Eldridge moves to dismiss the indictment against her alleging that the government is precluded from trying her under the doctrines of res judicata and collateral estoppel based on a civil ruling in the Southern District of Indiana that dismissed Eldridge from the SEC's civil enforcement proceeding after finding a lack of venue.  Exhibit 3 is a copy of the Dismissal Order.

The Supreme Court has stated that "collateral estoppel (issue preclusion) cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case." Allen v. McCurry, 499 U.S. 90, 95, 101 S.Ct 411, 415 (1980). (internal quotations and citations omitted).  See also Harris v. Washington, 404 U.S. 55, 56, 92 S.Ct. 183, 184 (1972) (for collateral estoppel to apply, issue of ultimate fact has to be determined by a final judgement involving the same parties).

In Nevada v. United States, the Supreme Court stated "the doctrine of res judicata (claim preclusion) provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which

might have been offered for that purpose." 463 U.S. 110, 129, 103
S.Ct. 2906, 2918 (1983) (internal citation omitted).

The court in the Southern District of Indiana did not
address the merits of the action but rather, examined only the
allegations in the SEC's Complaint to determine proper venue.
The court determined that because the complaint failed to allege
acts or transactions by Eldridge occurring in the Southern
District of Indiana, and because a conspiracy among Eldridge and
the other defendants was not alleged, there was no basis to apply
coconspirator theory to establish venue.  Therefore the court
ruled that venue over defendant Eldridge was improper.  In the
present indictment, conspiracy among Eldridge and the other
defendants is alleged in two Counts One and Ten and the
indictment is replete with alleged overt acts committed during
and in furtherance of the conspiracy that directly involve the
Western District of New York thereby establishing proper venue.

Nor was the government in privity with the SEC.  In the
earlier civil proceeding the government was not represented in
its capacity to prosecute defendant Eldridge for criminal
violations as the SEC does not have the authority to represent
the United States in criminal matters and defendant Eldridge was
specifically informed of that fact during the SEC proceeding.
See Exhibit 4, SEC form 1662 at paragraph 6, Rule 5f.  Therefore,
there was no joinder of parties, there was no final adjudication

on the merits, and there is no basis to apply the principles of
res judicata or collateral estoppel.

### 4.   Conspiracy to commit fraud and Conspiracy to launder money are not duplicitous.

Defendants Knight and Lyttle argue that there was only one
conspiracy alleged in the indictment and that charging the
defendants with conspiracy to commit mail and wire fraud under
Title 18, United States Code, Section 371, and conspiracy to
commit money laundering under Title 18, United States Code,
Section 1956(h) are duplicitous, violate their Sixth Amendment
right against double jeopardy and  request that the 1956(h)
charge be dismissed.  The statutes in question charge different
criminal violations, have different elements, each requires proof
of an additional fact which the other does not and therefore, are
not duplicitous under the test in Blockberger v. United States,
284 U.S. 299, 52 S.Ct 180 (1932).

A reported case directly addressing these statutes is United
States v. Kimbrew, which notes the distinct elements of the two
separate offenses by recognizing that, "[t]o convict [for
conspiracy to commit mail and wire fraud] the jury [i]s required
to find an agreement to use the mail or interstate wire
communications to execute the scheme to defraud, whereas to
convict on [conspiracy to launder money], the jury h[as] to find
an agreement to conduct a financial transaction involving the
proceeds of mail or wire fraud."  406 F.3d.1149, 1152 (9th Cir.

-13-

2005).  The <u>Kimbrew</u> court held that, "the acts necessary to establish a conspiracy to commit mail and wire fraud will not necessarily also support a conviction for conspiracy to launder money or vise versa.  <u>Id</u>.  The conspiracies charged in the indictment charge separate criminal violations, are not duplicitous and do not violate the defendants' Sixth Amendment rights against double jeopardy.  Therefore Count Ten charging conspiracy to commit money laundering should not be dismissed.

Defendants Knight and Lyttle also requests that the Court dismiss Count 10 as duplicitous alleging that two crimes are charged: (1) "to promote the carrying on of unlawful activity," and (2) "to knowingly engage in monetary transactions."[4]  Count Ten actually only charges only one offense, the agreement among defendants Eldridge, Lyttle and Knight to use criminal proceeds however the conspiracy had two objects, (1) to promote the criminal investment fraud scheme alleged in earlier Counts and (2) to knowingly utilize criminal proceeds in monetary transactions in excess of $10,000.  Multiple objectives of a conspiracy are not multiple criminal offenses.  Under the same logic, defendants Knight and Lyttle should be challenging Count One which alleges a conspiracy to commit both mail fraud and wire fraud but they fail to do so.  Count Ten alleges one crime, is not duplicitous and should not be dismissed.

---

[4] Defendant Knight's brief at ¶ 24.

## B.    DISCOVERY AND INSPECTION

The defendants make various motions relating to discovery, many of which have been rendered moot by the voluntary discovery already provided.   The government has continuously provided discovery to the defendants and their counsel since the time of their arraignment in September of 2005.   The remainder of the defendants' requests, except as noted below, are not discoverable pursuant to Rule 16 and therefore should be denied.

### 1.    Defendants' statements

The government believes that all currently known statements which are discoverable under Fed. R. Crim. P. 16(a)(1)(A) have been provided to the defendants during voluntary discovery.   The defendants statements are memorialized in transcripts of sworn testimony they provided at enforcement proceedings initiated by the Securities and Exchange Commission (SEC) which were made available during discovery.   This sworn testimony was provided by the defendants after being informed of their Fifth Amendment right to remain silent.[5]   Each defendant received notice that: "information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.[6]

---

[5] See Exhibit 4, SEC form 1662, ¶ 5 at the top of page 2 titled "Fifth Amendment and Voluntary Testimony."

[6] Id.

Defendants Eldridge, Lyttle and Knight were represented by private counsel at the time their testimony was provided to the SEC.  Defendant Montana appeared pro se and received additional warnings about his right to exercise his Fifth Amendment right to remain silent prior to testifying.

Defendants argue that the government should be precluded from using the defendants' SEC testimony as evidence in its case in chief and or must first be required to identify the precise statements to be offered.  The government submits that any or all of the defendants' sworn testimony is admissible in its case in chief or may be used in cross examination.  The defendants received actual notice that their testimony before the SEC could be used in future criminal proceedings and of their right to remain silent and not testify.  However, in an attempt to conceal their criminal conduct, the defendants freely chose to provide sworn testimony which may be proven to be demonstrably false and misleading.  The defendants have no legitimate expectation, nor do they cite to any legal basis, for their premise that the defendants are permitted to provide false sworn statements and thereafter, can preclude the use of those statements in a criminal proceeding.  The grand jury has charged offenses which require proof of criminal intent and the substance and veracity of the SEC statements are directly probative of the defendants'

criminal intent and conduct.  The defendants request that the
Court reward conduct that cannot be sanctioned.

Other defendant statements appear in written materials used
to promote the scheme including investment offering materials
such as the First National Equity (FNE) "Exclusive Asset
Management Agreement" and the P. K. Trust "Private Placement
Agreement;" associated investment materials; and email from the
defendants all of which were available in discovery.  It is
anticipated that investor testimony will also identify defendant
statements made directly to the investors the substance of which
will be made available to the defendants if the witness(es)
testified before the grand jury when the government provides its
Jencks material.  Any other statements will be provided as they
are identified.

