**Exhibit A**

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

03 OCT 14 PM 4: 10

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN L. MONTANA, JR.,<br>MELVIN R. LYTTLE ,<br>PAUL E. KNIGHT,<br>VIOLET GAIL ELDRIDGE,<br>WORLDWIDE T&P, INC.<br>FIRST NATIONAL EQUITY, LLC,<br>P.K. TRUST & HOLDING, INC., and<br>UTA-BVI, LTD.,<br><br>Defendants,<br><br>and<br><br>THE UNITED TRIBES OF THE<br>AMERICAS, INC. and<br>EXECUTIVE BUREAU OF RESEARCH AND<br>RECOVERY, INC.,<br><br>Relief Defendants. | : : : : : : : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION<br>FILE NO.<br><br># 1:03-CV- 1513 SEB - VSS |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission

("Commission"), alleges as follows:

### Summary

1.  This case involves the fraudulent sale of approximately $30 million in

investment contract securities to approximately 29 investors in several states.  From

August 1999 until April 2000, Defendants John L. Montana, Jr. ("Montana"), Melvin R.

Lyttle ("Lyttle"), and Paul E. Knight ("Knight") sold interests in a bank trading program

which purported to invest money in the trading of various instruments including medium term notes (hereinafter referred to as the "Trading Program"). Montana, Lyttle and Knight raised funds for the Trading Program through the entities that they controlled: Lyttle's First National Equity, LLC ("First National Equity"), Knight's P.K. Trust & Holding, Inc. ("P.K. Trust") and Montana's Worldwide T&P, Inc. ("Worldwide T&P").

2. Montana, Lyttle and Knight told investors that they could earn significant returns, risk-free in the Trading Program. In reality, the Trading Program did not exist. Lyttle misappropriated at least $6 million of investor funds for his personal use, rather than invest it in the supposed Trading Program. The remaining investor funds, totaling approximately $24 million, were transferred to Defendant UTA-BVI, Ltd ("UTA-BVI") which used the funds to engage in highly leveraged and unprofitable stock trading. Defendant Violet Gail Eldridge ("Eldridge"), the president of UTA-BVI, controlled the brokerage accounts used for the stock trading.

3. In the offer and sale of the investments in the Trading Program, Montana, Lyttle and Knight defrauded investors because they knowingly or recklessly made misrepresentations and omissions of material fact regarding the investment's rate of return, the safety of the investment and the use of investor funds.

4. Eldridge and UTA-BVI, in turn, defrauded First National Equity and P.K. Trust. Pursuant to "trust management agreements," UTA-BVI agreed to serve as trustee for a trust that consisted of the $24 million in investor funds transferred to UTA-BVI by First National Equity and P.K. Trust and identified First National Equity and P.K. Trust as beneficiaries of the trust. However, instead of managing the funds for the benefit of First National Equity and P.K. Trust, UTA-BVI used the trust funds to pay Eldridge's

personal expenses and also transferred funds to several bank accounts including ones she controlled in the name of the Relief Defendants, The United Tribes of the Americas, Inc. ("United Tribes") and Executive Bureau of Research and Recovery, Inc. ("Executive Bureau"). Eldridge never disclosed to First National Equity and P.K. Trust that UTA-BVI would use the trust funds in this manner. United Tribes and Executive Bureau had no right to receive the ill-gotten gains transferred to them by UTA-BVI.

5.   Defendants, directly and indirectly, have engaged and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business of the sort which constitute the violations of the federal securities laws set forth in this Complaint.

### Jurisdiction and Venue

6.   The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78aa] and Sections 209(d), 209(e)(1) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) and 80b-14].  Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 214 of the Advisers Act [15 U.S.C. §§ 80b-14].

7.   The acts, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Southern District of Indiana and elsewhere.

8.   Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the transactions, acts, practices, and courses of business alleged herein in the Southern District of Indiana and elsewhere.

## Defendants

9. <u>John L. Montana, Jr.</u>, age 51, is a resident of Staten Island, New York. Montana is chief executive officer of Worldwide T&P, Inc.

