# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____
                                        :
**UNITED STATES SECURITIES**            :
**AND EXCHANGE COMMISSION,**            :
                                        :
     **Plaintiff**       :
                                        :
                                        :    **Case Number**:
                                        :    **05-CV-0735-CC**
**VIOLET GAIL ELDRIDGE, and**           :    **Judge Clarence Cooper**
**UTA-BVI, LTD.,**                      :
                                        :
     **Defendants,**     :
    **and**                  :
                                        :
**THE UNITED TRIBES OF THE**            :
**AMERICAS, INC. and**                  :
**EXECUTIVE BUREAU OF RESEARCH AND**    :
**RECOVERY, INC.,**                     :
                                        :
     **Relief Defendants.**  :
_____ :

## MOTION TO STAY EVIDENTIARY HEARING

    Defendants Violet Gail Eldridge and UTA-BVI, Ltd., and Relief

Defendants United Tribes of the Americas, Inc., and Executive Bureau of

Research and Recovery, ("Defendants") respectfully request the Court exercise

its discretion and stay the evidentiary hearing scheduled for Monday, August

13, 2007.  The Defendants are in need of access to records being subpoenaed

under seal in the companion criminal case.  Further time will be needed to

process these subpoenas and to request court permission to use these records in this civil case. For example, copies of settlement agreements have been demanded which will show that two brokerage have disgorged funds to third parties related to UTA-BVI, and these funds should reduce the amounts which the Securities and Exchange Commission seeks to have Defendants disgorge. A Banc of America Securities settlement agreement was mediated in September 2006 pursuant to *Banc of America Securities LLC v. Stott*, case no. 04-81086, USDC Southern District of Florida. (Exhibit A). Copies of any and all such agreements have been demanded from the two brokerage houses involved in this matter pursuant to *USA v. Eldridge,* case no. 6:05-cr-06116-CJS, USDC Western District of New York. Additional information is being subpoenaed which will also have bearing on this hearing and this case. All such subpoenas are currently under seal and are described as "sealed documents" in the court records. (Exhibit B). None of the information being demanded will be available for either Defendants or Plaintiff to use until after the hearing scheduled for August 13, 2007.

It is requested that the evidentiary hearing be stayed until the completion of the *USA v. Eldridge* trial scheduled for October 15, 2007. (Exhibit C). This short delay will also allow Eldridge to testify at the evidentiary hearing without having the disadvantage of asserting her fifth amendment rights and therefore

all relevant evidence can be presented to this Court to determine disgorgement, prejudgment interest and civil penalties, so that interests of justice can be served.

## II. Legal Support

Stay of the evidentiary hearing is appropriate to safeguard Defendant Eldridge's Fifth Amendment protection and to allow all relevant evidence to be presented before the Court. Concurrent governmental involvement in both the civil and criminal proceedings supports a stay. Allowing the government to use civil proceedings to obtain evidence or to reveal defenses unobtainable in a criminal case allows the government to compromise the Fifth Amendment and to compromise the ability of Defendants to present all evidence in the civil case. A stay is most appropriate when the government is prosecuting both the civil and criminal actions. *United States v. Private Sanitation Industry Assn.*, 811 F. Supp. 802, 806 (E.D.N.Y. 1992).

Eldridge may technically be able to invoke the Fifth Amendment and decline to provide information in the present case, but may do so only at great cost to herself as relevant evidence supporting her position and the position of the other Defendants would not be introduced. Additionally, in a civil case, it may be permitted to draw adverse inferences from the invocation of the Fifth Amendment. *Baxter v. Palmigiano*, 425 U.S. 308, 316-20 (1976). Such an inference

would not be permissible in a criminal case. *Griffen v. California*, 380 U.S. 609 (1965). "The noncriminal proceeding ... might undermine the party's fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Fed. R. Crim. P. 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case. *SEC v. Dresser Indus., Inc.* 628 F.3d 1368,1376 (D.C. Cir. 1980).

To proceed with the evidentiary hearing prior to the resolution of the criminal proceeding creates an extraordinary potential that the government will obtain an unfair advantage in the prosecution of the criminal case, while inhibiting Defendants in their defense of the civil case. Further, as additional relevant evidence is continually being uncovered in the discovery process of the criminal matter, staying the hearing until after the criminal matter is complete will give all parties the opportunity to include any additional relevant evidence and thereby guarantee that the Court is presented with the best possible information upon which to make an informed decision.

Balancing of interests supports a stay of the evidentiary hearing pending a ruling in the criminal case. The stay of civil proceedings are factually intensive matters that are within the discretion of this court. *United States v. Kordel*, 397 U.S. 1, 12 (1970). In this instance, the delay of the hearing does not cause any

damages to Plaintiff.  Defendants, on the other hand, have much to lose and

nothing to gain by proceeding with the hearing, as described above.  All factors

weigh in support of staying the evidentiary hearing pending the availablitlity of

evidence being uncovered in the companion criminal case, and pending the

resolution of the criminal proceeding.

Respectfully submitted,

     Dated: July 29, 2007.

Respectfully submitted,

/s/ Katherine Crase

_____

Katherine Crase, Attorney at Law
Florida Bar No. 881510
Appearing Pro Hac Vice
2804 Aquilla Street
Tampa, Florida 33629
813.251.2684
fax 813.251.2688
kitcrase@cs.com

**Exhibit E**

<u>Certification of Service</u>

I hereby certify that on July 29, 2007, I electronically filed a copy of the foregoing MOTION TO STAY EVIDENTIARY HEARING with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> Jason A. Yonan
> Attorney for Plaintiff
> yonanj@sec.gov

/s/ Katherine Crase
_____
Katherine Crase, Attorney at Law
Florida Bar No. 881510
Appearing Pro Hac Vice
2804 Aquilla Street
Tampa, Florida 33629
email: kitcrase@cs.com
813.251.2684
fax 813.251.2688

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | **Case Number:** |
| **Plaintiff,** | : | **05-CV-0735-CC** |
| | : | |
| **v.** | : | **Judge Clarence Cooper** |
| | : | |
| **VIOLET GAIL ELDRIDGE and UTA-BVI, LTD.,** | : | |
| | : | |
| **Defendants,** | : | |
| **and** | : | |
| | : | |
| **THE UNITED TRIBES OF THE AMERICAS, INC. and EXECUTIVE BUREAU OF RESEARCH AND RECOVERY, INC.,** | : | |
| | : | |
| **Relief Defendants.** | : | |

## <u>RESPONSE IN OPPOSITION TO MOTION TO STAY EVIDENTIARY HEARING</u>

Plaintiff, the United States Securities and Exchange Commission ("Commission"), hereby respectfully files its response in opposition to the Defendants' and Relief Defendants' Motion to Stay Evidentiary Hearing [Docket #99]. In support, the Commission states as follows:

**Exhibit E**

On July 20, 2007, this Court granted the Commission's Motion for an Evidentiary Hearing on Disgorgement, Prejudgment Interest and Civil Penalties and scheduled a hearing to take place on Monday, August 13, 2007, at 9:30 a.m. [Docket #98].  Pending before the Court is the Defendants' and Relief Defendants' motion to stay the evidentiary hearing until resolution of a parallel criminal case against Defendant Violet Gail Eldridge ("Eldridge"), titled *United States* v. *Eldridge, et al.*, 6:05-cr-06116-CJS (W.D.N.Y.).  The Defendants and Relief Defendants present two central arguments in support of their motion to stay:  (1) they need access to additional documents which have been subpoenaed in the criminal case, and (2) a stay is appropriate to safeguard Eldridge's Fifth Amendment rights and to protect against the government obtaining an unfair advantage in the prosecution of the parallel criminal case.  Their motion comes after a previous evidentiary hearing scheduled for June 4, 2007, was postponed because the Defendants and Relief Defendants filed a premature appeal from the Court's Order granting the Commission's Motion for Summary Judgment.

With respect to the first argument, if the Defendants and Relief Defendants needed documents to support their defenses in this case, they should have subpoenaed such documents during discovery.  Discovery was open in this case

from January 26, 2006 until November 27, 2006, giving the Defendants and Relief

Defendants ten months to subpoena any and all relevant documents. The

Defendants and Relief Defendants did not subpoena any documents and did not

move to extend the discovery deadline to afford them more time to do so. The

evidentiary hearing should not be stayed and the resolution of this case delayed

because the Defendants and Relief Defendants did not actively pursue the

production of documents during discovery.

Furthermore, while the Defendants and Relief Defendants fail to identify

with any detail the documents they seek, they suggest that some of the documents

relate to settlements involving certain brokerage firms. The Defendants and Relief

Defendants argue, without citation to authority, that amounts paid by these

brokerage firms would reduce the amounts that the Defendants and Relief

Defendants should be ordered to disgorge. The Defendants' and Relief

Defendants' argument, however, confuses the concepts of damages and

disgorgement. "The purpose of disgorgement is not to compensate the victims of

the fraud, but to deprive the wrongdoer of his ill-gotten gain." *SEC* v. *Blatt*, 583

F.2d 1325, 1335 (5th Cir. 1978) (citation omitted). Since the purpose of

disgorgement is to deprive the Defendants and Relief Defendants of any ill-gotten

gains they received, it is irrelevant that victims of the fraud may have received

compensation from other sources. *See, e.g., SEC* v. *Cavanaugh*, 445 F.3d 105, 117

(2d Cir. 2006) ("[D]isgorgement has been used by the SEC and courts to prevent

wrongdoers from unjustly enriching themselves through violations, which has the

effect of deterring subsequent fraud.  A district court order of disgorgement forces

a defendant to account for all profits reaped through his securities law violations

and to transfer all such money to the court, even if it exceeds actual damages to

victims."); *SEC* v. *Abacus Int'l Holding Corp.*, No. C99-02191, 2001 WL 940913,

at *4 (N.D. Cal. Aug. 16, 2001) ("The amount of disgorgement should be

measured by the defendant's unjust enrichment or personal benefit, not by the

damages inflicted upon purchasers and sellers of the relevant securities.") (quoting

*SEC* v. *Penn Central Co.*, 450 F. Supp. 908, 916 (E.D. Pa. 1978)).

The Defendants' and Relief Defendants' second argument—that a stay is

appropriate to safeguard Eldridge's Fifth Amendment rights and to protect against

the government obtaining an unfair advantage in the prosecution of the parallel

criminal case—has been rejected by this Court twice.  *See* Docket #86, March 30,

2007 Order (denying motion to stay as moot); Docket #5, April 14, 2005 Order,

(denying motion for a protective order based on criminal investigation).  Indeed, a

stay makes little sense now because this action is nearly complete.  The only issue

left for resolution at the evidentiary hearing is the appropriate amount of

disgorgement and prejudgment interest against the Defendants and Relief

Defendants and the amount of a civil penalty against Eldridge.

The Defendants and Relief Defendants warn that if the evidentiary hearing

goes forward there is "extraordinary potential" that the government will obtain an

unfair advantage in the prosecution of the criminal case.  The Defendants and

Relief Defendants, however, fail to actually explain what this unfair advantage

would be.  They appear to assert that, through the evidentiary hearing, the

Defendants and Relief Defendants will be forced to disclose certain of their

defenses.   That argument is unavailing because the Defendants and Relief

Defendants can challenge the Commission's evidence at the evidentiary hearing

without divulging any defenses Eldridge may plan to raise in the criminal case.

The Commission will not call Eldridge to testify as a witness at the hearing and, as

a result, she will not be forced to choose between answering questions and

asserting her rights under the Fifth Amendment.  Moreover, the Defendants and

Relief Defendants fail to show why Eldridge's testimony is essential to the hearing

or why they are unable to present defenses based on the testimony of other

individuals or based on the documents that are already part of the record in this case.

