# United States District Court
## Western District of Arkansas

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

AUG 1 6 2006

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

UNITED STATES OF AMERICA
v.

JAMES WILLIAM BOLT;
MELVIN LYNN ROBINSON;
JOHN C. DODGE, and
LEROY H. HOBACK

(Name & address of defendant)

## CRIMINAL COMPLAINT

CASE NUMBER: 5:06M5033-001,
002,
003,
004

I, Michael Patkus, the undersigned, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about April 5, 2005 to May 9, 2006, in Benton County, in the Western District of Arkansas defendant(s) did commit the offense of, (track statutory language of offense)

the defendants entered into a conspiracy to commit the offense of wire fraud,

in violation of Title __18__ United States Code Section (s), __1343 and 371__.

I further state that I am a(n) __Special Agent__ and that this complaint is based on the
Official Title
following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made part hereof: ☒ Yes ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 16, 2006                at    Fort Smith, Arkansas
Date                                  City & State

Beverly S. Jones, U. S. Magistrate Judge          _Beverly Stiles Jones_
Name & Title of Judicial Officer                   Signature of Judicial Officer

# AFFIDAVIT

### A. Introduction

I, Michael Patkus, having been sworn, do hereby state the following:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been a Special Agent for approximately 22 years. I am currently assigned to the Little Rock Division of the FBI. My duties include the investigation of violations of mail fraud, wire fraud and securities laws.

2. The information in this Affidavit is based upon my personal knowledge, discussions with fellow agents, review of records, and the review of tapes and transcripts of consensually monitored telephone conversations and meetings. I have prepared this Affidavit only to establish probable cause that the individuals named herein have committed the crime charged in this Complaint. Therefore, this Affidavit does not contain all the information I know about this matter.

3. Unless I have put a statement of another person in quotes, I have described statements of others in this Affidavit in substance and in part only.

### B. Subjects

4. Based on the facts contained in this Affidavit, there is probable cause to believe that

  (a) MELVIN LYNN ROBINSON;

  (b) JAMES WILLIAM BOLT;

  (c) JOHN C. DODGE; and

  (d) LEROY H. HOBACK

have conspired to commit wire fraud as charged in this Complaint.

### C. Facts

5. In or about February 2005, the FBI learned that the defendants named in paragraph 4 may be creating an investment fraud scheme in which they planned to seek investments in Shimoda-Atlantic, an Arkansas business that was supposedly developing Xenavex, a new pharmaceutical drug. Each of the defendants was employed by Shimoda-Atlantic. Shimoda-Atlantic's web site invited potential investors to send the company an e-mail to obtain additional information about investing in the company.

6. Based on this information, another FBI Special Agent, acting in an undercover capacity as "John Firo," a financial consultant from Florida, sent an e-mail on or about April 4, 2005 from

his office in Florida to Shimoda-Atlantic in which he stated that some of his clients might be interested in investing in Shimoda-Atlantic. "Firo" received an email in return which stated that the company was "under contract for sale to a foreign subsidiary of a division of Pfizer" and did not have any investment openings at that time. On or about May 11, 2005, "Firo" sent an email to Shimoda-Atlantic stating that if the sale didn't go through, his clients might still be interested in investing in the company.

7.     On or about June 7, 2005, "Firo" received an email from "Paul McLouth" of Shimoda-Atlantic. "McLouth" is a suspected alias of one of the defendants. "McLouth" stated in the email that Shimoda-Atlantic's deal with Pfizer fell through and that the company now was seeking "interim financing of $250,000 with total project financing of $5 million dollars." "McLouth" further stated that the $250,000 would allow Shimoda-Atlantic to "launch the Phase II lung cancer study that we have delayed since early April." "McLouth" referred "Firo" to Shimoda-Atlantic's Chief Financial Officer "Lynn Owen" for further details. "Owen" is an alias of defendant ROBINSON.

8.     On or about August 31, 2005, "Firo" received an e-mail in Florida from defendant ROBINSON, who was the Vice President for Shimoda-Atlantic. ROBINSON said that he was replacing "McLouth" who was leaving Shimoda-Atlantic. ROBINSON informed "Firo" that they were in the process of moving to a new location and gave him Shimoda-Atlantic's new telephone numbers. He also said that he was looking forward to visiting with "Firo" soon.

9.     On or about October 19, 2005, "Firo" received from Shimoda-Atlantic, via either U.S. Post or commercial carrier at his office in Florida, a 68 page PowerPoint presentation on a CD which said Shimoda-Atlantic needed "an overall funding commitment in the amount of $2.5 million dollars for FY2005/2006" in order to facilitate the development of Xenavex and other projects. The PowerPoint presentation also stated that Shimoda-Atlantic needed $250,000 by December 31, 2005, another $250,000 by March 30, 2006, and the balance of the funding by June 30, 2006.

10.    An official of the Food and Drug Administration ("FDA") has viewed this PowerPoint presentation. He has advised me that it contains a number of false statements regarding Shimoda-Atlantic's products, including the following statement:

> "Xenavis is also currently lawful to deliver to a patient in the U.S., upon a physician's prescription. A physician may write such a prescription to a patient for treatment of an 'indicated' illness, described in the current 'label.' Xenavex is labeled as a cardiovascular drug, for cardiology conditions. Other indications for the drug are herpes simplex and eczema."

The FDA official advised me that Xenavex is not approved by the FDA for any treatment, including treatment of cardiovascular diseases, herpes simplex or eczema. Therefore, a physician in the United States may not prescribe Xenavex for any reason.