> ### 2.  Statements of co-conspirators, co-defendants and
> ### third parties

The defendants seek the pretrial disclosure of co-
conspirator and co-defendant statements.  Rule 16(a), however,
"simply does not encompass these statements, nor does the Jencks
Act permit their disclosure over the objection of the
government." United States v. Percevault, 490 F.2d 126, 131 (2d
Cir. 1974); see also In re United States, 834 F.2d 283 (2d Cir.
1987); United States v. Marquez, No. 91CR451, 1992 WL 88139, slip
op. at 6 (S.D.N.Y. Apr. 22, 1992) ("Rule 16 permits discovery
only of defendant's statements, not those of others.")

-17-

To the extent the defendants also seek to obtain statements attributable to them contained in the recorded statements of various third persons, the government declines to produce any such material prior to trial.  The Jencks Act, 18 U.S.C. § 3500, rather than Fed. R. Crim. P. 16, controls the discovery of such material.  United States v. Viserto, 596 F.2d 531, 538 (2d Cir.), cert. denied, 447 U.S. 841 (1979); United States v. Nelson, 606 F. Supp. 1378, 1389-90 (S.D.N.Y. 1985).

Notwithstanding the above and as noted earlier, the government has provided all defendants and their counsel access to and permitted the copying of all recorded testimony of the defendants during their appearances before the SEC.

### 3.    Defendants' criminal records

The government is unaware of any defendant having a criminal record but will further verify this at two weeks prior to trial. If a criminal record of a defendant is identified, it will be provided at that time.

### 4.    Documents and tangible objects

All material discoverable under Fed.R.Crim.P. 16(a)(1)(c) is believed to have been made available since September of 2005 for inspection as part of voluntary discovery.  To the extent that any other material is identified, it will be provided.  The government did not execute any search warrants during this investigation nor did it perform any seizures.  Defense counsel

-18-

may continue to examine such evidence at any mutually agreeable time upon prior notice.

### 5.   Investigative files and witness lists

Federal Rule of Criminal Procedure 16 does not require the government to furnish the names and addresses of its witnesses in general.  United States v. Bejasa, 904 F.2d 137, 139 (2d Cir.), cert. denied, 498 U.S. 921 (1990).  Absent some particularized showing of need, the defendant is not entitled to lists of government witnesses or persons interviewed by it.  United States v. Wilson, 565 F. Supp. 1416, 1437 (S.D.N.Y. 1983) , aff'd. 750 F.2d 7 (2d Cir. 1984), cert. denied 479 U.S. 839, 107 S.Ct. 143 (1986); accord, United States v. Valerio, 737 F. Supp. 844, 847 (S.D.N.Y. 1990).

In this case, defendants have been provided through discovery with materials that essentially inform them of many of the witnesses in the case.  To the extent that defendant seeks Jencks Act and impeachment material regarding government witnesses, as noted below, it will be provided earlier than required by 18 U.S.C. § 3500 and at a reasonable time in advance to permit its effective use at trial and to avoid the necessity for adjournments during trial to permit review of the material. Since there is no specific showing of need particularized to this case for the requested witness lists, the motion should be denied.

-19-

Defendants seek to effectively discover the entire investigative files of the government.  They request, for instance, the names and addresses of all persons who have knowledge regarding the case or who have been interviewed by the government; statements by non-witnesses not being called by the government to testify at trial; investigative notes of law enforcement personnel; and other items of the same all-encompassing character.  All such requests should be denied as the material sought is prohibited from disclosure or inspection by Rule 16(a)(2) as "internal government documents."  United States v. Feola, 651 F. Supp. 1068, 1142 (S.D.N.Y. 1987), aff'd mem., 875 F.2d 857 (2d Cir.), cert. denied, 493 U.S. 834 (1989); United States v. Cherry, 876 F. Supp. 547, 551 (S.D.N.Y. 1995) (investigative reports of local or state law enforcement agents exempt from discovery and inspection under Rule 16(a)(2)).

More generally, while Rule 16(a) provides a mechanism for liberal discovery, it does not authorize a rummaging of the prosecution's files.  A criminal defendant is not entitled to know everything that the government investigation has unearthed when such information is not used against him at trial.  United States v. Arroyo-Angulo, 580 F.2d 1137, 1144 (2d Cir.), cert. denied, 439 U.S. 913 (1978); United States v. Percevault, supra, 490 F.2d at 130; United States v. Feola, supra, 651 F. Supp. at 1143.

Defendant Eldridge requests copies of all interviews and reports of investors relied upon by Special Agent Kassouf in his expert witness report.  As explained under heading "F Expert Witnesses" Special Agent Kassouf will offer expert testimony on the tracing of assets and the mechanisms employed in money laundering.  His analysis did not utilize or rely on witness statements and therefore the requested information is not discoverable for the reasons cited <u>supra</u>.

### 6.   Jencks act material

The government declines to produce Jencks Act material immediately or on the schedule proposed by defendants.  The government will provide materials earlier than required by 18 U.S.C. § 3500 at a reasonable time in advance to avoid the necessity for adjournments during trial to permit review of materials.  To the extent the defendants request the government's list of trial witnesses, such will be provided two weeks before trial or as required by pretrial order.

### C.   DISCLOSURE OF RULE 404(b), 608(B) AND 609 MATERIALS

Defendants seek notice and or the limitation of the government's ability to use prior criminal acts and other conduct within the scope of Federal Rules of Criminal Procedure 404(b), 608(b) and 609.  The government believes it has disclosed its

anticipated 404(b) evidence to defendants Eldridge and Montana[7].

Exhibits 5 and 6 are copies of 404(b) notices provided to counsel for defendant Montana which identify the intended evidence which might fall within the ambit of other crimes evidence.[8]

Counsel for defendant Eldridge in his motion acknowledges receipt of notice under Rule 404(b). During the time period charged in the conspiracy, Eldridge had discussions with at least two individuals, identified to Eldridge's counsel, who defendant Eldridge instructed how to promote HYIP's other than the programs charged in the indictment. Additionally, defendant Eldridge is the subject of a FBI undercover operation investigating money laundering being investigated in the Southern District of Florida. Defendant Eldridge was provided with copies of her taped conversations obtained during the undercover investigation. The subject matter of the conversations relates to future money laundering activity and can be used to prove defendant Eldridge's motive, opportunity, intent, preparation, plan, knowledge, identity and or absence of mistake or accident for the money laundering crimes charged in the indictment.

---

[7] The government has taken a liberal approach to identifying "other crimes evidence" in that a portion of the evidence identified may actually be intrinsic, rather than extrinsic, to the crimes charged.

[8] Defendant Montana's counsel mistakenly states in his motion that he has not received notice under Rule 404(b). Notice under Rule 404(b) was provided to defendant's counsel on three occasions, during a telephone conference on July 7, 2006 between the government and all defense counsel and via two letters dated August 17 and 18, 2006, Exhibits 5 and 6 respectively.

Furthermore, the government hereby notifies all defendants that it intends to introduce at trial pursuant to Rule 404(b) any and all prior criminal conduct, acts or wrongs for the purpose of showing proof of the defendants' motive, opportunity, intent, preparation, plan, knowledge, identity and or absence of mistake or accident.  This notice is only preliminary in nature and is not intended to foreclose the government, with the Court's permission, from relying on other types of 404(b) evidence should it deem the introduction of such evidence appropriate at the time of trial.