10. <u>Melvin R. Lyttle</u>, age 52, is a resident of Aurora, Indiana. Lyttle is chief executive officer of First National Equity, LLC.

11. <u>Paul E. Knight</u>, age 55, is a resident of Kodak, Tennessee. Knight is president and chief executive officer of P.K. Trust & Holding, Inc.

12. <u>Violet Gail Eldridge</u>, age 59, is a resident of Woodstock, Georgia and New York, New York. Eldridge is president of UTA-BVI, Ltd, The United Tribes of the Americas, Inc. and Executive Bureau of Research and Recovery, Inc.

13. <u>Worldwide T&P, Inc.</u>, is a New York corporation formed in 1997 and is located in Staten Island, New York. Worldwide T&P purports to serve as an intermediary for import-exporters.

14. <u>First National Equity, LLC</u>, is an Indiana corporation formed in 1993 and is located in Aurora, Indiana. According to its letterhead, First National Equity is a company of international investment advisors.

15. <u>P.K. Trust, Inc.</u>, is a Tennessee corporation formed in 1996 and is located in Kodak, Tennessee. P.K. Trust was formed to facilitate the execution of "prime bank" transactions. Knight is the owner, chief executive officer and only employee of P.K. Trust.

16. <u>UTA-BVI, Ltd.</u>, is a British Virgin Islands corporation formed in 1997 and headquartered in New York, New York. UTA-BVI was organized purportedly to facilitate the establishment of a central bank for Native American tribes.

## Relief Defendants

17. The United Tribes of the Americas, Inc., is a 501(c)(3) not-for-profit Delaware corporation incorporated in 1995. United Tribes was purportedly organized to facilitate the establishment of a central bank for Native American tribes.

18. Executive Bureau of Research and Recovery, Inc., is a corporation headquartered in Marietta, Georgia. According to Eldridge, Executive Bureau performed research to facilitate UTA-BVI's efforts to establish a central bank for Native American tribes.

## The Scheme by Montana, Lyttle and Knight to Defraud Investors

19. This fraudulent scheme operated in two phases. In the first phase of the scheme, from in or about August 1999 through in or about December 1999, Montana solicited investments totaling approximately $22 million from 21 investors in several states including New York, New Jersey, North Carolina, Texas, Idaho, Alabama and Ohio.

20. Montana told investors that he would direct their funds into the Trading Program run by Lyttle, through which investors earned returns of 25% per week, risk-free. Montana told investors that their funds would be invested in bank instruments including medium term notes.

21. Montana, on behalf of Worldwide T&P, and each investor signed a "Joint Venture Agreement" ("Montana Agreement"). According to the Montana Agreement, investors and Worldwide T&P split equally the returns generated by investments in the Trading Program. After entering into the Montana Agreement, Montana directed investors to wire funds into First National Equity bank accounts controlled by Lyttle.

22. Thereafter, Lyttle, on behalf of First National Equity, and each investor signed an "Exclusive Asset Management Agreement" ("Lyttle Agreement"). According to the Lyttle Agreement, First National Equity sold to investors interests in a $100 million Trading Program for which Lyttle, as the "funds manager," was charged with obtaining a return on investor funds. The Lyttle Agreement stated that the Trading Program generated net returns of more than 11% per trade, with hundreds of trades occurring in a year. Investors were to share in the profits made from the trades done through the Trading Program. The Lyttle Agreement also stated that First National Equity kept investor funds safe in a segregated account that prevented anyone but the investor from removing the funds.

23. From August 1999 to December 1999, 21 investors wired approximately $22 million directly to First National Equity bank accounts controlled by Lyttle.

24. Knight assisted Lyttle during this phase of the scheme by reviewing documents submitted by the investors and purportedly performing "background checks" on each investor.

25. The second phase of the scheme, which lasted from in or about October 1999 through in or about March 2000, was operated by Knight. Knight offered and sold approximately $8 million of investments in the Trading Program to eight investors from several states including Michigan, Oklahoma, Florida, North Carolina and Oregon.