Ironically, while the Defendants and Relief Defendants express concern that they may be forced to reveal their defenses if the evidentiary hearing goes forward, they nevertheless disclose in their brief at least one of Eldridge's defenses to the criminal charges. In their brief the Defendants and Relief Defendants divulge the content and purpose of subpoenas filed under seal in the criminal case. As noted above, these subpoenas, according to the Defendants and Relief Defendants, were for the production of documents by certain brokerage firms which purport to show settlements that the Defendants and Relief Defendants believe should offset their disgorgement liability. Clearly, if the Defendants and Relief Defendants had genuine concern about the government obtaining an "unfair advantage" by forcing Eldridge to reveal her defenses, they would not be disclosing in publicly filed documents the subject matter of subpoenas filed under seal in the criminal case. This argument is another weak attempt by the Defendants and Relief Defendants to delay the ultimate resolution of this matter.

**Exhibit E**

For all of the reasons stated above, the Commission respectfully requests that this Court deny the Defendants' and Relief Defendants' Motion to Stay Evidentiary Hearing [Docket #99].

Respectfully submitted,

/s/ Jason A. Yonan

_____

John E. Birkenheier
Georgia Bar No. 058158
e-mail: birkenheierj@sec.gov
Jason A. Yonan
Admitted *Pro Hac Vice*
e-mail: yonanj@sec.gov
ATTORNEYS FOR PLAINTIFF
THE UNITED STATES SECURITIES
AND EXCHANGE
COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Tel: (312) 886-3947 (Birkenheier)
      (312) 886-3812  (Yonan)
Fax: (312) 353-7398

Local Counsel,

/s/ William P. Hicks

_____

William P. Hicks
Georgia Bar No. 351649
U.S. Securities and Exchange Commission
3475 Lenox Road, N.E. Suite 1000

Atlanta, GA 30328
Tel: (404) 842-7675

Dated: August 3, 2007

# CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2007, I electronically filed a copy of the

foregoing Response in Opposition to Motion to Stay Evidentiary Hearing with the Clerk

of the Court using the CM/ECF system which will automatically send email notification

of such filing to the following attorney of record:

> Katherine Crase
> Attorney for Defendants
> UTA-BVI and Eldridge and
> Relief Defendants
> **kitcrase@cs.com**

/s/ Jason A. Yonan
_____

Jason A. Yonan,
Admitted Pro Hac Vice
Attorney for Plaintiff
U.S. Securities and Exchange
Commission

United States Securities and Exchange Commission
175 W. Jackson Blvd. Suite 900
Chicago, Illinois 60614
Tel. (312) 353-7390
Fax (312) 353-7398
**E-mail:** yonanj@sec.gov

Exhibit E

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____ :
                                       :

**UNITED STATES SECURITIES**      :
**AND EXCHANGE COMMISSION,**   :
                                         :

         **Plaintiff**                  :

                                         :    **Case Number**:
                                         :    **05-CV-0735-CC**
**VIOLET GAIL ELDRIDGE, and**    :    **Judge Clarence Cooper**
**UTA-BVI, LTD.,**                           :
                                         :

         **Defendants,**            :
      **and**                        :
                                         :

**THE UNITED TRIBES OF THE**    :
**AMERICAS, INC. and**              :
**EXECUTIVE BUREAU OF RESEARCH AND**   :
**RECOVERY, INC.,**              :
                                         :

         **Relief Defendants.**     :
_____ :

## <u>REPLY TO OPPOSITION TO STAY EVIDENTIARY HEARING</u>

Defendants Violet Gail Eldridge and UTA-BVI, Ltd., and Relief

Defendants United Tribes of the Americas, Inc., and Executive Bureau of

Research and Recovery, ("Defendants") hereby respectfully reply to the

Plaintiff's Response in Opposition to Motion to Stay Evidentiary Hearing.

Plaintiff clarifies in its response that the purpose for bringing this action

was not to return any funds to "victims" but to benefit itself by taking

- 1 -

possession of any "ill-gotten gains." This purpose is neither urgent nor likely, as

the corporate defendants do not exist, and Defendant Eldridge filed bankruptcy.

*In Re Eldridge*, Bankruptcy Court for Northern Georgia case no. 05-80129.

Plaintiff offers no argument that the requested stay would damage,

inconvenience or otherwise cause Plaintiff to suffer any slight disadvantage.

However, Plaintiff suggests that Defendants should reveal matters

currently under seal in the companion criminal matter, *USA v. Eldridge,* case no.

6:05-cr-06116-CJS, USDC Western District of New York, in order to justify a stay

of this evidentiary hearing.  To reveal these matters would be to allow the

Government to use this civil action to benefit itself in ways other than

determining the amount of uncollectible "ill-gotten gains."  A possible

explanation for Plaintiff bringing this case, and its effort to rush this evidentiary

hearing, is that it is an attempt by the Government to thwart the constitutional

and court ordered protections in the criminal matter.

Many facts are being uncovered in the extensive discovery in the

companion criminal case that were not disclosed by Plaintiff.  Included in this

information are indications of cooperation and combined effort between the

Plaintiff SEC, US Department of Justice, and FBI in conducting sting operations,

including directing actions of the alleged victims in this case in an effort to

entrap Defendant Eldridge.  Exhibits 1 through 9 contain 2 affidavits and two

letters and attachments sent to the FBI from a "confidential informant" who was

under indictment at the time and was working on behalf of the FBI to target

Eldridge.   All of this information was provided to the SEC, who failed to notify

counsel for Defendants of this additional evidence.   The second affidavit from

the "confidential informant" was received by the SEC who forwarded it to the

FBI.  It was not any part of any public filing and therefore its existence was

unknown to Defendants until such time as delivered by prosecution to

Eldridge's defense counsel in the criminal case.

Exhibit 1, page 4, item 30 shows the confidential informant, presumably at

the bequest of the government as he was "volunteering" for the Intelligence

Community at that time (Exhibit 2), instructed the "victims" to cease activity

with UTA-BVI and Eldridge, and to make no attempt to have funds distributed

from the trust.  During the time of his activity as a confidential informant, Mr.

Bevre was under indictment, and prior to the indictment, was under

investigation.  *USA v. Bevre*, 1:99-cr-00055-MP.  It appears from his affidavits

that Mr. Bevre's role as a confidential informant targeting Eldridge began as far

back as 1997, and prior to Eldridge having made any acquaintance with the

"victims".  Bevre was apparently assigned to detect any criminal activity of

Eldridge, and even hired an attorney who was also representing Eldridge to continue to monitor her for illegal activities.  Exhibit 8 shows this clause included in Bevre's retaining the legal services of Joseph D'Erasmo.  Exhibit 9, also an exhibit to Bevre's affidavits, shows D'Erasmo performing legal services on behalf of Eldridge nine days prior to agreeing to act as a confidential informant for Bevre.

Exhibits 4, 6 and 7 contain affidavits of the 'victims' of this case, such affidavits being secured by the 'confidential informant' and delivered to the FBI. Exhibit 6, page 9, contains the statement that Lyttle had been trying for some time prior to the affidavit to find something criminal in Eldridge's activities.  This indicates that he was following someone's instructions rather than behaving as a Grantor or Beneficiary of a Trust.  This exhibit also shows that Lyttle had received information that Eldridge was under 'intense scrutiny and investigation' prior to his having contracted with UTA-BVI as trustee.  He indicates that he had contacted federal authorities, and despite this intense scrutiny, was given a 'green light' to proceed with Eldridge.  Exhibit 7 shows James Sutton attempting to secure Lyttle's assistance as early as May 2000, to 'nail Gail.'  All of this evidence supports the proposition that the entire scenario which makes up the fact pattern of this case may have been part of an

entrapment effort by the government.

This evidence was not made available by the SEC, despite the "victims" making the SEC aware of their cooperation with the FBI in their testimony before the SEC. (Transcripts on file in this case.) The evidence which could taint both the criminal and the civil cases was not made available by the SEC nor the FBI, and was only forthcoming due to the "victims" filing the affidavits of the cooperating witness in their civil case.

Continuing involvement of the SEC with FBI in efforts to entrap Eldridge is indicated by a follow up sting targeting Eldridge and counsel in this case. The undercover FBI agent falsely represented he was a licensed securities broker working for two licensed security brokerage houses, Talon Holdings and Texas Caribe. Exhibit 10. The SEC participated in creating phony licenses, so that when counsel validated all licenses, they were reported by the NASD to be valid, when in fact, these licenses were fake. This type of cooperation goes far beyond the authorized transmittal of evidence of potential securities laws violations to the United States Attorney General. 15 U.S.C. § 80b-9(d) (provision in the Advisers Act.) In fact, this type of activity violates the constitutional due process guarantees. The types of benefits being realized by the government from the concurrent prosecution of a criminal matter and a civil matter on the

same fact pattern falls within the circumstances which warrant a stay. *SEC v.*

*First Fin. Group of Tex., Inc.*, 659 F.2d 660 (5th Circ. 1981).

Additionally, the arbitration awards and settlement agreements could

indicate that not only is the government possibly a participant in "wrongdoing,"

but the brokerage houses also were responsible for "wrongdoing." The extent of

any wrongdoing, and how it impacts the level of responsibility of Defendants,

directly impacts the determination of "ill gotten gain." Therefore, evidence

which may have a significant bearing on the issues to be determined by the

evidentiary hearing has not yet been fully disclosed by the government in either

the civil or the criminal matter, and is in the process of being discovered.

Plaintiff offers a lame argument that Defendants should have uncovered

all relevant evidence in discovery.   This is difficult, when undercover operations

are designed to avoid disclosure, and evidence received by SEC was not

disclosed.

Plaintiff also argues that Defendants should have requested an extension

of discovery.  Defendants made a motion to stay discovery pending the outcome

of the criminal matter.  Docket #53, June 9, 2006.  This motion was outstanding,

awaiting a ruling, for the entire duration of the discovery period, and then was

ruled as moot.  Defendants made their best efforts to protect their rights to

discovery in this case, and presented the arguments that awaiting the companion criminal case resolution would be in the best interest of justice, would allow the introduction of all relevant evidence, would prevent the government from obtaining an unfair advantage in either the criminal or this case, and would protect the constitutional rights of Defendants.

Plaintiff claims that they will not call Defendant Eldridge as a witness, and asserts that is sufficient protection for her fifth amendment rights.  However, there is evidence which is not a part of the record of this case, including testimony that only Eldridge can provide, or documents to which Eldridge can attest.  Other witnesses who could be called are also under indictment in the companion case, or must otherwise consider invoking their fifth amendment rights.  Once the companion criminal matter is resolved, full evidence should be available, and this evidentiary hearing may have the benefit of that evidence.

Plaintiff offers no argument that a delay will result in any potential harm or disadvantage for Plaintiff.  In essence, Plaintiff seeks to deny additional relevant evidence to Defendant by opposing the requested delay, but does not attempt to justify this position, either factually or legally.  It is respectfully requested that the stay of the evidentiary hearing be granted.

Respectfully submitted,

      Dated: August 6, 2007.

Respectfully submitted,

/s/ Katherine Crase

_____

Katherine Crase, Attorney at Law
Florida Bar No. 881510
Appearing Pro Hac Vice
2804 Aquilla Street
Tampa, Florida 33629
813.251.2684
fax 813.251.2688
kitcrase@cs.com

Certification of Service
==========================

I hereby certify that on August 6, 2007, I electronically filed a copy of the foregoing REPLY TO OPPOSITION TO STAY EVIDENTIARY HEARING with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

>    Jason A. Yonan
>    Attorney for Plaintiff
>    yonanj@sec.gov

/s/ Katherine Crase
_____

Katherine Crase, Attorney at Law
Florida Bar No. 881510
Appearing Pro Hac Vice
2804 Aquilla Street
Tampa, Florida 33629
email: kitcrase@cs.com
813.251.2684
fax 813.251.2688

Local Counsel

/s/ Nicholas Lotito
_____

Nicholas A. Lotito
Georgia Bar No. 458150
918 Ponce De Leon Avenue, N.E.
Atlanta Georgia 30306

# AFFIDAVIT

The undersigned being duly sworn hereby states under oath that:

1.  I, George M. Bevre-Hart, residing at 17430 County Road 28, Colfax, North Dakota, worked in the Intelligence Community, hereinafter the IC, under Presidential Decision Directive 39, hereinafter PDD-39, of June 21, 1995. I was assigned to Gail Eldridge by the IC in 1997. I am now retired.