11.     On or about February 21, 2006, "Firo" and a Cooperating Witness ("CW") met in Arkansas with defendants ROBINSON, BOLT, DODGE, and HOBACK, who provided an overview of the company and repeated the false representation set forth in paragraph 10 of this Affidavit. They also gave "Firo" a Shimoda-Atlantic brochure which stated in part that Xenavex

> "is a prescription therapeutic drug for its labeled indications related to cardiovascular disease, eczema and herpes zoster. Shimoda-Atlantic makes no specific representations as to the indications for Xenavex nor its potential effectiveness in treating any human disease, other than such indications as are currently recognized by the FDA."

As previously stated in paragraph 10, the FDA has not recognized or approved Xenavex for treatment of any disease.

12.     At the same meeting described in paragraph 11 above, ROBINSON described himself as being responsible for raising $2.5 million in financing. ROBINSON explained an investor who put up $2.5 million would receive a 20% share in the business. The defendants gave "Firo" and the CW brochures about Shimoda Atlantic; the company's unaudited balance sheet as of January 31, 2006; and a twelve month cash flow analysis reflecting how the $2.5 million would be spent.

13.     In a second meeting on February 21, 2006 in Arkansas, "Firo" and CW told defendants DODGE and HOBACK that the investment was too speculative for them but that they had a client who was a wealthy Middle Eastern businessman who would be interested in investing in Shimoda-Atlantic. "Firo" and CW sought a kickback fee from defendants DODGE and HOBACK in exchange for providing the investor.

14.     On or about March 24, 2006, "Firo" telephoned defendant ROBINSON to advise him that the client had agreed to invest $2.5 million in Shimoda-Atlantic in exchange for a twenty percent interest in the company.

15.     In a telephone call on or about March 27, 2006, defendant ROBINSON asked "Firo" if the client could increase his investment from $2.5 million to $3 million, and asked how much of a fee "Firo" and CW were seeking. When "Firo" told defendant ROBINSON that the fee could not be disclosed to their client, defendant ROBINSON said that he could "bury" the fee payment. Defendant ROBINSON further suggested that there be two separate agreements so that the client would never see the commission contract.

16.     Later on March 27, 2006, "Firo" called defendant ROBINSON back and asked for a payment of ten percent if his client invested $2.5 million and fifteen percent if the client invested $3 million. Defendant ROBINSON agreed and informed "Firo" that he would provide a cash flow analysis and a projected balance sheet, and would tell "Firo" in advance where the secret payment was "buried."

17. On or about March 27, 2006, defendant DODGE sent "Firo" by facsimile from Arkansas to Florida a written agreement in which Shimoda-Atlantic agreed to pay "Firo" and CW $325,000. DODGE also faxed a Shimoda-Atlantic 12 month cash flow statement.

18. On or about April 5, 2006, ROBINSON informed "Firo" during a telephone conversation that the $325,000 payment was hidden in a $600,000 expense listed under the category of "Accrued Salaries Payable" on the 12 month cash flow statement reflecting how Shimoda-Atlantic would spend the $3 million.

19. On or about May 9, 2006, "Firo" and CW met with defendants BOLT, DODGE, HOBACK and ROBINSON at Shimoda-Atlantic's office in Rogers, Arkansas. During this meeting, all four defendants acknowledged the $325,000 payment and agreed not to disclose it to "Firo's" client. Later that day, "Firo" and CW introduced the "client," who was actually an undercover law enforcement official, to defendants BOLT, DODGE, HOBACK and ROBINSON. While reviewing the 12 month cash flow analysis sheet, defendant ROBINSON informed the "client" that the $600,000 in "Accrued Salaries Payable" was for intellectual property that the company had received, but had not paid for. Defendant BOLT added that the expense was to obtain an exclusive patent on a license. None of the four subjects informed the "client" about the $325,000 fee that was to be paid to "Firo" and CW.

### D. Conclusion

20. The facts described in this Affidavit demonstrate a scheme to defraud that was carried out using interstate telephone calls, faxes and e-mails. In particular, among other things, the defendants' false representations regarding Xenavex set forth in paragraphs 10 and 11, the defendants' agreement to pay a secret kickback to "Firo," the defendants' hiding of the secret kickback on Shimoda-Atlantic's cash flow statement, and the false statements to the "client" regarding the cash flow analysis sheet, all constituted a scheme to defraud.

21. Based on these facts, I respectfully submit that there is probable cause to believe that the defendants named above conspired to commit violations of the wire fraud statute, contrary to 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 371.

Michael Patkus, Special Agent, FBI

Sworn to me this
16th day of August 2006

UNITED STATES MAGISTRATE JUDGE

◎ AO 245A  (Rev. 12/03) Judgment of Acquittal

Exhibit J

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____WESTERN ARKANSAS_____

UNITED STATES OF AMERICA

V.

JOHN C. DODGE

**JUDGMENT OF ACQUITTAL**

CASE NUMBER:  06-50059-003

The Defendant was found not guilty.  IT IS ORDERED that the Defendant is acquitted, discharged, and any bond exonerated.

_____
Signature of Judge

JIMM LARRY HENDREN,  U.S. DISTRICT JUDGE
Name and Title of Judge

_____3/15/07_____
Date

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

MAR 1 5 2007

CHRIS R. JOHNSON, CLERK
BY _____
DEPUTY CLERK