One coconspirator, Marc Eugene Robinson, has pled guilty to his participation in the scheme charged in the indictment and his plea and Information are a matter of public record under case number 6:06-CR-6065 and are available to defense counsel.

The government declines to release any further impeachment information at this juncture.  To provide defense counsel with advance notice of impeachment evidence -- whether under rule 608, 609 or otherwise -- would obviously destroy its effectiveness and would undermine the truth seeking function of the jury.  As at least one court has held, there is simply "[n]o rule or rationale [which] guarantees the defense advance knowledge of legitimate impeachment before it calls a witness." United States v. Baskes, 649 F.2d 471, 477 (7th Cir. 1980), cert. denied, 450 U.S. 1000 (1981); cf. United States v. Stevens, 985 F.2d 1175, 1180 (2d

-23-

Cir. 1993) (evidence does not become discoverable "merely because it would have dissuaded the defendant from proffering easily impeached testimony").  Any questions with respect to the propriety and the timing of the disclosure of any further 404(b), 608(b) and 609 information can be addressed to the Court at the time of the pre-trial conference.

### D.   BRADY

While the government is fully aware of its responsibilities under the doctrine of Brady v. Maryland, 373 U.S. 83 (1963), it does not agree that the doctrine covers many of the Brady requests made by the defendants.  Contrary to the extremely expansive notions underlying these requests, Brady does not create a constitutional right of pre-trial discovery in a criminal proceeding and it does not require that the prosecution reveal before trial the names of all of its witnesses. Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  Nor does it require the disclosure of evidence affecting the credibility of prosecution witnesses before it would otherwise become available under the discovery rules or the Jencks Act.   See United States v. Dotel, No. 93CR173, 1994 WL 25787, slip op. at 3 (S.D.N.Y. 1994) (Brady impeachment material as to government's witnesses -- i.e. Giglio material -- is properly disclosed when witness testifies at trial); United States v. Feldman, 731 F. Supp. 1189,

1200 (S.D.N.Y. 1990) (same); United States v. Victor Teicher &
Co., L.P., 726 F. Supp. 1424, 1442-43 (S.D.N.Y. 1989) (same).

Further, Brady "does not require the Government to do
defense counsel's pre-trial preparation, nor develop a defense
strategy, nor does it require the Government to point out the
obvious." United States v. Larson, 567 F. Supp. 500, 503
(S.D.N.Y. 1983), aff'd, 742 F.2d 1443 (2d Cir. 1984). Accord
United States v. Amor, No. 92CR223, 1992 WL 309875, slip op. at 4
(N.D.N.Y. 1992) ("'the purpose of the Brady rule is not to
provide a defendant with complete disclosure of all evidence in
the government's file which might conceivably assist him in the
preparation of his defense, but to assure that he will not be
denied access to exculpatory evidence known to the government but
unknown to him.'") (quoting United States v. Ruggerio, 472 F.2d
599 (2d Cir.), cert. denied, 412 U.S. 939 (1973))).

Brady compels the government to disclose exculpatory
material in time for its effective use at a trial or at a plea
proceeding. United States v. Copa, 267 F.3d 132, 144 (2d Cir.
2001) ("as long as a defendant possesses Brady evidence in time
for its effective use, the government has not deprived the
defendant of due process of law simply because it did not produce
the evidence sooner. There is no Brady violation unless there is
a reasonable probability that earlier disclosure of the evidence

would have produced a different result at trial or at a plea proceeding." (citations omitted)).

With these limitations in mind, the government believes that it has disclosed all evidence which is factually exculpatory of which the government is aware see Exhibits 7, 8 and 9, letters to defense counsel identifying possible Brady information.  The letters identify George Bevre and provide Bevre related information that was produced to the SEC by defendant Lyttle through his private attorney.[9]  At no time was Mr. Bevre an agent of, or acting at the direction of the United States government.[10] Giglio material will be disclosed at the time the government provides its trial witness list.  The government will disclose any additional exculpatory evidence should any be discovered.

E.   DISCLOSURE OF INFORMANT INFORMATION

Defendants seeks the identity of and other information concerning any and all informants in this case.  Regarding the government's direct case, no informants were utilized.  In regard to "other crimes evidence" provided to defendant Eldridge under Fed.R.Evid 404(b), one or more individuals acted in an undercover capacity in a FBI sting operation whose identities have not been

---

[9]  Counsel for defendant Eldridge mischaracterized this disclosure as a Rule 404(b) disclosure.

[10]  Defendant Eldridge assumes Bevre was an agent of the government and demands production of directives from the U.S. Government to Bevre and access to tangible objects and Title III intercepts Bevre obtained as a government agent or operative none of which exist.

disclosed.  Defendant Eldridge's recorded conversations, if
admitted as "evidence of other crimes, wrongs or acts," will be
utilized to prove motive, opportunity, intent, preparation, plan,
knowledge or absence of mistake.  The identity of the informants
or undercover operatives are collateral to the issue being tried
and before the jury.  Defendant Eldridge has not demonstrated why
the government should be required to disclose any undercover or
informant identity before trial.  That is the defendants' burden.
See United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988),
cert. denied, 489 U.S. 1089 (1989). Defendants' blanket request
is simply not a valid reason for the disclosure of the
informant's or undercover agent's identity.  Roviaro v. United
States, 353 U.S. 53 (1957).   The Second Circuit has clearly
held that it is the defendant who bears the burden of showing the
need for disclosure. See United States v. Saa, 859 F.2d 1067,
1073 (2d Cir. 1988), cert. denied, 489 U.S. 1089 (1989).

      The defendants surmise that disclosure of the Informants'
identity might lead to exculpatory evidence is not sufficient to
warrant disclosure.  "A defendant who merely hopes without
showing a likelihood that disclosure will lead to evidence . . .
has not shown that disclosure will be relevant and helpful to the
defense...." United States v. Brown, 3 F.3d 673, 679 (3d Cir.
1993).  Accord Roviaro, 353 U.S. at 62, 77 S.Ct. at 628-29;
United States v. Flaharty, 295 F.3d 182, 202 (2d Cir. 2002)

("speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden [of showing that disclosure is essential to the defense]"); United States v. Gonzales, 606 F.2d 70, 75-76 (5th Cir. 1979) (where defendants do not establish any basis, other than by mere conjecture, for claiming relevancy of informant's testimony, disclosure is inappropriate); United States v. Canty, 971 F. Supp. 687, 1997 WL 422444, at 5 (N.D.N.Y. July 21, 1997) (defendants cannot compel disclosure on the basis of "bald statements" and mere speculation).

Viewed as simply a discovery request, the motion should be denied at this time.  Should the government decide to call a confidential informant or undercover agent at the trial of this case, it will disclose such informant's identity along with the identity of its other trial witnesses in the government's pretrial disclosures either two weeks before trial or at the time of the pretrial conference.  At that time, the government will also turn over any Giglio impeachment material relating to any informant which the government will call to testify.  See United States v. Grant, 2003 WL 1884297 (D. Del. 2003) ("The identity of a CI who was an active participant in the transaction at issue need not be released until one week before trial if the Government indicates its intention to call the CI as a witness at

-28-

trial and if the Government provides the defendant with the necessary impeachment information at that time.")