26. Knight, on behalf of P.K. Trust, and each investor signed a "Private Placement Agreement" ("Knight Agreement"). Knight also executed Knight Agreements with each of the investors who had previously entered into a Lyttle Agreement because Lyttle was purportedly too ill to continue to invest their funds. According to the Knight

Agreement, P.K. Trust sold interests in a Trading Program for which Knight, as "Asset Manager," was charged with generating returns on investor funds. The Knight Agreement provided that he would use his "special knowledge" and the "capacity and skill" to direct investor funds into a high-yield, risk-free bank Trading Program and that investors would split returns equally with P.K. Trust. Investors were to share in the profits made from the trading done through the Trading Program. Knight also told investors that they could earn substantial returns on their investment and that their funds were not placed at risk because they would be secured through T-Bills and insured at 196% of the principal investment.

27. In connection with the investment contract securities offered by Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust, no registration has ever been in effect and no registration statement has ever been filed with the Commission. Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust are not entitled to any registration exemption with respect to the offering of these securities.

28. At all relevant times, Montana, Knight and Worldwide T&P were not registered with the Commission as a broker-dealer, nor were any of them associated with a registered broker-dealer.

### Use of Investor Funds

29. The two phases of this scheme were united through the use of investor funds. Most of the investor funds solicited by Montana, Lyttle and Knight ended up at brokerage accounts in the name of UTA-BVI and controlled by Eldridge.

30. Of the $22 million of investor funds raised by Lyttle and Montana, Lyttle transferred approximately $16 million to UTA-BVI's brokerage accounts.

31. Additionally, at Paul Knight's direction, from October 1999 to April 2000 eight investors transferred to UTA-BVI's brokerage accounts approximately $8 million that they invested with P. K. Trust.

32. UTA-BVI obtained the $24 million of investor funds under the guise of "trust management agreements" which UTA-BVI, through Eldridge, executed with First National Equity and P.K. Trust in or about August 1999.  These agreements provided that UTA-BVI, as trustee, would manage the trust funds that it had received for the benefit of the beneficiaries, First National Equity and P.K. Trust.  According to the "trust management agreements," the trust funds were owned by First National Equity and P.K. Trust and not by any of the investors. These agreements did not provide for how the trust funds would be invested, for a return on investor funds, for the security of investor funds or for any of the assurances that Montana, Lyttle and Knight had given to investors. UTA-BVI did not segregate investor funds nor did it obtain any security for the account funds.  Neither Lyttle, First National Equity, Knight nor P.K. Trust exercised any control over the investor funds after they were transferred to UTA-BVI.

33. UTA-BVI used the funds to engage in highly leveraged stock trading which resulted in a total loss of at least $3 million.  UTA-BVI returned about half of the funds to some of the 29 individual investors.  In addition, Eldridge transferred at least $700,000 in investor funds to bank accounts that she controlled in the name of the Relief Defendants, United Tribes and Executive Bureau of Research, and also used funds to pay her personal expenses.  During all relevant times, Eldridge was the signatory on the UTA-BVI brokerage accounts.

34. In addition, approximately $6 million of the investors' funds solicited by Montana and Lyttle was misappropriated by Lyttle. Lyttle used the misappropriated investor funds to, among other things, purchase real estate for himself and his family, invest in a failed industrial concern and transfer funds to Knight.

35. None of the investors' funds were invested in a Trading Program as Montana, Lyttle and Knight had represented to investors. The Trading Program as described to investors was a type of "prime bank" investment scheme. "Prime bank" schemes are premised on the fiction that investors can share in extraordinary profits generated by trading programs run by large banks. Regulatory warnings abound that such programs do not exist – including warnings issued by the U.S. Securities and Exchange Commission and the U.S. Treasury Department.

## Montana, Lyttle and Knight Made Fraudulent Statements to Investors About the Trading Program

**Montana**

36. Montana made misrepresentations and omissions of material fact to investors regarding the Trading Program including the investment's rate of return, the safety of the investment and the use of the investors' funds. Montana told investors that their funds would earn 25% per week because they would be invested in a Trading Program and used to buy and sell various bank instruments such as medium term notes. This was false. The investors' funds were not invested in the Trading Program that Montana described to investors because no such program existed.