    See attached document cover of PPD-39 as Exhibit A.

2.  In approximately late January or early February 2001, I was approached by Melvin R. Lyttle and Paul E. Knight who requested me to inform and submit records to the FBI in connection with the fraudulent activities of Violette Gail Eldridge, the United Tribes of the Americas (UTA) and the UTA-BVI, an international business corporation created to lure investors into supposed financial transactions, which she promoted as High Yield Investment Programs (HYIP's).

3.  I submitted Lyttle and Knight's records to FBI Special Agent Timothy Adams in Gainesville, FL.

    See files on disk "Melvin Lyttle," "Paul Knight" dated February 22, 2001 as Exhibit B.

4.  I explained the fraudulent activities associated with previously submitted records to S.A. Timothy Adams further supporting an "ongoing IC investigation" of Gail Eldridge and her UTA schemes.

    See files on disk at "UTA, UTA2, UTA3, UTA4" headings submitted as Exhibit C.

5.  The submitted cover letter for the initial Paul Knight documents with comments regarding Melvin Lyttle possibly duping Mr. Knight incorrectly tied Lyttle to Gail Eldridge's activities. This is because at that time the FBI and myself were not completely aware of the severity of Mr. Lyttle's health problems which prompted need for a traveling companion. And it was later discovered these trips were hard pressed for by Eldridge and her partners of the scheme, Bill Marvin and Marc Robinson. Mr. Lyttle did not participate with Eldridge in the DLJ scheme. In fact he was a victim.

6.  S.A. Timothy Adams thanked me for their records and said to convey the FBI's gratitude to Mr. Lyttle and Mr. Knight assuring me that it would be duly noted on their behalf.

7.  When I met Gail Eldridge she showed me her CIA badge (which the CIA denied authorization therefor) and William (Bill) Marvin in June 1997. For over a year they and their subsequent partner Marc Robinson discussed plans in my presence regarding a future sham HYIP promotion to lure investors into Donaldson, Lufkin & Jenrette (DLJ) investment company. I heard numerous conference calls between these three partners and spoke with Robinson a few times witnessing their discussions of portraying the scheme legitimate while divesting themselves from associated culpability. Eldridge claimed that she would always be able to find a way out of legal problems, which she had in the past, as she and her husband Robert were "long term 'Masons' just like the Judges in the court system and had to be highly favored as it was their special secret right."

Affidavit of George Bevre-Hart
5 Pages

Initials:

8.  Throughout this planning period I heard them discussing the use of the DLJ company for the ultimate impression upon potential investors. Bill Marvin personally told me that he had it arranged for using DLJ's conference rooms and even giving tours, with no questions asked by the DLJ staff, to convince clients into depositing funds with DLJ and the UTA.

9.  At that time these partners claimed they were going to use the professionally organized business entities of the Redrose Fund Ltd., and Whiterose Braveheart, L.P., whose holding company was the Geraldine Fund Ltd. All these entities were sponsored by Saitco International Inc., and all created by Mr. & Mrs. Igou, Esq., with their transaction related revenue dependant on performance of each entity. This is where the beginning concept for the UTA-BVI came from.

    See attached two cover pages for the Igou Companies as Exhibit D.

10. The UTA-BVI was organized as an off-shore financial branch of the UTA to portray its savvy business depth while further clouding legitimacy as described to me by these three partners and their attorney Katherine (Kit) Crase, who orchestrated setting-up the UTA-BVI company.

11. Bill Marvin and Marc Robinson both confided in me that they could not have conceived what the Igou's had already created. They and Eldridge were going to setup their own structure for promotional purposes to get investors' funds under their control using this impressive business layout.

12. I heard these three partners and attorney Katherine Crase discuss how to copycat the model business concept directly from the Igou's companies for their own DLJ promotions and additionally in case the Igou's backed out of profit sharing with the UTA. Bill Marvin used to carry the two Igou company documents around with him like a bible as he traveled back and forth to UTA headquarters from New York. They studied them intensely like it was their treasure.

13. The three partners of Eldridge, Marvin, Robinson and attorney Kit Crase repeatedly asked me to make any special contacts I could, domestically or internationally, to assist them in this so-called specialized field of private banking. They wanted to hire a professional bank trader for their business and grant that person a head position in their soon to be created central bank. They had no substantial means of accomplishing these goals and nothing they tried was working for them.

14. Their pretext was to offer High Yield Investment Programs (HYIP's) through the UTA and the UTA-BVI off-shore company, trading Medium Term Notes (MTN's), Forward Derivatives (FD's) and various other banking instruments for extreme profit potentials. They were not capable of performing these activities nor even had any first hand knowledge of the business.

15. When I asked each of them how they were going to handle transactions after receiving investors funds they simply said they'll cross that bridge when they get to it. I immediately challenged such comments as being a promotional sham as they had no way to complete what they promoted. I told them this was illegal and they would all get caught trying such a scam.

Affidavit of George Bevre-Hart
5 Pages

Initials

Exhibit E

16. At that time Gail Eldridge stated she would get a financial trader appointed from the Federal Reserve through her CIA connections once they had control of the minimum required funds of 10 million dollars. I informed Eldridge, her DLJ partners, and attorney Katherine Crase that this scheme was highly illegal. They were not in such a business and could not simply "demand to be in it" to those in authority.

17. Each one of these partners and attorney Crase stated to me that their "true intent" was to continue funding the UTA anyway possible until it could launch its own central bank, the UTA-CB, which they said would insure their own trading capability. This is well documented throughout the UTA promotional propaganda in Exhibit C.

18. Eldridge and the UTA needed the Native American tribes to support her concept of a new tribal sovereign nation "on their behalf." This was accomplished on July 4, 1998 with the signing of the "Medicine Wheel Accord" accompanied by the Washington, DC press club announcements for the signing ceremony.

   See group documents on disk at "UTA" pages 15-24 as Exhibit E.

19. Eldridge later insisted on making changes to the prescribed constitution drawn up by the Native Americans for the new nation of "The United Tribal Alliance," yet another "UTA." The natives then sent a cancellation notice to Gail Eldridge and the UTA, thereby revoking the "Medicine Wheel Accord" (MWA) on September 9, 1998, as she went beyond their allowed legal parameters.

   See attached group of four "MWA" documents with revocations as Exhibit F.

20. Eldridge told me we were not to divulge this crushing news of the Accord revocation to anyone and do our best to keep it under wraps for as long as possible while she continued her promotions to acquire continued funding as if nothing had changed in the UTA's legal status.

21. At that time Isabelle Igou, Esq., confided in me she was feeling quite irritated about Eldridge and her partners' constant query for detailed information on how to do financial transactions and now the vanished UTA legal status. I told her that if she felt uncomfortable, then she and her husband should detach themselves from the UTA legal fiasco.

22. Prior to departing the fraudulent operations of the UTA and UTA-BVI schemes, I saw her priority list of target names for the future DLJ investor scheme in the summer of 1998. I remembered the priority names of Melvin R. Lyttle and Paul E. Knight on that list, who at that time I had not met, but easily recalled their names later on due to Eldridge's continual references to them as the next target.

23. On numerous occasions I heard Eldridge discussing with Bill Marvin and Marc Robinson how soon she could begin her HYIP promotions to Lyttle and Knight to bring them into their web. I heard them repeatedly tell her that only when they were fully prepared to cover themselves could they give her the green light to start the scheme.

Affidavit of George Bevre-Hart
5 Pages

Initials 

24.    Eldridge pushed Marvin and Robinson hard to finish the DLJ matter as she was fast becoming more exposed by the Native American's rejection of the Medicine Wheel Accord denying her the required legal support for her new "nation within a nation." UTA attorney Katherine Crase, was trying hard to find some Native American somewhere to sign a new Medicine Wheel Accord. But it seemed that the word was out on them on the Reservations and they could find no one to sign.

25.    When I asked Eldridge if she ever studied or even read any books on international or domestic banking for her to be eligible in this business, she stated to me that "she sleeps with her head on the books and receives understanding via osmosis." I then confronted attorney Katherine Crase regarding the continued activities of Eldridge and the UTA operating without legal support.

26.    Katherine Crase, Esq., was in a myriad of conflicts of interest as she was representing the UTA "in all of its corporate variations," Eldridge personally, and myself personally. Discussions regarding Eldridge's osmosis technique in her knowledge quest hit a wall with Ms. Crase as she finally stated that I was no longer a team player.

27.    This newly surfaced personal exposure of the Eldridge & Crase team, plus the legal problems of the UTA necessitated a change of attorneys for myself. I signed a retainer agreement with attorney, Joseph J. D'Erasmo on September 23rd, 1998. Katherine Crase could no longer represent both Eldridge and myself.

        See document on disk, Joseph J. D'Erasmo, Esq., at "UTA3" page 159 as Exhibit G.

28.    In early October 1998, I was ordered by the IC to formally detach myself from the Eldridge-UTA enterprise and prepare final reports for probable legal action to proceed. That separation occurred on October 10, 1998. This divorce type of event was documented by material witness Joseph J. D'Erasmo, Esq. Law Office, 103 N. Adams St., Rockville, Maryland 20850-2217.

29.    When I initially met Melvin Lyttle and Paul Knight in late January or early February of 2001 they were already entrapped by the DLJ ongoing scheme. They had moved and lost the investors' funds given to Eldridge and were trying to find ways to recover these assets.

30.    I informed them that it was too late and they needed to get prepared legally. Eldridge was already painting them as her scapegoats to the FBI, trying to portray herself innocent. Her notice advising them of her preliminary contact to the FBI of November 3, 2000 was already in their possession.

        See document on disk at "Melvin Lyttle," page 61, as Exhibit H.

Affidavit of George Bevre-Hart
5 Pages

Initials 

31.   Mr. Lyttle and Mr. Knight provided considerable assistance to the IC and the FBI regarding the
      activities of Gail Eldridge and her associates through the various corporate versions of the UTA.
      The facts conveyed to me by Mr. Lyttle and Mr. Knight in addition to my own reports were later
      confirmed in the summer of 2001 by the Justice Department noting the high quality and sensitivity
      of information.

>     See Lyttle and Knight's documents supplied to the FBI on disk at "Melvin Lyttle, Paul
>     Knight, Paul Knight2, Paul Knight3, and Vladimir Zantsev from Mr. Lyttle".

32.   For National Security reasons, other details of my investigation cannot be disclosed at this time.

33.   Further the affiant says naught.


George Bevre-Hart

Date: 9-19-06

State of North Dakota            )
County of Richland               )
The United States of America     )


Subscribed and sworn to before me
On this 19 day of September, 2006


Notary Public

MARK A. MEYER
Notary Public, Richland Co., N. Dak.
My Commission Expires March 1, 2007
STATE OF NORTH DAKOTA
NOTARY PUBLIC SEAL

Seal


Affidavit of George Bevre-Hart
5 Pages

Initials



[Presidential Decision Directives - PDD]

*EXHIBIT-A*

**UNCLASSIFIED**



# THE WHITE HOUSE
# WASHINGTON

June 21, 1995

MEMORANDUM FOR THE VICE PRESIDENT
    THE SECRETARY OF STATE
    THE SECRETARY OF THE TREASURY
    THE SECRETARY OF DEFENSE
    THE ATTORNEY GENERAL
    THE SECRETARY OF HEALTH AND HUMAN SERVICES
    THE SECRETARY OF TRANSPORTATION
    THE SECRETARY OF ENERGY
    ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY
    ASSISTANT TO THE PRESIDENT FOR NATIONAL SECURITY AFFAIRS
    DIRECTOR OF CENTRAL INTELLIGENCE
    DIRECTOR, UNITED STATES INFORMATION AGENCY
    CHAIRMAN OF THE JOINT CHIEFS OF STAFF
    DIRECTOR, FEDERAL BUREAU OF INVESTIGATION
    DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY

SUBJECT: U.S. Policy on Counterterrorism (U)

It is the policy of the United States to deter, defeat and respond vigorously to all terrorist attacks on our territory and against our citizens, or facilities, whether they occur domestically, in international waters or airspace or on foreign territory. The United States regards all such terrorism as a potential threat to national security as well as a criminal act and will apply all appropriate means to combat it. In doing so, the U.S. shall pursue vigorously efforts to deter and preempt, apprehend and prosecute, or assist other governments to prosecute, individuals who perpetrate or plan to perpetrate such attacks. (U)

We shall work closely with friendly governments in carrying out our counterterrorism policy and will support Allied and friendly governments in combating terrorist threats against them. (U)

PRELIMINARY
MEMORANDUM
1-90

# REDROSE FUND LTD.

### *November 15, 1997*

The REDROSE FUND LTD. (the "Company") is a Bahamian International Business Corporation, limited liability investment company organized by Saitco International Inc. (the "Sponsor"). The Company's objective is to achieve significant capital appreciation while attempting to maintain an advantageous risk/reward profile.