Accordingly, defendants' request for disclosure of the informants' identities at this time should be denied.

### F.   EXPERT WITNESSES

The government has provided defense counsel with notice of its intention to call Leonard A. Zawistowski, Jr., who is employed as a Senior Special Investigator within the Division of Banking Supervision and Regulation of the Board of Governors of the Federal Reserve System as an expert witness.  A copy of Mr. Zawistowski's expert report was provided to the defendants and indicates that Mr. Zawistowski will offer expert testimony on the fraudulent nature of High Yield Investment Programs (HYIP's) and the indicators of such programs which include specific types of false representations.  Mr. Zawistowski will testify that HYIP's are not operated in conjunction with, and under the control of the, Federal Reserve System.  Mr. Zawistowski will offer his expert opinion that the investments offered by the defendants were HYIP's.  The fraudulent nature and characteristics of HYIP are not within the customary knowledge of lay jurors and represents appropriate subject matter for expert testimony as addressed more fully below.

The government has also provided the defendants with the expert report of Special Agent Jeffrey P. Kassouf of the Federal

-29-

Bureau of Investigation who will offer expert testimony relating to the tracing of assets including financial transfers.  Special Agent Kassouf will also testify about the methods and practices employed in the practice of money laundering including the return of old investor's funds with new investor's proceeds, a practice utilized in <u>ponzi</u> schemes.  The volume of financial transfers in furtherance of the alleged scheme, as well as the number of entities used to disguise the true source and criminal nature of the funds being used by the defendants, necessitates the use of expert testimony to present the evidence to the jury in a coherent and summarized manner.  Mr. Kassouf's analysis will demonstrate that the investors' funds were used in a manner contrary to representations in the various investment documents employed in promoting the scheme.

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

<u>The nature of the financial transactions</u>

The defendants utilized over 45 financial accounts at foreign and domestic banks and stock brokerage houses to hold or transfer investors' funds.  The accounts were opened in the names

of the individual defendants as well as the names of various nominees including attorneys and business entities associated with the defendants.  The following provides a synopsis of some, but not necessarily all, of the accounts used by the defendants:

### Violet Gail Eldridge

Defendant Eldridge utilized over 35 different accounts at 10 separate financial institutions to hold investors' funds.  The accounts associated with defendant Eldridge were opened under the following names:

```
United Tribes of the America, Inc.;
UTA(BVI) Ltd.;
UTA Inc.;
UTA BVT (BTO);
UTA Financial Developments Inc.;
Executive Bureau of Research;
UTA BVI Trust;
First Chase Holding;
Pinnacle Risk Management;
Robert Eldridge (Spouse);
Michael Bach (Attorney);
TRG Wolff (Attorney); and
Michael Fine (Attorney).
```

Defendant Eldridge used brokerage accounts she controlled at Donaldson, Lufkin and Jenrette (DLJ), First Union, Bank of America and Charles Schwab to deposit investors' funds and to trade on margin.  Margin trading was significant - - in two DLJ accounts alone from December of 1999 through July of 2000, defendant Eldridge incurred over $800,000 of margin interest.

### Melvin Lyttle

Defendant Lyttle maintained over nine different accounts at

six separate domestic and foreign financial institutions to hold and transfer investors' funds.  The accounts associated with defendant Lyttle were opened under the following names:

    SCCP, Inc.;
    First National Equity;
    Industrial Hardwoods;
    Melvin and Suzanne Lyttle (Spouse);
    R. Jill Lyttle (Daughter); and
    Neil Comer (Attorney).

Defendant Lyttle used investors' funds to personally purchase commercial and residential real estate.  The properties were not titled in the name of defendant Lyttle, but rather were titled in the name of his wife, Suzan Lyttle, in the name of BERJ Trust, a trust controlled by Suzan Lyttle for the benefit of defendant Lyttle's children, and in the name of a nominees Tony Gregory,  James Allen, and Neil Comer (utilizing Comer's attorney trust account.)  Defendant Lyttle also made significant personal purchases with investors' funds.

Paul K. Knight

Defendant Knight utilized three different accounts at three separate financial institutions to hold investors' funds.  The accounts associated with defendant Knight were opened under the following names:

    PK Trust and Holding, Inc.;
    Marilyn Rush; and
    Shining Seas International.

Defendant Knight made significant personal purchases with investors' funds.

John L. Montana, Jr.

Defendant Montana utilized nine different accounts at four separate financial institutions to hold investors' funds.  The accounts associated with defendant Montana were opened under the following names:

> Global Atlantic Group;
> T & P Worldwide, Inc.; and
> Janice Maher (Spouse using maiden name).

While defendant Montana did not personally receive any of the investors' funds through the scheme charged, he re-solicited investors once the investors received the return of their investment from the charged scheme.  Defendant Montana ultimately kept the funds of one investor causing a one million dollar loss.  Defendant Montana received notice under Fed.R.Evid. 404(b) that this evidence will be offered against defendant Montana as "other crimes evidence" at trial.[11]

All together the defendants received over $32.8 million from 26 investors of which $19.2 million was returned to investors generating a loss of $13.6 million.  The defendants caused over $99 million of financial transfers using investors' funds.[12]  Transfers were made by wire, check, credit card and currency.  Investors' funds were not parked in bank accounts in the

---

[11] See footnote 8.

[12] Since only $32.8 million was received through the scheme, the same investors' funds were transferred multiple times.

investors' names as represented in the investment documents. Rather, investors' funds were utilized in novel ways such as being leveraged, used in collateralized financing, used for speculative currency trading, and transferred to allegedly capitalize an insurance company, all in violation of the terms of the investment agreements.  Investors' funds were personally expended by the defendants to  purchase automobiles, real estate, a piano, a pool, furniture, other businesses, clothing, limousine services, for entertainment and living expenses, and to generate cash.  Special Agent Kassouf examined over three thousand financial transactions in tracing the source and ultimate disposition of investors' funds.

The volume and unusual nature of the financial transactions utilizing investors' funds mandates the use of an expert witness in order to assist the jury's understanding and to promote efficiency.  While all of the financial documentation relating to transfers identified in the indictment as overt acts or substantive offenses will be presented in the government's case in chief, a financial expert is necessary to summarize the multitude of transfers employed by the defendants before and after the transfers charged as substantive offenses or overt acts.

Special Agent Kassouf will also describe the general practices employed in the practice of money laundering including:

-34-

specific types of transfers including foreign transfers; the utilization of multiple accounts at a single financial institutions; the use of multiple financial institutions including stock brokerages to hold funds; the use of nominees to hold cash and property; and the generation of large amounts of cash.

Expert witnesses have been allowed to testify in other complex financial cases and including those which charge fraud and money laundering. See United States v. Nektalov, 461 F.3d.309, 318 (2d Cir. 2006) (expert testimony shed some light on the significance of facts for lay jurors unfamiliar with the objectives and practices of money laundering); United States v. Majors, (11th Cir. 1999) (FBI analyst provided expert opinion as to the amount of loss after months of analyzing defendant's financial records); United States v. All Funds on Deposit in any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith, 801 F.Supp. 984, 997 (E.D.N.Y. 1992) (sophisticated drug/money laundering activities are a proper subject for expert testimony and testimony was supported by, and required by, huge amount of financial documentary evidence).