37. Montana also told investors that their funds would be safe because they would be secured by T-Bills and because they would remain untouched in an account held in the investor's name. This was false because investor funds were not protected

from loss but instead were put at risk by purchasing stocks on margin, were not held in segregated accounts for the benefit of each investor and were removed from the account without investor consent.

38.   Montana knew or was reckless in not knowing that his representations to investors regarding the Trading Program were false and misleading because, among other things, he did not conduct due diligence to verify the truth of what he told investors, including whether investor funds would be safe.  In addition, Montana continued to solicit investors even though he had no idea how investor funds were being used and believed that Lyttle was not providing him with sufficient information regarding the terms of the Trading Program.

**Lyttle**

39. Lyttle made misrepresentations and omissions of material fact to investors regarding the Trading Program including the investment's rate of return, the safety of the investment and the use of the investors' funds.  The Lyttle Agreement represented to investors that their funds would be used in a Trading Program to profitably trade various instruments and that each trade would result in a net profit to the investor of 11.875%. Additionally, according to the Lyttle Agreement, investor proceeds would be in a segregated account and held in a "non-depletion Trust to prevent any loss or removal of Client funds by anyone except the Client."  Lyttle also assured investors that their funds were secured by U.S. Government T-Bills.

40. These statements were false.  The Trading Program that Lyttle described to investors did not exist.  Further, Lyttle misappropriated some of the investors' funds rather than direct them into a supposed Trading Program.  Investor funds also were not

secured by collateral as represented but, instead, were put at risk through UTA-BVI's highly leveraged and unprofitable stock trading.

41. Lyttle knew or was reckless in not knowing that, among other things, his representations regarding the Trading Program were false and misleading because he misappropriated about $6 million of investor funds for his personal use, using the funds to, among other things, buy real estate for himself and his family. Additionally, he transferred the remaining investor funds to a UTA-BVI securities account over which neither he nor First National Equity had any control and allowed UTA-BVI to manage investor funds pursuant to "trust management agreements" which did not provide for how the funds would be invested, what rate of return investors would earn or the safety of the investment. Even after learning that investor funds were being used to trade stocks in leveraged brokerage accounts, Lyttle continued to execute Lyttle Agreements with new investors and make the same false representations he made to previous investors.

**Knight**

42. Knight made misrepresentations and omissions of material fact to investors regarding the Trading Program including the investment's rate of return, the safety of the investment and the use of the investors' funds. The Knight Agreement stated that investor funds would be invested in the Trading Program and earn high returns. Additionally, Knight orally told several investors that they would earn substantial returns on their investment and told at least one investor that he would earn a 100% annual return or more. The Knight Agreement also provided that investor funds would not be at risk because they would be secured through U.S. Government T-Bills and insured at 196% of the principal investment. Moreover, to persuade investors that they

would obtain excellent returns in the Trading Program, the Knight Agreement stated that Knight had the "special knowledge" and "capacity and skill" necessary to successfully complete the transaction set out in the Knight Agreement and had "set up and operate[d] with top 24 West European Banks."

43. Knight's statements were false because the Trading Program described in the Knight Agreement did not exist, the investors' funds were at risk because they were used by UTA-BVI to engage in leveraged, unprofitable stock trading and were removed from the account without investor consent and Knight did not have any "special knowledge" or "capacity and skill" to earn returns for investors.

44. Knight knew or was reckless in not knowing that his representations about the Trading Program were false and misleading because, among other things, he directed investors to transfer funds to a UTA-BVI securities account over which neither he nor P.K. Trust had any control and allowed UTA-BVI to manage these funds pursuant to "trust management agreements" which did not provide for how the funds would be invested, whether the funds would be safe or whether investors would earn any profits.

45. Knight continually assured investors, after their initial investment, that their funds either were really being traded in the Trading Program or would soon be traded in the Trading Program, that their funds were safe and that any delay in trading investor funds was caused by "the Feds." Knight knew or was reckless in not knowing that these representations were false and misleading because he had notice of significant problems with UTA-BVI's use of investor proceeds at the time he made these statements to investors. Among other things, Knight was told that approximately $9 million was

"missing" from the Trading Program.  Nevertheless, Knight continually told investors

after they had invested that their funds had earned returns and were safe.