The Company does not engage in any trading directly, but rather invests its assets in Geraldine Fund Ltd. ("Geraldine Fund"), an open-ended Bahamian International Business Corporation (IBC) which trades and invests in a wide and substantially unrestricted variety of instruments. Hillcrest Asset Management Co. (Hillcrest) a BVI management company, is the trading advisor of Geraldine Fund. Hillcrest has retained Mr. Jean François EMPAIN (" JFE") to be its sole representative in charge of deciding on trading and investments in the name of Geraldine Fund. JFE has a proven track record in this field since October 1991, as evidenced in Appendix A.

The Participating Shares in the Company (the "Shares") are offered directly through the Company and one or more selling agents, subject to prior subscription and to certain other conditions. The minimum subscription is U.S. $1,000,000.00 (although the Company may, at its discretion, permit smaller initial subscriptions). Additional subscriptions may be made in U.S. $100,000.00 increments. Shares may be sold as of any calendar quarter-end. Shares may be redeemed at Net Asset Value without any redemption charge as of each quarter-end, subject to thirty days written notice and a one year non-redemption holding period. Shares requested to be redeemed within one year of investment will be subject to a 5% redemption charge.

Under existing legislation, Shareholders will not be subject to any United States or Bahamian taxation with respect to their investment in the Company.

| Price to Public Per Share | Selling Commission | Organizational Charge | Proceeds to Company |
|---|---|---|---|
| 101.5% of Net Asset Value | 1% of Net Asset Value | 0.5% of Net Asset Value | 100% of Net Asset Value |

THE COMPANY IS EXPRESSLY PROHIBITED TO SELL OR TRADE ITS SHARES IN THE UNITED STATES, OR TO ANY U.S. CITIZEN.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

SHARES MAY BE ACQUIRED FOR INVESTMENT PURPOSES ONLY, AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT THE CONSENT OF THE FUND AS WELL AS COMPLIANCE WITH APPLICABLE LAWS. THERE IS NO PUBLIC OR OTHER MARKET FOR FUND SHARE.

PROSPECTIVE INVESTORS MUST CONSULT THEIR PROFESSIONAL ADVISERS AS TO THE LEGAL, TAX AND RELATED CONSIDERATIONS RELEVANT TO THIS INVESTMENT. EACH INVESTOR MUST REPRESENT AND WARRANT, AMONG OTHER THINGS, THAT HE HAS REVIEWED THIS MEMORANDUM AND HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE IS CAPABLE OR EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE FUND.

Case Case 6:05-cv-00366-CV SD Document 124-2 Filed 06/09/2702 Page 32 of 66 12

*Page 2 of 2* *EXHIBIT-D*

# WHITEROSE BRAVEHEART, L.P.

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
### AND DISCLOSURE DOCUMENT
### DATED DECEMBER 15, 1997





| | Subscription Price Per Unit | Selling Commission | Organizational Charge | Proceeds to Partnership Per Unit |
|---|---|---|---|---|
| Before Trading Commences | $1,020,000 | $15,000 | $5,000 | $1,000,000 |
| After Trading Commences | 102% of Net Asset Value | 1.5% of Net Asset Value | 0.5% of Net Asset Value | 100% of Net Asset Value |

**********

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PARTICIPANTS, THIS OFFERING MEMORANDUM IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WIIH SUCH COMMISSION. THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A COMMODITY POOL OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING.

*****

FROM : KLYSIDE THLING-GIT NATION          PHONE NO. : 206 483 9251          Jul. 04 1998 10:57AM P3
Exhibit E

# Page 1 of 4      EXHIBIT - F

## MEDICINE WHEEL ACCORD
### A Treaty Declaring the Formation of a New Nation

We, the undersigned, as appointed representatives of our respective tribes, mutually enter into this treaty known as the MEDICINE WHEEL ACCORD. We make the following declarations on behalf of ourselves, our tribes and all indigenous peoples.

We have reached the consensus, prompted by our prophesies, that divided we have stumbled, but united we shall stand. We hereby declare that a new Nation is born to grace Mother Earth, a Nation born of the alliance and cooperation of very old nations. We open this Nation to the tribes of the world and to the World Tribe. We choose to create laws and government which are beneficial tools designed for the positive advancement of our peoples. Mother Earth needs to heal. We choose to pool our resources to build self-sustaining economies which are not injurious but show our love and respect for Father Sky, Mother Earth and all her creatures.

We name this new Nation the UNITED TRIBAL ALLIANCE, and hereby endow this nation with all the combined sovereignties of the signing Nations, and recognize this new Nation as equal in stature to any and all Nations of this world.

Each signing Nation or tribe shall retain its extant sovereignty and full rights to self-regulation and governing of its internal affairs. The UNITED TRIBAL ALLIANCE shall rely upon international laws, ancient laws and customs, tribal laws as well as laws of many nations. Using these as a base, new laws and regulations shall be created for modern times designed to accommodate and adapt to the world evolution.

The UNITED TRIBAL ALLIANCE shall be a neutral country offering constructive support to the signing nations and also recognizes the needs and the rights of individuals. Citizens of the UNITED TRIBAL ALLIANCE shall not be required to relinquish citizenship of any other nation.

Each signing Nation may send three delegates to participate in the formalization of the guiding constitution. Additional persons who may or may not be members or citizens of the signing nations may be appointed or selected because of their particular knowledge or skills to assist in this process.

We hereby appoint a provisional government for, at most, six months, or until such time as the formal constitution shall be enacted. The provisional government shall be made up of the delegates described above and overseen by the Keeper of the Fire. We hereby announce that the Keeper of the Fire is appointed to serve a five-year term and is embodied in the person who has devoted many years and is the inspiration for this treaty of unity. Violet Gail Eldridge is the Keeper of the Fire, the founding grandmother and first citizen of this new Nation. In the unfortunate event that a new Keeper of the Fire is required, the delegates shall by majority select such person.

Exhibit E

FROM : KUYE'DE THLING→GIT NATION        PHONE NO. : 206 483 9251        Jul. 04 1998 10:59AM P4

# Page 2 of 4   EXHIBIT- F

Each signing nation shall retain control and full rights to all territory currently under their jurisdiction. The UNITED TRIBAL ALLIANCE may receive or purchase additional real property which may be apportioned among the signing tribes or may become sovereign property of the new Nation.

The greatest asset of the UNITED TRIBAL ALLIANCE is our combined sovereignties. We have with our sovereignty the ability to offer a financial structure solidly anchored by a new Central Bank. This establishment allows new banking laws which support and enhance existing central banks throughout the world, strengthening the genuine economics of all nations. Our first act therefore is to allow the provisional government to adopt the Central Bank as designed by the UTA Trust and enacted immediately. This enables our licensed banks to receive deposits in order to earn funding of our self-supporting government and humanitarian projects.

This treaty is effective as of July 4, 1998, and may be signed in counterpart.

Signing Nation:

_Kuiu Kwáan Tribal Nation_

Authorized Signatory:

_Thlen How Yaittly Thlee_
_Rudy James July 4, 1998_

Witnesses:

Exhibit E

# Page 3 of 4  EXHIBIT - F



# Kuiu Thlingit Nation

**The Kuye'di Kwian of Kuiu Island, Alaska**
**Pacific Northwest Regional Office**
**Post Office Box 1546, Woodinville, WA 98072**
**Phone/Fax: 425-483-925**

*A First Nations Traditional Government--Indigenous Original Holders of Allodial Title*

September 1, 1998

Chief Richard Grass
Lakota, Dakota, Nakota Nation
Regional Tribal Office, PO Box 1134
Rapid City, SD 57709

Dear Chief Grass,

Please accept this letter as notification that the Tribal Council of the Kuiu Thlingit Nation has taken action to rescind the participation of the Kuiu Thlingit Nation in the Medicine Wheel Accord and revoke the signatures affixed on July 4, 1998.

You will recall that prior to signature, both our Peoples expressed concerns regarding the specific wording and language of the Medicine Wheel Accord. The document unfortunately does not follow Traditional Tribal Law and is also in conflict with the Constitution of the Kuiu Thlingit Nation. Therefore, at this point in time, the Tribal Council has no alternative but to take this action.

The Tribal Council of the Kuiu Thlingit Nation values the positive working relationship we enjoy with the Lakota, Dakota, Nakota Peoples.

We want to take this opportunity to reaffirm the Treaty of Friendship signed at the Lakota Nation War Crimes Tribunal in June of 1998.

Kindest Regards,

ThlauGooYailthThlee, The First and Oldest Raven
Rudy James, Leader and President of the Kuiu Thlingit Nation

Spokesman for the Tribal Council                                    TGYT:db

Cc: Gail Eldridge, United Tribal Alliance

Case 3:06-cv-05163-RJB Document 122-2 Filed 06/02/2007 Page 36 of 12

# Page 4 of 4 EXHIBIT-F



# Kuiu Thlingit Nation

**The Kuye'di Kwáan of Kuiu Island, Alaska**
**Pacific Northwest Regional Office**
**Post Office Box 1546, Woodinville, WA 98072**
**Phone/Fax: 425-483-925**

*A First Nations Traditional Government–Indigenous Original Holders of Allodial Title*

September 9, 1998

Ms. Gail Eldridge, United Tribes of the America's, Inc.
305 Cherokee Street
Marietta, GA 30060

Dear Ms. Eldridge,

Enclosed you will find a copy of a letter addressed to Chief Richard Grass dated September 1, 1998 concerning the Medicine Wheel Accord dated July 4, 1998.

Our Tribal Council has given careful analysis to the wording and language of the Medicine Wheel Accord, which do not follow Traditional Tribal Law. In addition, the Medicine Wheel Accord stands in conflict with the Constitution of our Nation. These conflicts leave our Council no alternative. The Council of the Kuiu Kwáan of the Kuiu Thlingit Nation hereby rescinds and revoke all of our signatures affixed to the Medicine Wheel Accord dated July 4th, 1998.

The Kuiu Thlingit Nation Tribal Council hold Chief Grass in high esteem and have reaffirmed our commitment to work together.

The Kuiu Kwáan Tribal Council Members value the friendship and contacts we have established with you and the other members of UTA. We wish you well and ask that the Creator Bless your positive efforts on behalf of our Indigenous Peoples.

Kindest Regards,

*Thlau Goo Yailth Thlee*

*Rudy James*

ThlauGooYailthThlee, The First and Oldest Raven
Rudy James, Leader and President of the Kuiu Thlingit Nation
Spokesman for the Tribal Council

TGYT:db
cc: Chief Richard Grass

Exhibit E

## AFFIDAVIT 2

The undersigned being duly sworn hereby states under oath that:

1. This is a supplement to my previous affidavit of September19, 2006.

2. At the time of events discussed in that affidavit, I worked in the Intelligence Community (IC) not as an employee of any agency of the U.S. government, but as a confidential informant. I was asked to volunteer work for our country and I did not receive any payment for the voluntary services rendered.

3. I was a witness to crimes perpetrated by Gail Eldridge and "The UTA," along with her partners, CIA connection Donald Summers of Bethesda, Maryland, her international partners Patrick Lochrie, Dublin, Ireland, and Ralph Philippi, Taipei, Taiwan, her domestic partners Bill Marvin and Marc Robinson of New York and Samuel P. Hensley, Atlanta, Georgia. They conspired to defraud the United States Government and use investors money to fund their criminal enterprise and activities.