In his expert report, Special Agent Kassouf identifies the underlying documents and information relied upon to perform his analysis which all have been available to the defendants during discovery and for use by their expert if desired.

Defendant Knight argues for the preclusion of the testimony of both experts under a Daubert and Kumho rationale arguing that "there is no proof offered to insure that either or both 'expert's testimony' is relevant and, more importantly, rests on a reliable foundation." Knight Motion at p.14. The non-existence of HYIP's which the defendants were promoting is highly relevant and helpful to the jury's evaluation of the defendants conduct and intent. The fact that such programs are not regulated or controlled by the Federal Reserve System directly refutes representations made by the defendants to investors in promoting the scheme. The factors Mr. Zawistowski utilized in forming his opinion that the program being offered by the defendants was a fraudulent HYIP are specified in his report, are based on a historical analysis of these types of criminal schemes by investigative authorities, and represent the factors utilized by experts in his field in evaluating the legitimacy of investment programs.

Exhibit 10 details the numerous times Mr. Zawistowski has testified as an expert in other HYIP prosecutions and demonstrates that such expert testimony is widely recognized and accepted by other courts as being helpful to the jury and not unfairly prejudicial.[13] It is foreseeable that the average citizen sitting on the jury would not know the indicators of

---

[13] This listing appears as "Exhibit 1" in Mr. Zawistowski's expert report.

HYIP's, that such investments do not exist, or the investment's lack of federal regulation by either the Federal Reserve System or other regulators.

Special Agent Kassouf holds a licence[14] as a Certified Public Accountant and has prior experience in the public sector performing the audit function which directly involves the tracing of financial transactions. Agent Kassouf has received specialized training from the Federal Bureau of Investigation in investigating money laundering offenses and in tracing criminal proceeds. There is little question that the methodology employed by Special Agent Kassouf has demonstrated wide-scale acceptance among experts, namely other CPA's, and is reliable i.e., it is the methodology relied upon in recording all financial business transactions and is routinely utilized by accountants to recreate financial trails in public audits. Special Agent Kassouf can testify based upon his personal examination of the financial transactions and examinations made under his direction, that investors' funds were utilized by the defendants for their own personal benefit and contrary to the representations made in the investment documents. Special Agent Kassouf's testimony will also explain the process of money laundering and the mechanisms employed to launder criminal proceeds. The fact that ordinary jurors are unfamiliar with the principles of money laundering and

---

[14] Special Agent Kassouf's CPA licence is currently inactive.

is the proper subject matter for expert testimony has been recognized by other courts.  See supra United States v. Nektalov and  United States v. All Funds on Deposit in any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith.

All of the expert testimony being proffered by the government is offered through expert witnesses who objectively possess technical and or specialized knowledge and who employ reliable principles and methods in their evaluations.  The expert testimony will present evidence in subject matters that are not commonly understood by lay jurors and will assist the trier of fact in their understanding of the evidence and in determining a fact in issue.  Therefore, the expert testimony offered by the government's experts should be permitted.

Defendant Knight in his motion at ¶37 also requests that the Court preclude the proposed expert testimony based upon his speculation that, "it is likely that the witness's testimony will exceed the permissible scope of opinion testimony" citing United States v. Scop, 846 F.2d. 135 (2d Cir. 1988).[15] Defendant Knight first speculates that: (1) neither of the government's experts will be able to properly confine their testimony to the permissible scope of expert testimony and, (2) that the Court will be unable to successfully perform its gatekeeping function

_____

[15] A similar argument is presented by defendant Lyttle in summary fashion beginning at ¶ 25 of his motion.

under the doctrines of <u>Daubert</u> and <u>Kumho</u>, by precluding
impermissible testimony from the trial.  <u>Daubert v. Merrell Down</u>
<u>Pharmaceuticals, Inc.</u>, 509, U.S. 579, 589, 113 S.Ct. 2786 (1993);
<u>Kumho Tire Company, Ltd. v. Carmichael</u>, 526 U.S. 137, 138, 119
S.Ct. 116 (1999).  Defendant Knight also cites <u>United States v.</u>
<u>Dukagjini</u>, 326 F.3d. 45 (2d Cir. 2003), for its dicta stating
that the use of a case agent as an expert witness increases the
likelihood that inadmissible and prejudicial testimony will be
proffered at trial.  <u>Dukagjini</u> involved a drug conspiracy case
that was originally tried before the Honorable David G. Larimer
of this district and the convictions were upheld by the Second
Circuit.

      In <u>Dukagjini</u>, a DEA case agent testified as an expert about
drug jargon and impermissibly expanded his testimony to that of a
summary witness by bolstering the testimony of the cooperating
co-defendants and thereby impinging upon the exclusive function
of the jury. <u>United States v. Dukagjini</u>, 326 F.3d. at 55.  The
Second Circuit in <u>Dukagjini</u> recognized that case agents are
permitted to testify as experts. 326 F.3d. at 56.  (citing <u>United</u>
<u>States v. Feliciano</u>, 223 F.2d. 102, 121 (2d Cir. 2000) ("Such
dual testimony is not objectionable in principle"); and <u>United</u>
<u>States v. Young</u>, 745 F.2d. 733, 767 (2d Cir. 1984) ("[I]t was not
improper for the government to elicit ... expert testimony from
law enforcement officers who also testified as fact

witnesses.")).   The appellate court also recognized "that the Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to insure that it is reliable (internal citations omitted) and not substantially more unfairly prejudicial than probative." United States v. Dukagjini, 326 F.3d at 56.

The subject matter of the proffered expert testimony is distinctively different from the type of testimony provided in Dukagjini and does not present the same level of risk that it will impermissibly deviate from what is appropriate.   Special Agent Kassouf will testify about the financial tracing of investors' funds to the defendants, how investors' funds were expended, and the practices employed in money laundering. Kassouf's testimony will not involve the interpretation of what a defendant, coconspirator, or victim said or comments on witness credibility.   The underlying data utilized by Agent Kassouf consists of over three thousand financial transactions he analyzed and is not based upon hearsay, i.e., what he was told. Special Agent's Kassouf's accounting methodology is objective, routine practice in the financial industry, and can be tested through cross examination by the defendants with minimal risk of eliciting inadmissible testimony.

The government's experts will be diligent in limiting the scope of their testimony to appropriate subject matter, will be subject to monitoring by the Court in exercising its gatekeeping function and by defense counsel through their ability to raise spontaneous objections.  All of the above constraints provide the defendants with adequate protection from a speculative harm. Therefore, the Court should permit the government to present the identified relevant, reliable, specialized and or technical evidence through the testimony of its expert witnesses.

### G.    DEMAND FOR BILL OF PARTICULARS

In the defendants' motions, they request that the government provide a Bill of Particulars.  However, a bill of particulars is not necessary nor legally required in this case in that the detailed indictment sufficiently sets out the nature of the defendants' alleged criminal misconduct so as to put them on notice as to what the government contends they did which constitutes criminal offenses.  Moreover, when the indictment is considered in conjunction with the voluminous voluntary disclosure already made available by the government, there cannot be any mistake, confusion or surprise as to the acts alleged to constitute the offenses alleged.