### The Scheme by Eldridge and UTA-BVI to Defraud
### First National Equity and P.K. Trust

46. Eldridge and UTA-BVI engaged in a fraud within a fraud.  As discussed

above, Eldridge, the president of UTA-BVI, executed "trust management agreements"

with First National Equity and P.K. Trust.  Under the "trust management agreements,"

the trustee, UTA-BVI, obtained $24 million of trust funds from the beneficiaries, First

National Equity and P.K. Trust.  According to the "trust management agreements," the

trust funds were owned by First National Equity and P.K. Trust and not by the investors

who had provided the funds to First National Equity and P.K. Trust for investment.

47. As with any trust arrangement, UTA-BVI, as trustee, was charged with

managing the trust assets for the benefit of First National Equity and P.K. Trust, the

beneficiaries.  The "trust management agreements" provided that UTA-BVI was to either

hold uninvested trust property or invest trust property "…in any manner deemed in the

best interest of the [t]rust…"  Under the terms of the "trust management agreements,"

UTA-BVI was to receive "compensation for services rendered" plus a 0.50%

participation fee in the profits generated from the trust property.

48. UTA-BVI used its discretionary authority granted by the "trust

management agreements" to distribute the $24 million in trust funds among several UTA-

BVI brokerage accounts controlled by Eldridge and to give sole trading authority to a

broker who used the funds to engage in highly leveraged stock trading in margin

accounts.

13

49. However, instead of managing the funds for the benefit of First National Equity and P.K. Trust, UTA-BVI managed the funds for its own benefit and for the benefit of Eldridge and various entities with which she was affiliated. Among other things, Eldridge transferred at least $700,000 of trust funds to bank accounts that she controlled in the name of the Relief Defendants, United Tribes and Executive Bureau, and also used funds to pay her personal expenses. She did so without ever disclosing to First National Equity and P.K. Trust that UTA-BVI would use the trust funds in such a manner.

50. Eldridge knowingly provided substantial assistance to UTA-BVI's fraud against First National Equity and P.K. Trust by, among other things, executing the "trust management agreements" with First National Equity and P.K. Trust, controlling the UTA-BVI brokerage accounts into which the trust funds were deposited and using trust funds for her own personal use.

### COUNT I
### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. § 77e(a) and 77e(c)]

### [Against Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust]

51. Paragraphs 1 through 50 are realleged and incorporated by reference herein.

52. At the times alleged in this Complaint, Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust, directly and indirectly, made use of the means and instruments of transportation and communication in interstate commerce and of the mails to offer and sell, through the use or medium of a prospectus or otherwise, securities, including the investment contracts described above, and carried

14

such securities and caused them to be carried through the mails and interstate commerce

by the means and instruments of transportation for the purpose of sale and delivery after

sale.

53. No registration as to the securities described in Paragraph 52 above is in

effect nor has any registration statement been filed with the Commission.

54. By reason of the activities described in Paragraphs 51 through 53 above,

Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K.

Trust have violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of

the Securities Act [15 U.S.C. § 77e(a) and 77e(c)].

**COUNT II**
**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**

**[Against Defendants Montana, Lyttle, Knight, Worldwide T&P,**
**First National Equity and P.K. Trust]**

55. Paragraphs 1 through 50 are realleged and incorporated by reference

herein.

56. At the times alleged in this Complaint, Defendants Montana, Lyttle,

Knight, Worldwide T&P, First National Equity and P.K. Trust, in the offer and sale of

securities, including the investment contracts described above, by the use of the means

and instruments of transportation and communication in interstate commerce and by the

use of the mails, directly and indirectly, have employed devices, schemes and artifices to

defraud.

57. In the offer and sale of securities described above in Paragraph 56, and as

part of the scheme to defraud, Defendants Montana, Lyttle, Knight, Worldwide T&P,

First National Equity and P.K. Trust made false and misleading statements of material

15

fact and omitted to state material facts to investors and prospective investors regarding,

among other things:  the investment's rate of return, the safety of the investment and the

use of investor funds, all as more fully described above in Paragraphs 1 through 50

above.