4. This information was also given to FBI Special Agent David Young from Champaign, Illinois, Resident Agent in Charge (RAC), in addition to the accompanying Treasury Agent as further witnesses. This interview process was held at the Law Offices of Joseph J. D'Erasmo, 103 North Adams Street, Rockville, Maryland 20850-2217. Ph:301.762.8860 or 8865. The names and contact numbers of the Treasury Agents may be acquired through their accompanying FBI Special Agents, or through the Law Office's of Joseph J. D'Erasmo along with specific dates.

5. I am prepared to answer any questions regarding my past criminal history. I was "ordered" by the U.S. government to sign proposed plea agreements. Montana, Lyttle and Knight requested me to relate their disclosure of Eldridge's fraudulent schemes directly to the FBI, and expressed their willingness to come forward to testify against her and her partners in connection with the Eldridge-UTA crimes in February of 2001.

6. Further the affiant says naught.

George Bevre-Hart

Date: Nov 3, 2006

State of North Dakota )
County of Richland )
The United States of America )

Seal

JEANNETTE NOVOTNY
Notary Public
State of North Dakota
My Commission Expires June 11, 2008

Subscribed and sworn to before me
On this 3rd day of November, 2006

Affidavit of George Bevre-Hart

Jannette Nova
Notary Public

Exhibit E

## Spectrum Research, Inc. (SRi)



**SRi**

**Spectrum Research, Inc.**
9810 Mahogany Drive, Suite 406
Gaithersburg, MD 20878
Fax:: 1-301-250-5814
Ph: 1-301-250-5709

February 22, 2001

Timothy A. Adams, SA
235 South Main Street
Suite 204
Gainesville, Florida 32601

re:     Paul Knight

Dear Mr. Adams,

It is felt that I should attach this cover letter to Mr. Paul Knight's documentation as we have discovered pertinent information regarding his personality.

We believe that Mr. Knight has been duped and wronged by the various parties he has been associated with over the past few years. In particular that would be Ms. Gail Eldridge and Mr. Melvin Lyttle. He is a man that has contributed numerous times to the service of the United States and to the various communities of Law Enforcement.

If you check further in this regard, you will find that his special talents of a sixth sense nature have been successfully utilized with enforcement personnel. Please indulge one comment that I personally offer from my experience in such matters. Most of those that have such talents do not involve themselves with secular matters to the point of fraudulent schemes or illegal activities, at least of their own accord. Sometimes they trust too much or feel they can be of help to others, and thus become involved with matters beyond their control. Upon meeting him several times, he has presented this particular aspect which I felt should be stated for whatever value you might find it throughout your investigation of what others have involved him in. I don't usually make such comments, but in this situation I felt obligated to do so on his behalf.

Sincerely,

George Bevre

George Bevre
President / CEO
Spectrum Research, Inc.

917 PALMER CT.
KODAK,TN. 37764
PH: 865 -- 932 - 3926
FAX : 865 – 932 - 3929
E-MAIL: pktrust@bellsouth.net

# PK TRUST & HOLDING, INC.

### Addendum To Summary

February 22, 2001

In Oct of 1999, Marc Robinson had Melvin Lyttle and myself to go to Belgium and that there would be some people that would some people would meet us there at the airport, to do another program. Then they told us to go to London the next day and there would be a man to meet us to take us to the bank. This man turn out to be an Israeli agent and wanted Mr. Lyttle to sign everything over to him. He was told NO. Then we were told that the Queen Agent was to meet us at the airport before we left. A man that claimed that he was the Queen Agent met us. He was the one that we were to meet that morning that was supposed to take us to the bank. No name was given to me of this man, other than he was a MI something. He told us us to go back to Belgium and the young man that was with us would instruct us later about what to do. After we got back to Belgium, we tried to contact the people that sent us to London. However, they wouldn't talk to us. So the young man went to Mr. Lyttle room and I went to bed. The next morning, Mr. Lyttle called to tell me we were going to Budapest, that Marc Robinson wanted us to go there so we could do a currency deal. Over breakfast, Mr. Lyttle informed me that the young man had told him that he would contact us to go to Switzerland and that they were planning on buying weapons for Greece and other countries, with the profit that was made. After we got to Budapest, Mr. Lyttle contacted Mr. Robinson and told him what had happen in Belgium and London. I contacted Ms. Eldridge and told her what I had been told. A few days latter I left to N.Y. and was met by Mr. Robinson and a man called Mr. B. who took a deposition of what went on while we were in Belgium and London, latter that day he talk to Mr. Lyttle about the trip. A week or two latter, Ms. Eldridge told me that Mr. Robinson and Mr. B said that I was lying about the trip. However, before Mr. Lyttle left Budapest, Mr. Robinson tried to get Mr.Lyttle to go to Switzerland to meet Mr. B and Mr, Larson. Mr. Lyttle came straight home without doing this. After, I came home I got very sick and the doctor could tell me what was wrong.

About Dec. 6th, 1999, I was asked by Ms. Eldridge to go withMelvin Lyttle to Budapest. I returned Dec 17th,1999 to N.Y. City. While in New York I met with John Montana who had a client that met with Gail Eldridge, Marc Robinson of the U.S. Treasury and Bill Marvin of D.L.J. At that time I was told that they had been working with that client for almost a year. During my stay, Gail Eldridge had told me that Mr. Lyttle was very sick and I could tell that during our travels. And I would maybe have to take over the small investors. In the latter part of Jan. 2000, Mr. Lyttle and I flew to N.Y. City. Mr. Lyttle started to complain of chest pain and told me he wanted to leave to go home. Gail again mentioned to me that I would have to take over the small investors for Melvin. After we went home, Mr. Lyttle would only talk on the phone to me once or twice a week because of his health. These calls were 30 seconds to 2 minutes long. I asked for the names of everyone in these programs and finally Melvin faxed me a copy of all the wire transfer that he had. Yet, I didn't receive any phone numbers or addresses of these clients. I had a consultant named Keith McGee call me to ask about the health of Mr. Lyttle. I found out he had several investors through Mr. Montana and Mr. Lyttle. Mr. McGee contacted all the small investors that he brought in. One day, during this process, Mr. Abe Paul, a consultant, called me to tell me of several investors he had brought in through Mr. Montana and Mr. Lyttle. Then I had five more investors to contact me that said they were also in the program and Mr. Montana and Mr. Lyttle were who they had been talking to. I was told by Ms. Eldridge that I had to redo all the paper work that Mr. Lyttle had done, due to the fact it was wrong. I then called Mr. Lyttle

*February 22, 2001*
*Page 2*

to ask him if he had sent all the money to N.Y. to Ms. Eldridge and he confirmed he had. So, I redid all the paper work as I was asked to do and confirmed to the investors that their money was in a trust account with D.L.J. In the middle of March 2000, Ms. Eldridge called me to come to N.Y. to start the trade program. The first night I was there, someone shot at me as I was leaving the hotel. The next morning I was told from the hotel desk that their was a taxi waiting for me. I told them I had not ordered one. I then called Ms. Eldridge to see if she had. She told me no. I no more than got off the phone, when someone tried to break into my room. I called Ms. Eldridge again and told her what had happened. She told me to come to her place and bring all the paper work with me, which I did. She was very sick and told me she would call me later and for me to go back to the hotel. That evening as I was going to the American Place restaurant, a man tried to take my briefcase, but couldn't, so he ran away. The next morning the front desk called again and told me my limousine was waiting for me. I told them I had not orders one. Again, someone came to my door and tried to get in. About three hours later, the front desk called to inform me that I had a taxi waiting for me. And again about ten minutes later someone tried to break in my room. The next morning I was called by the front desk and was told I had a taxi waiting for me. I called Ms. Eldridge and was told to meet her at a little restaurant up the street in two hours. After meeting her I was told to go ahead in catch the next flight home. She said there were several investors that had committed perjury.

In the early part of April 2000, I was asked to come back to N.Y. to sign some papers to start the program again. Again, I was told after several days that it didn't work. However, I was told that the amount of money that I show that was supposed to be in the program, was not the amount of money that she showed in the trust account. After I went home, I started to do an inventory of all the clients that Mr. Lyttle brought in and the six clients that sent their money straight into the U.T.A. Trust account, for the benefit of the clients. After Easter, I was asked by Ms. Eldridge to go to the U.K. with Mr. Lyttle to meet some clients that came from Budapest. And that someone would contact us to take us to the bank to start a trade, nothing happened. No one contacted us for three days so we left for Budapest. The gentleman we stayed with in Budapest, tried to feed me some soup that I refused and got real mad, when I wouldn't eat. And Mr. Lyttle went to go and eat it, the gentleman knocked it off the table. About a week later we left to come home.

In the latter part of June 2000, I was asked by Ms. Eldridge again to come to N.Y. to sign some papers to go into another trade and that we would be paid out on or about Sept. 25th, 2000. That didn't happen . Dec.6th, 2000 I was asked to come to L.A. to meet with the trader and three other gentleman. Before I met the trader, I was informed by one of the gentleman, Mr. Michael Fine, An attorney, that the did not happen and he had kept Ms. Eldridge informed that it haven't happen. I was shown papers of this and that she had been lying the whole time. Then I was told that Mr. Eldridge had also applied to go in the program with a gentleman by the name of "Jack". And I was told to stay away from Ms. Eldridge since she was not a good person to be associated with.

:Sincerely,

*[signature: Paul E Knight]*

PAUL KNIGHT, CEO

**Exhibit E**

Spectrum Research, Inc. (SRi)



# SRi

**Spectrum Research, Inc.**
9810 Mahogany Drive, Suite 406
Gaithersburg, MD 20878
Fax: 1-301-250-5814
Ph: 1-301-250-5709

February 22, 2001

Timothy A. Adams, SA
235 South Main Street
Suite 204
Gainesville, Florida 32601

re:     Melvin Lyttle

Dear Mr. Adams,

The documentation from Mr. Lyttle is quite interesting. He of course is willing to testify against Eldridge, et al. There a great deal to be discussed regarding Mr. Lyttle and his activities here and abroad, as you will see, but I need to get this to you ASAP and we can discuss the numerous additional matters later.

Sincerely,

George Bevre
President / CEO
Spectrum Research, Inc.

Exhibit E

STATE OF INDIANA     )
COUNTY OF DEARBORN    ) SS:
UNITED STATES OF AMERICA  )

# AFFIDAVIT

I, **MELVIN R. LYTTLE**, WITH MAILING ADDRESS OF 502 FIFTH STREET,

POST OFFICE BOX 007, AURORA, INDIANA 47001-0007, FIRST BEING DULY

SWORN, DEPOSE AND SAY:

INITIAL MEETINGS AND INTRODUCTIONS TO **GAIL ELDRIDGE, MARC

ROBINSON, JAMES SUTTON** AND **WILLIAM MARVIN** FROM DONALDSON,

LUFKIN & JENRETTE WERE HELD IN NEW JERSEY AT A HOTEL 28 AND 29

AUGUST 1999 WITH MYSELF AND PAUL KNIGHT.  ON 30 AUGUST 1999, WE

WERE ESCORTED TO DLJ HEADQUARTERS BY JAMES SUTTON AND MET

ALL PARTIES IN "PRIVATE BANKING" ON THE 13TH FLOOR AFTER BEING

BADGED THROUGH SECURITY.  DURING THE MEETING HELD IN DLJ

OFFICES, WE DEPOSITED THE EIGHT (8) CASHIER'S CHECKS INTO "TRUST"

UNDER THE AUSPICES THAT DLJ HAD BLESSED EVERYTHING THAT WAS

BEING DONE FOR AND ON BEHALF OF UNITED TRIBES OF THE AMERICAS.

WE WERE TAKEN ON A TOUR OF THE FACILITY AND VISITED THE BOND

TRADING FLOOR, WHICH WAS QUITE IMPRESSIVE.  ALL LOOKED VERY

REAL AND VERY MUCH LIKE EVERYONE INVOLVED WAS VERY

CONNECTED AND BLESSED FOR WHAT THEY WERE DOING.