The application for a bill of particulars is addressed to the sound discretion of the Court, and the burden is on the defendants to show that non-disclosure of the requested

particulars will lead to prejudicial surprise at trial or will
adversely affect the defendant's substantial rights. <u>Wong Tai v.
United States</u>, 273 U.S. 77, 82 (1927).  The purpose of the bill
of particulars is to "apprise a defendant of the nature of the
charges against him, so that he can adequately prepare a defense,
avoid prejudicial surprise at trial and plead double jeopardy in
subsequent related actions." <u>United States v. Greater Syracuse
Board of Realtors</u>, 438 F. Supp. 376, 379 (N.D.N.Y. 1977); <u>United
States v. Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990); <u>United States
v. Bortnovsky</u>, 820 F.2d 572 (2d Cir. 1987).  The bill of
particulars is not a discovery device to seek complete discovery.
<u>Wong Tai</u>, 273 U.S. at 82.

The government is not obligated to "preview its case or
expose its legal theory." <u>United States v. Leonelli</u>, 428 F.
Supp. 880, 882 (S.D.N.Y. 1977).  Neither is the government
required to disclose the manner in which it will attempt to prove
the charges, <u>United States v. Brevard</u>, 27 F.R.D. 250, 251
(S.D.N.Y. 1961), nor the precise manner in which the crimes
charged in the indictment were committed, <u>United States v.
Andrews</u>, 381 F.2d 377, 378 (2d Cir. 1967), <u>cert</u>. <u>denied</u>, 390 U.S.
960 (1968), since the "manner or means by which a crime is
carried out constitutes evidentiary matter, nor ultimate facts."
<u>United States v. Boneparth</u>, 52 F.R.D. 544, 545 (S.D.N.Y. 1971).

Furthermore, the government is not required to provide
information tantamount to an itemized preview of its proof, lest

-42-

the defendant tailor his own testimony to explain away the government's case.  United States v. Cimino, 31 F.R.D. 277, 279 (S.D.N.Y. 1962), aff'd., 321 F.2d 509 (2d Cir. 1963), cert. denied, 375 U.S. 974 (1964).  Demands seeking disclosure of the government's legal theory are simply not within the proper scope of a bill of particulars.  See, e.g., United States v. Shorher, 555 F.Supp 346, 350 (S.D.N.Y. 1983); United States v. Mannimo, 408 F. Supp. 1182, 1185 (S.D.N.Y. 1979).

It is fundamental that a bill of particulars confines the government's proof to the particulars furnished.  United States v. Glaze, 313 F. Supp. 757, 759 (2d Cir. 1963); United States v. Murray, 297 F.2d 812, 819 (2d Cir.), cert. denied, 369 U.S. 828 (1962).  Accordingly, bills of particulars should not be granted where the details sought would unduly restrict the government in presenting its proof at trial.  Braatelien v. United States, 147 F.2d 888, 892 (8th Cir. 1945); United States v. Kessler, 43 F. Supp. 408, 412-13 (E.D.N.Y. 1942).

The indictment in this case clearly and specifically alleges its charges against the four defendants.  Moreover, the government has provided the defendants with substantial discovery material and access to other voluminous discovery materials, well beyond Rule 16 requirements.  To the extent that the voluntary discovery does not provide the particulars requested by the defendants, the government specifically declines to provide those

-43-

particulars.  Accordingly, the defendants' various requests for a
bill of particulars should be denied.

### H.    MOTIONS FOR SEVERANCE

All defendants have moved for severance alleging
antagonistic defenses and prejudicial spillover caused by
different levels of criminal participation in the scheme charged.
These motions should be denied as they have failed to demonstrate
that they are entitled to a severance.

With regard to all the defendants' Motions for severance the
general principles governing motions for a Rule 14 severance are
by now well settled.  A defendant bears the "extremely difficult
burden," United States v. Carpentier, 689 F.2d 21, 27 (2d Cir.
1982), cert. denied, 459 U.S. 1108 (1983), of showing that the
defendant will be so severely prejudiced that joinder would, in
effect, deny the defendant a constitutionally fair trial.  Zafiro
v. United States, 506 U.S. 534, 539 (1993) ("a district court
should grant a severance under Rule 14 only if there is a serious
risk that a joint trial would compromise a specific trial right
of one of the defendants, or prevent the jury from making a
reliable judgment about guilt or innocence"); United States v.
Cody, 722 F.2d 1052, 1061 (2d Cir. 1983), cert. denied, 467 U.S.
1226 (1984).  Merely establishing that the defendant would have a
better chance for acquittal at a separate trial is not sufficient
to make the required showing of "substantial prejudice."  Zafiro
v. United States, supra, 506 U.S. at 540; United States v.

Carson, 702 F.2d 351, 366 (2d Cir.), cert. denied, 462 U.S. 1108 (1983).  Rather, a defendant must establish that a "miscarriage of justice would occur as a result of the court's refusal to sever the trials."  United States v. Potamitis, 739 F.2d 784, 790 (2d Cir.), cert. denied, 469 U.S. 934 (1984).[16]

The law imposes this heavy burden on a defendant seeking a Rule 14 severance because joint trials are generally in the public interest.  See Zafiro v. United States, supra, 506 U.S. at 537.  A joint trial aids the trier of fact by permitting the presentation in one trial of all aspects of a criminal scheme. It also avoids the scandal and inequity of inconsistent verdicts and prejudice to the government at the second trial from having revealed the nature and extent of its evidence at the first trial.  See Richardson v. Marsh, 481 U.S. 200, 210 (1987); United States v. Kahaner, 203 F. Supp. 78, 81 (S.D.N.Y. 1962).

Therefore, as a general rule, persons jointly indicted should be jointly tried to "[conserve] judicial resources, [alleviate] the burdens on citizens serving as jurors, and [avoid] the necessity of having witnesses reiterate testimony in a series of trials."  United States v. Lyles, 593 F.2d 182, 191 (2d Cir.), cert. denied, 440 U.S. 972 (1979).  See also United

---

[16] Even showing that the defendants' theories of defense are antagonistic, and that they will attempt to cast blame on each other, is ordinarily not enough to meet this threshold.  See Zafiro v. United States, 506 U.S. 534, 538-39 (1993); United States v. Carpenter, supra, 689 F.2d at 27-28; United States v. Becker, 585 F.2d 703, 707 (4th Cir. 1978), cert. denied, 439 U.S. 1080 (1979).

States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983).  The

presumption in favor of joint trials is particularly strong

"[w]here, as here, the crime[s] charged involve[] a common scheme

or plan." United States v. Girard, 601 F.2d 69, 72 (2d Cir.),

cert. denied, 444 U.S. 871 (1979).

        Defendants' severance motions are conclusory and offer no

factual support whatsoever for their severance request, and

therefore do not satisfy the "extremely difficult burden," United

States v. Carpenter, 689 F.2d 21, 27 (2d Cir. 1982), cert.

denied, 459 U.S. 1108 (1983), of showing that they would be so

severely prejudiced that joinder would, in effect, deny them a

constitutionally fair trial.  Their motion for a severance should

therefore be denied.

        Defendant Knight also argues that his defense and that of

defendant Eldridge are antagonistic to the point where his

counsel, for effective representation, will be required to

comment on defendant Eldridge's speculated silence at trial and

therefore, severance is required.  If such a representation were

all that were required for severance, joint trials would be the

exception rather than the rule.