58. Defendants knew or were reckless in not knowing of the facts and

circumstances described in Paragraphs 1 through 50 and 57 above.

59. By reason of the activities described in Paragraphs 1 through 50 and 58

above, Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and

P.K. Trust have violated, and unless enjoined, will continue to violate Section 17(a)(1) of

the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT III**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. § 77q(a)(2) and 77q(a)(3)]**

**[Against Defendants Montana, Lyttle, Knight, Worldwide T&P,**
**First National Equity and P.K. Trust]**

60. Paragraphs 1 through 50 are realleged and incorporated by reference

herein.

61. At the times alleged in this Complaint, Defendants Montana, Lyttle,

Knight, Worldwide T&P, First National Equity and P.K. Trust, in the offer and sale of

securities described above in Paragraphs 1 through 50, by the use of the means or

instruments of transportation and communication in interstate commerce and by the use

of the mails, directly and indirectly, have obtained money and property by means of

untrue statements of material facts and have omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were

made, not misleading; and have engaged in transactions, practices or courses of business

which operated and will operate as a fraud and deceit upon purchasers and prospective

purchasers, all as more fully described in Paragraphs 1 through 50 above.

62. By reason of the activities described in Paragraphs 1 through 50 and 60

above, Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and

P.K. Trust have violated, and unless enjoined, will continue to violate Sections 17(a)(2)

and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act**
**[15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] Promulgated Thereunder**

**[Against Defendants Montana, Lyttle, Knight, Worldwide T&P,**
**First National Equity and P.K. Trust]**

63. Paragraphs 1 through 50 are realleged and incorporated by reference as if

set forth fully herein.

64. At the times alleged in the Complaint, Defendants Montana, Lyttle,

Knight, Worldwide T&P, First National Equity and P.K. Trust, in connection with the

purchase and sale of securities described above in Paragraphs 1 through 50, by the use of

the means and instrumentalities of interstate commerce and of the mails, directly and

indirectly, have employed devices, schemes and artifices to defraud; have made untrue

statements of material fact and have omitted to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading; and have engaged in acts, practices and courses of business which have

operated and will operate as a fraud and deceit upon purchasers and sellers of such

securities, all as more fully described in Paragraphs 1 through 50 above.

65. Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust knew or were reckless in not knowing of the activities described in Paragraphs 1 through 50 and 64 above.

66. By reason of the activities described in Paragraphs 1 through 50 and 65 above, Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and P.K. Trust violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## COUNT V
### Violations of Section 15(a)(1) of the Exchange Act
### [15 U.S.C. § 78o(a)(1)]

### [Against Defendants Montana, Knight and Worldwide T&P]

67. Paragraphs 1 through 50 are realleged and incorporated by reference herein.

68. At the times alleged in this Complaint, Defendants Montana, Knight and Worldwide T&P have made and are in the business of effecting transactions in securities for the accounts of others, as more fully described in Paragraphs 1 through 50 above.

69. Defendants Montana, Knight and Worldwide T&P have made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in and to induce or attempt to induce the purchase of securities, as more fully described in Paragraphs 1 through 50 and 68 above.

70. At all times alleged in this Complaint, Defendants Montana, Knight and Worldwide T&P were not registered with the Commission as a broker-dealer, as required by Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

71. By reason of the activities described in Paragraph 67 above, Defendants Montana, Knight and Worldwide T&P have violated, and unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

### COUNT VI
### Violations of Section 15(c)(1) of the Exchange Act
### [15 U.S.C. § 78o(c)]

### [Against Defendants Montana, Knight and Worldwide T&P]

72. Paragraphs 1 through 50 are realleged and incorporated by reference herein.

73. At all times alleged in this Complaint, Defendants Knight, Montana and Worldwide T&P were not registered with the Commission as a broker or dealer although, as alleged above, they were required to be so registered.