Page 1 of 10

## AFFIDAVIT / CHEMICALS

DURING THE INITIAL MEETINGS, BILL MARVIN WAS SPOKEN OF AS BEING "CIA" AND THE FOURTH (4TH) OWNER OF DLJ, MARC ROBINSON WAS TOLD TO REPRESENT AND WORK FOR THE UNITED STATES TREASURY DEPARTMENT. GAIL ELDRIDGE SHOWED DOCUMENTATION TO "PROVE" EVERYTHING SHE WAS DOING WAS BLESSED AND CONFIRMED BY THE UNITED NATIONS AND EIGHTY-SIX (86) COUNTRIES. JAMES SUTTON PURPORTED TO BE EXTREMELY CONNECTED AND WAS DESIGNING THE "NEW" *S.W.I.F.T. II* SYSTEM TO PROTECT THE BANKING SYSTEM WORLDWIDE. THERE WAS ALSO DISCUSSIONS OF HOW DANGEROUS IT WAS "OUT THERE" WITH WORLWIDE TERRORISTS DURING THE MEETINGS.

PAUL KNIGHT DID HIS BACKGROUND CHECKING ON THE INDIVIDUALS INVOLVED AS IS STANDARD PRACTICE. WE DO NOT WANT TO HAVE ANYTHING TO DO WITH PARTIES WHO ARE NOT CLEAN. AFTER THE MEETINGS WE HAD AND WHERE WE WERE ESCORTED TO IN PRIVATE BANKING AT DLJ HEADQUARTERS, PAUL DID BACKGROUND VERIFICATIONS ON THE PARTIES THROUGH THE FED RESERVE AND DID A CRIMINAL BACKGROUND CHECK. BOTH SOURCES CAME UP CLEAN AND WE HAD A "GREEN LIGHT" TO CONTINUE WORKING. IF YOU DO THE BACKGROUND CHECKS AND ARE TOLD THERE IS NOTHING WRONG AND TO CONTINUE WORKING WITH PARTICULAR PEOPLE BY THE SOURCES OF

Page 2 of 10

**AFFIDAVIT / CHEMICALS**

THE GOVERNMENT THAT DO LAW ENFORCEMENT, EVEN THOUGH THE PARTIES ARE UNDER INTENSE SCRUTINY AND INVESTIGATION, THEN SOMETHING IS WRONG WITH THE SYSTEM. AFTER THE CLEARANCE, BEING INFORMED OF BEING "CIA", TREASURY, AND BLESSED BY THE UNITED NATIONS, AND THE "FOURTH" (4TH) ***OWNER*** OF DLJ, WE BOTH FELT COMFORTABLE WITH CAUTIOUSLY PROCEEDING. EXPECTED PROFITS AND RETURNS ON THE INVESTED FUNDS WOULD BE EXTREMELY GOOD, AS WAS ASSURED BY BILL MARVIN. IF YOU CANNOT TRUST "DLJ"", ONE OF THE LARGEST SECURITIES FIRMS IN THE WORLD AND THE GOVERNMENT, THEN WHO CAN YOU TRUST?

UPON RETURN TO MY HOME, ARRANGEMENTS WERE MADE TO MEET WITH MARC ROBINSON. I DROVE TO HIS HOME IN COLUMBUS, OHIO IN SEPTEMBER TO HAVE DISCUSSIONS. AT THAT MEETING, I WAS INFORMED THAT HIS JOB WAS NOW TO MONITOR **"BANK ONE"** AND **"ME"**, BECAUSE OF MY CONNECTIONS WITH RUSSIAN GOVERNMENT OFFICIALS AND THE DEPOSITS WE HAD MADE IN DLJ WITH THE UTA. MR. ROBINSON DISCUSSED THE HORRIBLE TREATMENT, BEATINGS AND BEING LEFT FOR DEAD THAT HAD HAPPENED TO GAIL ELDRIDGE IN THE PAST FOR TRYING TO DO THE RIGHT THING. HE ALSO TALKED ABOUT ACTIVITIES OF TERRORIST GROUPS HERE AND ABROAD OF TRYING TO DO DAMAGE TO

**AFFIDAVIT / CHEMICALS**

THE UNITED STATES. THIS INCLUDED DEVICES ALREADY BEING IN PLACE

THROUGHOUT THE COUNTRY THAT THEY WERE TRYING TO FIND AND

ELIMINATE. HE DISCUSSED THE CHINESE AND OTHER ASIAN COUNTRIES

HAVING CASH IN AMOUNTS THAT COULD BRING DOWN THE U.S.

ECONOMY IF BROUGHT INTO THE MARKET. HE BROUGHT UP WHAT

COULD BE DONE TO HELP THE RUSSIAN ECONOMY, WHICH INCLUDED

INTERNAL AND EXTERNAL RUBLES, METALS AND OTHER VALUABLE

ASSETS, INCLUDING CASH. HE ALSO BRIEFLY MENTIONED THE NEED TO

"CLEAN UP THE STREETS" OF PEOPLE TRYING TO SELL ILLEGAL CHEMICALS

FROM EASTERN BLOCK AREAS. THEY WERE DANGEROUS TO

THEMSELVES AND THE POPULATION CENTERS WHERE THEY WERE

CARRYING THE MATERIALS AROUND IN THEIR POCKETS. I WAS ASKED IF I

HAD ANY WAY TO BRING ANY IN. I RESPONDED THAT I WOULD ASK, BUT

REALLY DID NOT KNOW. HE STATED THAT IF THERE WAS ANY

AVAILABLE THAT THE U.S. GOVERNMENT WAS PREPARED TO BUY ANY

AND ALL IMMEDIATELY TO GET IT OFF THE STREET AT FAIR VALUE. I

INFORMED HIM THAT IF I GOT A POSITIVE RESPONSE, THAT I DID NOT

WANT TO BE INVOLVED IN ANY WAY. I WOULD GIVE HIM THE CONTACT

INFORMATION, BUT WANTED NOTHING TO DO WITH IT, EVEN TO THE

POINT THAT I DID NOT WANT PAID A DIME FOR ANYTHING. I WOULD BE

WILLING TO DO IT FOR THE U.S. GOVERNMENT, BUT I DID NOT WANT IN

**AFFIDAVIT / CHEMICALS**

ANY WAY TO BE INVOLVED OR TO BE PAID. THIS WAS NOT MY TYPE OF
BUSINESS AND I DID NOT WANT ANYTHING TO DO WITH IT, BUT IF I
COULD HELP THE GOVERNMENT AND WE COULD FINISH OUR REGULAR,
COMMERCIAL TRANSACTIONS TO HELP FEED STARVING PEOPLE, THEN I
WOULD SEE WHAT COULD BE DONE.

IN SEVERAL SUBSEQUENT MEETINGS WITH GAIL ELDRIDGE, MARC
ROBINSON AND LATER WITH JIM OSSMER IN NEW YORK, THE SUBJECTS
WERE BROUGHT UP SEVERAL TIMES AS A REGULAR COURSE OF
DISCUSSION. SHE EXPLAINED HOW DANGEROUS IT WAS OUT THERE WITH
ALL THE TERRORISTS AND WHAT THEY WERE PLANNING. SHE DISCUSSED
DEVICES (17 OR 19) THAT WERE IN PLACE THROUGHOUT THE COUNTRY
THAT COULD BE SET OFF. THIS WAS THE SAME INFORMATION THAT
JAMES SUTTON HAD ESPOUSED SEVERAL TIMES BEFORE AND IN
MEETINGS WITH HIM IN LONDON AT THE GATWICK RENNAISSANCE
HOTEL WHILE TRAVELING WITH PAUL KNIGHT. SHE ALSO TALKED ABOUT
THE TERRORISTS AND HOW DANGEROUS IT WAS FOR THE ENTIRE EAST
COAST OF THE UNITED STATES. A "SPHERE" CONTAINING BIOLOGICAL
WEAPONS OF HUMAN DESTRUCTION WAS READY AND COULD BE USED BY
DROPPING IT INTO A HURRICANE TO SPREAD ACROSS MAJOR PORTIONS
OF THE COUNTRY BY THE WINDS. THE EFFECT WOULD BE TO DESTROY

**AFFIDAVIT / CHEMICALS**

HUMAN TISSUE (AS IN MELTING IT OR EATING IT AWAY), WITH NO

AFTERAFFECT TO PROPERTY. IT WOULD ONLY KILL LIVING BEINGS,

WHILE LEAVING NO DAMAGE TO THE LAND OR PROPERTY

IMPROVEMENTS. THE ONLY THING IT COULD NOT DO WAS TO PENETRATE

GLASS. THAT IS THE ONLY MEANS OF PROTECTION. DESTRUCTION OF

MILLIONS OF PEOPLE WAS POSSIBLE, AS WELL AS VERY LIKELY. IT WAS

ONLY A MATTER OF TIME. IN DISCUSSIONS WITH JAMES SUTTON, HE

CLAIMED HE WAS WORKING WITH THE NATIONAL SECURITY AGENCY

AND THIS WAS TOP PRIORITY TO PREVENT THIS TYPE OF DESTRUCTION.


ALL PARTIES INVOLVED STATED NUMEROUS TIMES THAT IF THERE WAS

ANYTHING THAT COULD BE DONE TO HELP BRING IN ANY CHEMICALS

THAT WERE DANGEROUS TO THE PEOPLE OF THE UNITED STATES AND OF

WESTERN EUROPE, PLEASE DO IT AND LET THEM KNOW. I REPEATEDLY

STATED THAT THIS WAS NOT MY TYPE OF BUSINESS, BUT IF IT WOULD

HELP, I WOULD ASK AROUND, BUT WANTED NO INVOLVEMENT OR TO BE

PAID. I WAS JUST BEING, OR SO I THOUGHT, A GOOD U.S. CITIZEN.


THIS WOULD BE SIMILAR TO THE TIME I THOUGHT I WAS BEING A GOOD

**AFFIDAVIT / CHEMICALS**

CITIZEN A FEW YEARS AGO AFTER MEETING WITH ITALIAN INDIVIDUALS
IN EUROPE OFFERING TO BRING SUITCASES FULL OF CASH ( I WAS
PHYSICALLY SHOWN SOME OF THE MONEY) OUT OF THE BACK DOOR OF
AN EMBASSY IN THE NETHERLANDS TO EXCHANGE DOLLARS AND
DEUTSCHE MARKS FOR ANY OTHER VALUABLE CURRENCY AT A
SUBSTANTIAL DISCOUNT. I CONTACTED, WITH MUCH DIFFICULTY, THE
FBI AND THE CIA. I FINALLY WAS INTERVIEWED BY THE FBI. ALL IT DID,
ESPECIALLY WITH THE CIA, WAS TO CAUSE "ME" TO BE INVESTIGATED. THE
ONLY WAY I GOT ANYWHERE WAS BY CONTACTING MY U.S.
REPRESENTATIVE AT THE TIME, LEE HAMILTON. WITHIN ONE DAY, I WAS
CONTACTED AND INTERVIEWED BY DRUG ENFORCEMENT AND WAS TO BE
CONTACTED BY U.S. CUSTOMS OUT OF INDIANAPOLIS. THEY MUST NOT
HAVE TAKEN IT SERIOUSLY, AS IT WAS DROPPED. I GAVE THEM ALL
TELEPHONE NUMBERS FOR CONTACT, LOCATIONS, AND FULL NAMES OF
THE PARTIES. IT DID NOT SEEM TO BE ANYTHING TO THEM EXCEPT THAT
I GOT INVESTIGATED.