        In actuality, defendant Knight's defense as presented in his

SEC testimony is that Knight solicited funds from the investors

under the investment program and then subsequently lost

investors' funds through a fraud perpetrated against him by

defendant Eldridge.  Such a defense neither diminishes Knight's

46

responsibility for soliciting and investing investors' funds
contrary to the terms of the investment documents nor does it
justify his personal misuse of investors' funds.  In essence,
Knight's implied defense is that he was not a member of a
conspiracy with defendant Eldridge.  After a valid indictment is
returned, such a determination can only be made after the
presentation of evidence.  Furthermore, even if Eldridge failed
to testify, which at this juncture is pure speculation, there
would be no professional need for Knight's counsel to comment on
Eldridge's silence.

The facts presented by defendant Knight in his Motion do not
demonstrate that Knight's defense is antagonistic and mutually
exclusive to that of defendant Eldridge and therefore Knight does
not meet the standard required  for severance.  See Graziano v.
United States, 710 F.2d. 691, 695 (11th Cir. 1983) (real
prejudice occurs only if the defenses offered by the defendant
and co-defendant are antagonistic and mutually exclusive,
(internal citations omitted)).  In Graziano, the court, without
causing real prejudice to the defendant, ruled that the defenses
presented were not sufficiently antagonistic to require severance
and the court precluded defense counsel from commenting on the
co-defendant's silence.  Graziano v. United States, 710 F.2d. at
695.  The same admonition to counsel would be appropriate in this
case.  As defendant Knight has not overcome the strong
presumption in favor of a joint trial when conspiracy is alleged,

47

his motion for severance base on a need to comment on a co-defendant's silence should be denied.

## I.   MOTION FOR HEARINGS ON COCONSPIRATOR STATEMENTS

The defendants request an advance ruling on the admissibility of declarations of coconspirators.  Such motion should be denied at this time, without prejudice to rebring them at the time of trial.

Commonly referred to as a "James hearing" after the Fifth Circuit case establishing the practice, United States v. James, 576 F.2d 1121, 1127-32 (5th Cir. 1978), modified en banc, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917 (1979), its functional equivalent in this Circuit is provided by the trial court's determination -- at the close of the government's case -- that a preponderance of the evidence demonstrates "that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy." United States v. Tellier, 83 F.3d 578, 580 (2d Cir.), cert. denied, 519 U.S. 955 (1996).  See also United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028 (1970); United States v. Margiotta, 688 F.2d 108, 136-37 (2d Cir. 1982), cert. denied, 461 U.S. 913 (1983); United States v. Mastropieri, 685 F.2d 776, 786-90 (2d Cir.), cert. denied, 459 U.S. 945 (1982).

48

Moreover, "[i]n making these preliminary factual determinations, the court may take into account the proffered out-of-court statements themselves if those statements are sufficiently reliable in light of independent corroborating evidence." United States v. Daly, 842 F.2d 1380, 1386 (2d Cir.), cert. denied, 488 U.S. 821 (1988) (citing Bourjaily v. United States, 483 U.S. 171 (1987)).  Any co-conspirator statements should be admitted "subject to connection" during the course of trial.  Any other hearing to control the use of alleged co-conspirator statements should be denied.  See United States v. Giovanelli, 747 F. Supp. 875, 879-80 (S.D.N.Y. 1989).

Accordingly, defendants' motions for a James hearing should properly be brought before the District Court at the time of trial.  Such motions should be denied at this time without prejudice.

**J.   DISCLOSURE OF RECORD OF GRAND JURY PROCEEDINGS**

Several of the defendants seek extensive details concerning the grand jury proceedings in this case, including the minutes, attendance and voting records of the grand jury, the attendance of particular witnesses before the grand jury and the legal instructions provided to the grand jury, in the hope that they will find a basis for dismissal of the indictment.  The Court should reject these requests on several grounds.

Disclosure of grand jury materials is controlled by Fed.R.Crim.P. 6(e), which

49

> was not designed as an authorization for
> pretrial discovery.  Its purpose, on the
> contrary, is to protect the secrecy of the
> Grand Jury proceedings by restricting
> disclosure to the exceptional case where a
> particularized need is shown.

United States v. Weinstein, 511 F.2d 622, 627 (2d Cir.) (footnote

omitted), cert. denied, 422 U.S. 1042 (1975).  A defendant has

the burden of showing that his "particularized need" for grand

jury notes of testimony outweighs the general policy of grand

jury secrecy.  Pittsburgh Plate Glass Co. v. United States, 360

U.S. 395, 400 (1959).  While Rule 6(e) does not insulate from

disclosure all information presented to grand juries, it is clear

that

> [t]he aim of the rule is to prevent
> disclosure of the way in which information
> was presented to the grand jury, the specific
> questions and inquiries of the grand jury,
> the deliberations and vote of the grand jury,
> the targets upon which the grand jury's
> suspicion focuses, and specific details of
> what took place before the grand jury.

In re Grand Jury Investigation of Ven-Fuel, 441 F. Supp. 1299,

1302-03 (M.D.Fla. 1977).  This information is exactly what

defendants seek.

There has not been the slightest evidentiary showing to

warrant the inquiry requested by defendants.  In rejecting a

similar request in United States v. DeGroote, 122 F.R.D. 131

(W.D.N.Y. 1988), this Court wrote:

> The defendant has made no "preliminary
> factual showing of serious misconduct"
> sufficient to give rise to a motion to

50

> dismiss. Fed.R.Crim.P. 6(e) (1979 advisory
> committee note).  Nor has he made any factual
> allegations sufficient to establish
> particularized need.

Id. at 136.  Speculation and surmise as to what occurred before

the grand jury is not a substitute for fact.  United States v.

Wilson, supra, 565 F. Supp. at 1436.  A general desire, like

defendants', to ferret out projected improprieties and to

demonstrate insufficiency of evidence will be present whenever a

grand jury indicts.  To consider defendants' proposed offer a

sufficient showing of particularized need will make disclosure of

grand jury notes of testimony a routine matter.  As noted in

United States v. DeGroote, supra, "[t]he conclusory and

speculative statements made in defendant's papers have been held

insufficient countless times." 122 F.R.D. at 136.  See also

United States v. Barber, 839 F. Supp. 193, 194 (W.D.N.Y. 1993).

Moreover, much of what defendants seek to show would be to

no avail.  For example, misinforming the grand jury as to the

applicable law does not constitute grounds for dismissal of the

indictment.  United States v. Beech-Nut Nutrition Corp., 659 F.

Supp. 1487, 1499 (E.D.N.Y. 1987).  More generally, in United

States v. Williams, 504 U.S. 36 (1992), the Supreme Court

reiterated that a challenge to the reliability or competence of

the evidence presented to the grand jury will not be heard and

went on to state:

> It would make little sense, we think, to
> abstain from reviewing the evidentiary

51

> support for the grand jury's judgment while
> scrutinizing the sufficiency of the
> prosecutor's presentation.  A complaint about
> the quality or adequacy of the evidence can
> always be recast as a complaint that the
> prosecutor's presentation was "incomplete" or
> "misleading."  Our words in Costello [v.
> United States, 350 U.S. 359 (1956),] bear
> repeating:  Review of facially valid
> indictments on such grounds "would run
> counter to the whole history of the grand
> jury institution[,] [and] [n]either justice
> nor the concept of a fair trial requires
> [it]."  350 U.S., at 364.