74. At all times alleged in the Complaint, Defendants Knight, Montana and Worldwide T&P, acting as brokers, have made use of the mails and instrumentalities of interstate commerce, and have induced the purchase and sale of securities, otherwise than on a national securities exchange of which they were members, by means of manipulative, deceptive and fraudulent devices and contrivances, all as more fully described in Paragraphs 1 through 50 above.

75. Defendants Knight, Montana and Worldwide T&P knew or had reasonable grounds to believe that their statements and omissions described above were untrue or misleading.

76. By reason of the activities described in Paragraph 72 above, Defendants Knight, Montana and Worldwide T&P have violated, and unless enjoined, will continue to violate Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)(1)].

## COUNT VII
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(1) and § 80b-6(2)]

### [Against Defendant UTA-BVI]

77. Paragraphs 1 through 50 are realleged and incorporated by reference herein.

78. At all times alleged in this Complaint, Defendant UTA-BVI, directly and indirectly, engaged for compensation, in the business of advising clients as to the advisability of investing in, purchasing or selling securities. As a result, Defendant acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act. [15 U.S.C. §§ 80b-2(a)(11)].

79. At all times alleged in this Complaint, Defendant UTA-BVI, while acting as an investment adviser, by use of the mails, and the means and instrumentality of interstate commerce, directly or indirectly, knowingly, willfully or recklessly: (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients, all as more fully described in Paragraphs 1 through 50 above.

80. By reason of the foregoing, Defendant UTA-BVI, has violated, and unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## COUNT VIII
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(1) and § 80b-6(2)]

### [Against Defendant Eldridge]

81. Paragraphs 1 through 50 are realleged and incorporated by reference herein.

82. Defendant UTA-BVI violated Sections 206(1) and (2) of the Advisers Act as alleged in Count VII and as described in Paragraphs 1 through 50 and 77 through 80 above.

83. Defendant Eldridge knowingly provided substantial assistance to UTA-BVI in the activities alleged in Paragraphs 1 through 50 and 77 through 80 above and thereby aided and abetted UTA-BVI's violations of Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### II.

Issue an Order of Permanent Injunction, in a form consistent with Fed. R. Civ. P. 65(d), permanently restraining and enjoining Montana, Knight and Worldwide T&P and their officers, agents, servants, employees and attorneys, and those persons in active concert or

**Exhibit A**

participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act and Sections 10(b), 15(a) and 15(c)(1) of the Exchange Act and Rule 10b-5 thereunder.

## III.

Issue an Order of Permanent Injunction, in a form consistent with Fed. R. Civ. P. 65(d), permanently restraining and enjoining Lyttle, First National Equity and P.K. Trust and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## IV.

Issue an Order of Permanent Injunction, in a form consistent with Fed. R. Civ. P. 65(d), permanently restraining and enjoining UTA-BVI and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violations of Sections 206(1) and 206(2) of the Advisers Act.

**Exhibit A**

## V.

Issue an Order of Permanent Injunction, in a form consistent with Fed. R. Civ. P. 65(d),

permanently restraining and enjoining Eldridge and her officers, agents, servants,

employees and attorneys, and those persons in active concert or participation with any of

them, who receive actual notice of the order by personal service or otherwise, and each of

them, from aiding and abetting violations of Sections 206(1) and 206(2) of the Exchange

Act.

## VI.

Order Defendants Lyttle, Knight, Eldridge, First National Equity, P.K. Trust, UTA-BVI

and Relief Defendants United Tribes and Executive Bureau to disgorge all ill-gotten

gains that they have received as a result of the acts complained of herein, with

prejudgment interest thereon.

## VII.

Order Defendants Montana, Lyttle, Knight, Worldwide T&P, First National Equity and

P.K. Trust to pay civil money penalties under Section 20(d) of the Securities Act, 15

U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Order Defendants UTA-BVI and Eldridge to pay civil money penalties under Section

209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

**Exhibit A**

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered, or to entertain any suitable application or motion

for additional relief within the jurisdiction of this Court.

DATED: October 10 __ , 2003

Respectfully submitted,

Steven L. Klawans
John J. Sikora, Jr.
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 West Jackson Boulevard
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398