I DID ASK AROUND ABOUT POSSIBLE CHEMICALS ON THE STREET. YES,
THEY ARE AVAILABLE, AND FROM CREDIBLE SOURCES. PRIMARILY,
WHAT IS AVAILABLE IS SMALL QUANTITIES BY EMPLOYEES OF
MANUFACTURING FACILITIES THAT PRODUCE CHEMICALS. EMPLOYEES

**AFFIDAVIT / CHEMICALS**

"LIFT" A LITTLE AND WALK THE STREETS TRYING TO SELL IT. THEY ARE

TRYING TO MAKE A LITTLE MONEY SO THEY CAN FEED THEIR FAMILIES,

BECAUSE WHERE THEY COME FROM AND WORK, THEY HAVE NOT BEEN

GETTING PAID AT ALL OR NOT QUITE ENOUGH TO EVEN SURVIVE. THEY

REALLY DO NOT KNOW WHAT THEY ARE DOING OR THE DANGERS THEY

PUT THEMSELVES IN OR THE PEOPLE THEY COME INTO CONTACT WITH OR

PASS BY ON THE STREET WALKING AROUND. THIS DID NOT GO

ANYWHERE, PRIMARILY DUE TO THE FACT THAT WE WERE VERY BUSY

TRYING TO WORK AND DEVELOP REGULAR BUSINESS AND DUE TO THE

FACT THAT MARC ROBINSON WAS REMOVED FROM THE STREET, HIMSELF.

IT WAS ALSO A PROBLEM TO WORK MUCH FROM JANUARY OF 2000 UNTIL

RECENTLY DUE TO PERSONAL HEALTH PROBLEMS. I HAVE NOT BEEN IN

CONTACT WITH GAIL FOR SEVERAL MONTHS. IT WAS NOT REALLY A

HIGH PRIORITY FOR MYSELF OR ANYONE I WORK WITH.


I HAVE, HOWEVER, HAD NUMEROUS OFFERS OF MATERIAL DUE TO THE

INITIAL QUESTIONING. NOTHING HAS BEEN DONE. I WAS RECENTLY SENT

A NOTIFICATION OF AND OFFER TO USE AS COLLATERAL, CHEMICAL

ASSETS IN STORAGE VAULTS IN FRANKFURT, GERMANY, OF WHICH, I

FORWARDED THE INFORMATION REQUESTING GUIDANCE AS TO

CONTINUE OR NOT. THESE PEOPLE ONLY WANT TO FINANCE

**AFFIDAVIT / CHEMICALS**

COMMERCIAL PROJECTS AND FEED THEIR PEOPLE. UNDER THE CURRENT
MONETARY POLICIES IN PLACE AND THE RESTRAINTS ON THEIR LOCAL
ECONOMIES, THEY ARE TRYING TO BE CREATIVE IN WAYS TO RAISE
MONEY TO PAY FOR WHAT THEY NEED. THIS IS ONE AVENUE.

AT THIS POINT, NOTHING HAS BEEN DONE, OR ACTUALLY GIVEN TO GAIL
ELDRIDGE OR ANY OF HER ASSOCIATES OR ANYONE ELSE CONCERNING
ANY CHEMICAL PRODUCTS. THEY COULD NOT HANDLE MONEY, LET
ALONE GIVE THEM SOMETHING LIKE THIS. TRUST AND CREDIBILITY HAS
BEEN LOSING GROUND FOR A LONG TIME, BUT WE COULD NOT PROVE
ANYTHING CRIMINAL. WE HAVE BEEN TRYING. I AM NOT ABOUT TO GIVE
THEM SOMETHING LIKE THIS AND BE INVOLVED WITH ANYTHING OUT OF
THE NORMAL REALM OF BUSINESS AND COMMERCIAL ACTIVITY. AT
LAST CONTACT, THE SUBJECT HAD NOT BEEN RAISED, AND I HOPE IT DOES
NOT COME UP ANY MORE.

IN CONCLUSION, IF THE UNITED STATES GOVERNMENT, FROM A CREDIBLE
AGENCY WITH PROPER DOCUMENTATION, REQUESTS ANY ASSISTANCE I
CAN PROVIDE, WITHOUT REPERCUSSIONS TO MYSELF, TO CLEAN UP THE
STREETS, I WILL HELP. IF NOT, I HAVE NOT, NOR DO I HAVE ANY
INTENTION TO BE INVOLVED WITH ANY MATERIAL OR ASSETS THAT MAY

**AFFIDAVIT / CHEMICALS**

BE DEEMED AS ILLEGAL OR A CRIMINAL ACTIVITY.  IT IS TOUGH ENOUGH,

JUST TRYING TO KEEP REGULAR BUSINESS GOING.


FURTHER, AFFIANT SAYETH NOT.

_____          18 FEBRUARY 2001

**MELVIN R. LYTTLE**


Subscribed and sworn to before me a Notary Public in and for the State of Indiana,
County of Dearborn on this _19_ th day of _February_____ , 2001

_____
NOTARY PUBLIC

_10/2/07_____
My commission expires:


Page 10 of 10

21 February 2001

TO: **MR GEORGE BEVRE**

SENT BY FAX FROM BUDAPEST, HUNGARY

# AFFIDAVIT AMENDMENT

I, **MELVIN R. LYTTLE**, WITH MAILING ADDRESS OF 502 FIFTH STREET, POST OFFICE BOX NUMBER 007, AURORA, INDIANA 47001-0007, AS AN AMENDMENT TO AFFIDAVIT PREVIOUSLY SUBMITTED, HEREBY DEPOSE AND SAY:

A NUMBER OF SCENARIOS WERE PRESENTED OR DISCUSSED FOR HANDLING OF SMALL INVESTOR FUNDS THAT WERE ON DEPOSIT AT DONALDSON, LUFKIN & JENRETTE IN THE #5150 ACCOUNT UNDER THE NAME OF THE UNITED TRIBES OF THE AMERICAS WITH GAIL ELDRIDGE AS TRUSTEE ON BEHALF OF MY COMPANY. WE WERE, HOWEVER, NEVER GIVEN FIRM OFFERS NOR DID ANY ACTUAL PROPOSALS COME TO FRUITION. WE WERE TOLD SEVERAL TIMES "THE PROGRAM IS READY TO START", GIVEN DATES, ASKED TO TRAVEL TO EUROPE TO GO INTO A BANK TO SIGN DOCUMENTS, COME TO NEW YORK TO START AND ON AND ON.

MARC ROBINSON STATED TO PAUL KNIGHT AND MYSELF AS REPRESENTING THE UTA WHAT WAS POSSIBLE SEVERAL DIFFERENT OCCASIONS. DURING THE SAME TRIP TO NEW YORK WHEN BILL MARVIN

Page 1 of 6



**AFFIDAVIT / AMENDMENT**

GAVE ME THE "MISTAKE" FULL ACCOUNTING OF THE TRUST ACCOUNT,
ROBINSON STATED AMOUNTS OF RETURNS THAT WERE TO BE MADE,
THEN LESS THAN TEN (10) MINUTES LATER, TOLD PAUL KNIGHT,
SEPARATELY, ENTIRELY DIFFERENT AMOUNTS.

QUITE A FEW TIMES, THERE WAS CONVERSATION AND EVENTS THAT
REVEALED FRICTION BETWEEN MARC ROBINSON, GAIL ELDRIDGE AND
JAMES SUTTON. GAIL MADE SEVERAL COMMENTS ON SEVERAL
DIFFERENT OCCASIONS ABOUT SUTTON LIKE, THEY HAD SENT HIM TO
LONDON TO KEEP HIM BUSY, SHE DID NOT WANT THE RIGHT HAND
KNOWING WHAT THE LEFT HAND WAS DOING, AND SEVERAL TIMES DID
NOT WANT PAUL KNIGHT OR ME TO TALK TO HIM OR IF WE DID, DO NOT
SAY ANYTHING ABOUT ANYTHING. SHE STATED THAT HE WAS A LOOSE
CANNON AND IT WAS CAUSING HER PROBLEMS. SHE JUST NEEDED TO
KEEP HIM BUSY.

THE MOST SHOCKING INFORMATION CAME DURING A TRIP TO BUDAPEST.
I RECEIVED A TELEPHONE CALL IN THE EVENING FROM JIM SUTTON
WHILE I WAS HAVING A DINNER MEETING AND COFFEE AT MAMMUT
MALL WITH PAUL KNIGHT AND VLADIMIR K. ZANTSEV, WHO IS THE
PRESIDENT OF THE GROUP OF EXPERTS OF ECONOMICS UNDER THE PRIME

Page 2 of 6



## AFFIDAVIT / AMENDMENT

MINISTER AND PRESIDENT OF NATIONAL GOLD FOR THE RUSSIAN

FEDERATION. THE DATE WAS 12 MAY 2000. WE WERE PREPARING TO SIGN

THE MEMORANDUM OF UNDERSTANDING BETWEEN US FOR JOINT

COOPERATIVE EFFORTS FOR BRINGING RUSSIAN ASSETS AND MONEY

INTO THE WESTERN BANKING SYSTEM.


I HAD NOT TALKED TO SUTTON FOR QUITE A LONG TIME PRIOR TO THIS

EVENT. THE IS ONE OF THE REASONS IT CAUGHT ME BY SURPRISE. HE

STATED THAT HE NEEDED MY HELP AND REQUESTED THAT I INTERVENE

ON HIS BEHALF OR HELP HIM "NAIL GAIL". HE STATED THAT HE HAD NOT

BEEN PAID FOR WHAT HE DID FOR THE UTA, NOR DID THEY COVER ANY

OF HIS EXPENSES FOR WHAT THEY HAD HAD HIM DO FOR THEM. I AM NOT

SAYING THIS IS TRUE, BUT ONLY THAT SUTTON CLAIMED IT. MY

PERSONAL OPINION IS THAT HE IS A BRAGGART AND A BLOWHARD,

MAKING WILD CLAIMS TO APPEAR "BIGGER" BECAUSE OF HIS SMALL

STATURE. EVERYONE IS ENTITLED TO AN OPINION, BUT THIS IS MORE OF

EXPERIENCE, INTERACTION AND HISTORY WITH THE MAN THAN JUST

MAKING A JUDGMENT.


HE STATED VERY EMPHATICALLY THAT HE HAD SHOWN ELDRIDGE,

MARVIN AND ROBINSON AT A MEETING BETWEEN THEM IN NEW YORK,

HOW TO USE ACCOUNT #5150 AND THE FUNDS ON DEPOSIT THERE, BUY T-



**AFFIDAVIT / AMENDMENT**

BILLS AND LEVERAGE THEM SEVENTEEN (17) TIMES TO MAKE A LOT OF

MONEY. AFTER HE HAD DONE THAT, THEY WERE SUPPOSED TO AND THEN

HE DID NOT GET PAID AND HE WANTED TO KNOW WHY. I EXPLAINED TO

HIM THAT I DID NOT KNOW ANYTHING ABOUT WHAT HE WAS TALKING

ABOUT, BUT IF THEY WERE DOING THAT WITH INVESTOR FUNDS, THEN

WHY WERE WE NOT INFORMED AND THE INVESTORS NOT PAID FOR USING

THEIR MONEY. HIS EXPLANATION WAS THAT IT WAS A WAY TO FINANCE

THE UTA AND CENTRAL BANK, BUT THAT THEY WERE SUPPOSED TO

MAKE A LOT OF MONEY. HE STATED HE KNEW THEY DID IT, BUT HAD NOT

BEEN ABLE TO FIND THE ACCOUNTS YET. HE WOULD, AND THEN HE WAS

GOING TO "TAKE HER DOWN" FOR CHEATING HIM OUT OF HIS MONEY. HE

WAS VERY UPSET SOUNDING. I ASKED HIM HOW THE INVESTORS AND I

SHOULD FEEL, BUT HE SLUFFED THAT OFF BY STATING THAT WAS

BETWEEN ME AND ELDRIDGE. HE WAS ONLY INTERESTED IN HIS MONEY.

THE CONVERSATION ENDED AND HE CALLED ME A FEW DAYS AFTER I

RETURNED HOME TO SEE ABOUT IT, BUT I STATED THERE WAS NOTHING I

COULD OR WOULD DO. IF THERE WERE, I WOULD BE TRYING TO GET IT

FOR THE INVESTORS FIRST, AS IT _WAS_ THEIR MONEY, NOT HIS. NO CALLS

TOOK PLACE AFTER THAT WITH SUTTON.