Id. at 54-55 (footnote omitted).  The indictment here, being

valid on its face, requires a trial on the merits.  United States

v. Wilson, supra 565 F. Supp. at 1437.

For all of the above reasons, the motions for inspection of

grand jury materials should be denied.  The concurrent motion by

defendants to dismiss the indictment on grounds of insufficient

evidence, improper jury instructions and voting irregularities

should be denied.

**K.   REQUEST FOR RULE 15 CRIMINAL DEPOSITIONS AND SUBPOENA
      DUCES TECUM**

Defendant Eldridge makes a generic request for the Court to

allow the taking of  Criminal Depositions under Fed.R.Evid.

15(a)(1) without identifying any "exceptional circumstance," why

such deposition(s) would be required in the interest of justice,

or why the witness(es) would be unavailable for trial, all

factual determinations the Court is required to make in granting

such a request.  See United States v. Gigante, 166 F.3d. 75, 81

(2d Cir. 1999) (detailing requirements for Rule 15 criminal

deposition as a benchmark for video testimony in a criminal
trial); <u>United States v. Singleton</u>, 460 F.2d 1148, 1154 (2d Cir.
1972) (test for Rule 15 deposition is whether '"it appears that a
prospective witness may be unable to attend or prevented from
attending a trial or hearing, that his testimony is material and
that it is necessary to take his deposition in order to prevent a
failure of justice'"). Defendant Eldridge's request should be
summarily dismissed at this time due to its failure to provide
the necessary predicate facts.

Defendant Eldridge further requests the Court to authorize
the issuance of subpoena duces tecum due to the government's
refusal to respond to the defendant's discovery requests. As
indicated earlier the government has exceeded its discovery
responsibilities by providing access  since the defendants'
arraignment to all discoverable materials as soon as received.
However, defendant Eldridge demands more than Rule 16 requires,
i.e., that the government conduct the review and collation of
evidence pursuant to defense counsel's demands -- something that
is neither appropriate nor compelled.

The government, other than questioning the late demand, has
no objection to the Court authorizing the issuance of subpoenas
duces tecum for defendant Eldridge, or any of the other
defendants, so long as their purpose is to produce existing
relevant materials not currently available and are not merely

being utilized by the defendant as a mechanism to delay the criminal trial.[17]

## L.  EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS AND TITLE III INTERCEPTS

Defendants move to suppress evidence seized pursuant to various state and federal search warrants.  No search warrants were executed during this investigation and therefore, this issue is moot.

Defendant Eldridge also moves to suppress any recorded conversations or Title III intercepts.  The government did not obtain any intercepted communications of any of the defendants during this investigation therefore this issue is moot.

## M.  PRESERVATION OF ROUGH NOTES AND OTHER EVIDENCE

Defendants have moved for the preservation by government agents of rough notes and other evidence.  Appropriate instructions have been given to the agents involved in the investigation.

## N.  JOINDER WITH AND RESERVATION OF MOTIONS

Several defendants seek to preserve their respective rights to bring further motions concerning issues involved in this litigation, as well as to join in the motions of co-defendants. The government has no objection to a defendant bringing further

---

[17]  The government's concern is the late hour at which this request is being made. Discovery has been ongoing since September of 2005, and it is questionable that defendant Eldridge, on the eve of setting a trial date, has just now determined that she needs to compel parties to provide additional documents for her defense.

motions in this case, provided that such motions could not have been made with the omnibus motions presently before the Court and that such motions have not been previously made and decided by the Court.  The government defers to the discretion of this Court on the issue of joinder by any defendant in the motions of his co-defendants.  However, it should be noted that particular motions do require an independent demonstration of standing which the government does not waive.

**O.    GOVERNMENT'S RULE 12(b)(4) PRELIMINARY NOTICE OF INTENT TO USE EVIDENCE**

The government makes and files its preliminary notice, pursuant to Federal Rule of Criminal Procedure 12(b)(4), of its intention to use evidence in its case in chief at trial which the defendants may be entitled to discover and which arguably may be subject to suppression by the defendants.  The government currently intends to use all of the evidence disclosed to the defendants and made available for inspection by the defendants which falls within the scope of Rule 12(b)(4).  The government will notify the defense of any additional evidence of the same kind which becomes available to it prior to trial.

**P.  GOVERNMENT'S REQUEST FOR RECIPROCAL DISCOVERY**

The government hereby repeats its request that the defendant be ordered to produce any and all discovery to which the government

55

is entitled under Rules 16(b)(1)(A), 16(b)(1)(B) and 16(b)(1)(c)

of the Federal Rules of Criminal Procedure.[18]


    Dated:  Rochester, New York, March 22, 2007

                                  TERRANCE P. FLYNN
                                  United States Attorney


                      BY:  <u>S/RICHARD A. RESNICK</u>
                                  RICHARD A. RESNICK
                                  Assistant United States Attorney
                                  WILLIAM H. BOWNE, III
                                  Trial Attorney
                                  Department of Justice

---

[18] The government first requested reciprocal discovery from the defendants on September 18, 2006. <u>See</u> page 2 of <u>Exhibit 11</u>, a copy of the government's request.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

                                                        05-CR-6116

          v.

VIOLET GAIL ELDRIDGE, et. al

                    Defendants.
_____

### CERTIFICATE OF SERVICE


          I hereby certify that on March 22, 2007, I electronically

filed the foregoing with the clerk of the District Court using

the CM/ECF system, which would then electronically notify the

following CM/ECF participants:


          1.    Christopher S. Ciaccio, Esq.

          2.    Mark D. Hosken, Esq.

          3.    James P. Vacca, Esq.

          4.    Maurice J. Verrillo, Esq.


          I hereby certify that I have mailed the foregoing to the

following non-CM/ECF participants:


          1.    Christopher Ciaccio, Esq.
                30 West Broad Street
                Suite 400
                Rochester, New York 14614

2.  Mark D. Hosken, Esq.
    Federal Public Defender
    28 East Main Street
    Suite 400
    Rochester, NY 14614

3.  James P. Vacca, Esq.
    One East Main Street
    Rochester, NY 14614

4.  Maurice J. Verrillo, Esq.
    Law Office of Maurice J. Verrillo
    One East Main Street
    Suite 711
    Rochester, NY 14614

S/ANNA M. SEDOR
ANNA M. SEDOR

## **EXHIBIT LIST**

1.   STATUTE OF LIMITATION SUSPENSION ORDER

2.   MLAT FINAL ACTION LETTER

3.   ELDRIDGE DISMISSAL ORDER (S.D.IN.)

4.   SEC FORM 1662

5.   DEFENDANT MONTANA 404(b) DISCLOSURE DATED AUGUST 17, 2006

6.   DEFENDANT MONTANA 404(b) DISCLOSURE DATED AUGUST 18, 2006

7.   BRADY DISCLOSURE DATED OCTOBER 2, 2006

8.   BRADY DISCLOSURE DATED OCTOBER 26, 2006

9.   BRADY DISCLOSURE DATED NOVEMBER 27, 2006

10.  PRIOR TESTIMONY OF LEONARD A. ZAWISTOWSKI

11.  GOVERNMENT'S RECIPROCAL DISCOVERY REQUEST