I CALLED ELDRIDGE AND ASKED HER ABOUT THE SITUATION. SHE

SHRUGGED IT OFF AND STATED THAT SUTTON WAS CAUSING OR TRYING

Page 4 of 6

## AFFIDAVIT / AMENDMENT

TO CAUSE ALL KINDS OF TROUBLE BECAUSE HE WAS BROKE AND WAS TRYING TO GET MONEY FROM HER. SHE STATED THAT THE ORIGINAL DISCUSSION TOOK PLACE, BUT THERE WAS NO WAY TO DO IT. SHE TOLD ME TO KEEP HER INFORMED IF HE CALLED AGAIN. SHE WAS "TAKING CARE OF HIM". DO NOT TELL HIM ANYTHING THAT WAS GOING ON AND THAT HE DID NOT REALLY HAVE ANY POWER OR KNOW ANYTHING ABOUT THE BUSINESS. HE WAS ONLY RIDING ON THE REPUTATION OF HIS FRIEND WHO HAD DIED AND SUTTON WAS WORKING FOR. HE DID NOT HAVE ANYTHING AND WAS TROUBLE.

IF THAT IS THE CASE, THEN WHY WAS SHE WORKING WITH HIM IN THE FIRST PLACE AND WHY WAS SHE HAVING HIM TRAVEL ON HER ERRANDS. JUST TO KEEP SOMEONE BUSY DOES NOT MEAN YOU HAVE THEM FLYING AROUND THE WORLD, LIVING IN EXPENSIVE HOTELS AND CONSTANTLY ON THE TELEPHONE WITH THEM OVERSEAS AT HIGH TOLL RATES.

I DO NOT KNOW THE TRUTH FROM EITHER SIDE. NEITHER HAD A BELIEVABLE STORY. I HAVE NOT TALKED TO SUTTON SINCE THE INCIDENT AND I DO NOT NOR HAVE I FOR MANY MONTHS, COMMUNICATED WITH ELDRIDGE.

I HAVE NO IDEA WHETHER THE STORY IS TRUE OR FALSE, BUT THEY DO NOT APPEAR TO GET ALONG WITH EACH OTHER AT ALL.

Page 5 of 6

**Exhibit E**

## AFFIDAVIT / AMENDMENT

IT SEEMS STRANGE, THOUGH, THAT SHE SENT ONE OF HER TWO

BODYGUARDS, "LARS", TO SAN FRANCISCO, TO "GET HIM OUT OF THE

WAY" AS HE WAS "TALKING TOO MUCH. SUPPOSEDLY SHE SENT HIM

THERE TO OPEN A "WEST COAST OFFICE" FOR THE UTA AND KEEP HIM

BUSY. WHY IN THE WORLD WOULD THEY NEED A WEST COAST OFFICE?

I RESERVE THE RIGHT TO AMEND PREVIOUS AFFIDAVITS AS NECESSARY.

FURTHER AFFIANT SAYETH NOT.

**MELVIN R. LYTTLE**

SENT BY FAX FROM BUDAPEST, HUNGARY THIS 21ST DAY OF FEBRUARY
2001.

Page 6 of 6



Exhibit E

LAW OFFICES

## *D'Erasmo, Shure & Perez*

103 NORTH ADAMS STREET
ROCKVILLE, MARYLAND 20850-2217

(301) 762-8860
FAX (301) 424-7710
FAX (301) 762-3382

Writer's Fax: (301) 424-7710

DEANE A. SHURE
JOSEPH J. D'ERASMO
CAROLE C. PEREZ *†
———————————
DAYNA R. GOLDSMITH *

ALSO ADMITTED IN:
* DISTRICT OF COLUMBIA
† NEW YORK

GREENBELT OFFICE
6404 IVY LANE
SUITE 405
GREENBELT, MD 20770
(301) 441-3131
———————————
HON. RALPH G. SHURE (RET.)

### RETAINER AGREEMENT

In consideration of services rendered and to be rendered, GEORGE BEVRE, 762 Bedford Oaks Drive, Marietta, Georgia 30068, hereby retains and employs Joseph J. D'Erasmo, 103 North Adams Street, Rockville, Maryland 20850, to represent him for the purpose of (1) investigating and evaluating the legal status of his and his team's efforts to repatriate U. S. dollars; (2) to evaluate on a continuing basis the lawfulness of UTA's efforts with respect to funding of its projects, especially those that involve donation and/or investment programs; (3) to represent him individually with respect to any regulation or law enforcement actions that might arise as a result of his efforts on behalf of UTA or with respect to the Omega Trust & Trading or Nations investigations.

Mr. D'Erasmo will not represent Mr. Bevre in any corporate, administrative, or legal proceedings primarily intended to cause an ouster of Gail Eldridge.

Further, Mr. Bevre represents that there are not now pending any other SEC, criminal, or civil proceedings against him arising out of his efforts on behalf of UTA.

Upon the execution of this Agreement, Mr. Bevre will pay an initial retaining fee of $12,000, against which Mr. D'Erasmo will provide his services at the rate of $200 an hour.

Mr. Bevre also agrees to pay for any necessary and reasonable costs associated with Mr. D'Erasmo's representation and as to which he is advised in advance. "Costs" shall include, but are not limited to, traveling expenses, expenditures for subpoenas, depositions, reproduction costs, expert witness fees, investigative fees, and long distance telephone calls and long distance computer costs. No cost in excess of $25 will be incurred without client's prior knowledge and consent.

Mr. Bevre agrees to keep the attorney informed of his current home and work address and telephone numbers in order to make any necessary decisions on the his behalf with respect to the matters described above.

_____
JOSEPH J. D'ERASMO

Date: September 23, 1998

_____
GEORGE M. BEVRE

Date: September 23, 1998

**Exhibit E**

LAW OFFICES

*D'Erasmo, Shure & Perez*

103 NORTH ADAMS STREET
ROCKVILLE, MARYLAND 20850-2217

(301) 762-8860
FAX (301) 424-7710
FAX (301) 762-3382

Writer's Fax:   (301) 424-7710

DEANE A. SHURE
JOSEPH J. D'ERASMO
CAROLE C. PEREZ *†

DAYNA R. GOLDSMITH *

ALSO ADMITTED IN:
* DISTRICT OF COLUMBIA
† NEW YORK

GREENBELT OFFICE
6404 IVY LANE
SUITE 405
GREENBELT, MD 20770
(301) 441-3131

HON. RALPH G. SHURE (RET.)

TO:      Gail
FROM:    Joe
DATE:    September 14, 1998
RE:      A follow-up note re: the application

1.    We need to obtain signatures of other <u>members</u> of the Alliance, from other countries or indigenous, government-recognized tribes from other parts of the world.  Some of the leaders of the Dahli Lama group would be excellent.

2.    We need the Central Bank information, and we need to beef up that part of the application.

3.    If we've got more evidence or information of U. S. Government involvement, we need to add it.

4.    If we can get endorsements of support for the application from reputable bankers, Native American leaders, congressmen, and similar persons, we could attach those.

[FOR GAIL ELDRIDGE, PRESIDENT, UTA
DRAFT FOR REVIEW, DISCUSSION, AND COMPLETION]

TO:       Stephen D. McCreary
          Office of the Legal Adviser
          Diplomatic Law and Litigation (L/DL)
          2201 C Street, N.W., Room 5420
          Department of State
          Washington, D. C. 20520
FROM:     Joseph J. D'Erasmo
          Attorney for United Tribal Alliance
DATE:     September 14, 1998
RE:       United Tribal Alliance

---

## APPLICATION FOR DESIGNATION AS
## AN INTERNATIONAL ORGANIZATION

The United Tribal Alliance (hereinafter referred to as "The UTA") files this application for designation as an "international organization" under the provisions of 22 U.S.C. § 288, et seq., and in support of this application, the chief executive officers of its constituent members state as follows:

### 1.    The Members of UTA; Its Purposes.

The United Tribal Alliance, formed by the signing of the "Medicine Wheel Treaty" on July 4, 1998, is an organization consisting of Native American Indian tribes, Canadian indigenous (Indian) tribes, and those organizations of indigenous tribal people from nations around the world belonging to "UNPO", a new organization created by the Dahli Lama, whose purpose is to provide international representation at the United Nations and elsewhere for indigenous peoples.

The United States representative of UTA is a 501(c)(3) non-profit corporation known as "The United Tribes of the

Americas, Inc.", located at 305 Cherokee Street in Marietta, Georgia 30060. Its organization and staff are principally located at that address within the United States.

The purposes of the United Tribal Alliance are both economic and humanitarian. Its member organizations [are in the process of forming] or [have organized] a central bank to fund their own humanitarian projects to provide jobs, education and the benefits of cutting-edge computer technology to Native Americans, Canadian, and third-world indigenous people throughout the world, guided by the principles of self-support and self-direction. As many countries around the world now do, the UTA will also provide the advice and representation to properly access programs available through organizations such as the International Monetary Fund, the World Bank, and the Bank for International Settlements.

A further principle underlying the structure of the UTA is that of respect for the sovereignty and independence of the member organizations of UTA; that is, the UTA will not control or direct the purposes, activities, or membership of the individual member organizations of the UTA. Instead, the UTA's direction and activities will itself be determined by the voting delegates of its international membership.

2. United States Participation

The Government of the United States has, through the Internal Revenue Service, approved the non-profit corporate charter of the Native American member of the UTA. In addition, the Bureau of Indian Affairs and the President of the United

-2-

States have recognized its "unique legal relationship with Indian tribal governments, as set forth in the Constitution of the United States, treaties, statutes, executive orders, and court decisions". <u>See</u>, Executive Order No. __?__, published May 14, 1998.

That Executive Order also states:

In treaties, our Nation has guaranteed the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory. The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, trust resources, and Indian tribal treaty and other rights.

As noted, the Native American and Canadian tribes, and [the member organizations connected to UNPO?] have virtually all of the characteristics of independent nations.

The Government of the United States will also be involved with the functions and economic benefits of the UTA central bank because [insert].

Additional participation of U. S. agencies of the UTA is found in [insert].

Of course, the UTA is not scheduled for liquidation now or in the immediate future.

Attached to this application is Exhibit A, which lists the principal officers, number of employees, and location of the principal offices of UTA and its central bank.

The purpose of this application is to obtain the same privileges, exemptions, and immunities granted to other

-3-

international organizations under the provisions of 22 U.S.C. § 288a through 22 U.S.C. § 288f.

Any additional requests for information will be promptly provided.

Signed and dated this _____ day of September, 1998 by:

[HERE LIST SIGNATORIES OF MEMBERS]

-4-

**Exhibit E**

**John Firo**
Vice-President

# Talon Holdings, Inc.

Call 561-441-6437

5015 Addison Circle
Suite 509
Addison, Texas 75001

Phone: (972) 735-9170
Fax: (972) 931-0045

John Firo@texas-caribe.com

SO ORDERED this 8th day of August, 2007.


_s/   CLARENCE COOPER_

CLARENCE COOPER
UNITED STATES DISTRICT JUDGE

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. |
| vs. | : : | 1:05-CV-0735-CC |
| VIOLET GAIL ELDRIDGE and UTA-BVI, LTD., | : : : | |
| Defendants, | : : | |
| and | : : | |
| THE UNITED TRIBES OF THE AMERICAS, INC. and EXECUTIVE BUREAU OF RESEARCH AND RECOVERY, INC., | : : : : : | |
| Relief Defendants. | : : | |

## ORDER

For good cause shown, and in the interests of justice, the Court hereby **GRANTS** the Motion to Stay Evidentiary Hearing [Doc. No. 99] filed by Defendants Violet Gail Eldridge and UTA-BVI, Ltd. and Relief Defendants United Tribes of the Americas, Inc. and Executive Bureau of Research and Recovery.  Accordingly, the evidentiary hearing scheduled for Monday, August 13, 2007, is hereby removed from the Court's calendar and will not be placed back on the Court's calendar until the conclusion of the criminal trial involving Defendant Violet Gail Eldridge, United States v. Eldridge, et al., 6:05-CR-06116-CJS (W.D.N.Y.).  The Court **DIRECTS** the parties to notify the Court of the conclusion of the criminal trial.

**(SIGNATURE ON FOLLOWING PAGE)**