# EXPERT REPORT

### In the District Court of the United States
### For the Western District of New York
### Rochester Division

### The United States of America
### -vs-
### Violette Gail Eldridge, aka Gail Violette Eldridge, Melvin Ray Lyttle, Paul E. Knight, and John L. Montana, Jr.

by

### LEONARD A. ZAWISTOWSKI, JR.

### September 9, 2005



GOVERNMENT
EXHIBIT
2200

# EXPERT REPORT

**The United States of America -v-Violette Gail Eldridge, aka Gail Violette Eldridge, Melvin Ray Lyttle, Paul E. Knight, and John L. Montana, Jr.**

## In the District Court of the United States
### For the Western District of New York
### Rochester Division

By

**LEONARD A. ZAWISTOWSKI, JR.**

I, Leonard A. Zawistowski, Jr., do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and further that this report is made on my personal knowledge and that I am competent to testify as to the matters stated herein:

1.    I am a Senior Special Investigator in the Special Investigations Section within the Division of Banking Supervision and Regulation of the Board of Governors of the Federal Reserve System. I conduct financial fraud, terrorist financing, and money laundering investigations of interest to the Federal Reserve, participate in the background checks of commercial bank applicants to the Federal Reserve, and maintain liaison with intelligence and law enforcement agencies. In order to accomplish these duties, I hold a national security clearance higher than Top Secret. I have been in this position since 1993.

I have been employed in Federal law enforcement since 1975. Prior to my present position, I was a Criminal Investigator in the Office of Inspector General for the Federal Reserve for three years. While in that office I investigated frauds committed against the Federal Reserve. Before my time at the Federal Reserve, I was employed as a Special Agent in the Diplomatic Security Service at the U.S. Department of

2

state, and concentrated in Visa issuance fraud, serving as Chief of the Visa Fraud Section.  Early in my career I was a Police Officer at the Supreme Court of the United States, as well as a fingerprint examiner at the Federal Bureau of Investigation.

In my career I have been called upon to participate in investigations with the Federal Bureau of Investigation, the Bureau of Immigration and Custom Enforcement, the Internal Revenue Service, the United States Secret Service, the Drug Enforcement Administration, the U.S. Department of State Diplomatic Security Service, the Central Intelligence Agency, the Financial Crimes Enforcement Network (FinCEN), the OKOKRIM in Norway, the City of London Police and Metropolitan Police in the United Kingdom, various Offices of Inspector General, as well as with numerous state and local agencies.

I serve as an instructor for financial fraud and international money movement training programs offered by the Federal Law Enforcement Training Center (FLETC), the United States Secret Service, the United States Department of Justice National Advocacy Center, the United States Department of State, and at Quantico, Virginia, for both the Federal Bureau of Investigation and Drug Enforcement Administration. In August 2003, I conducted a live broadcast regarding international funds movement and financial crimes on the Justice Television Network for U.S. Attorney Offices.  I have provided training and technical assistance related to financial crimes to a number of foreign governments, including Romania, Poland, Norway, Russia, Argentina, and Singapore.

2.      I hold a Juris Doctor from George Mason University School of Law, and a Bachelor of Arts .om Gannon University.

3

3.      In these capacities, I have garnered extensive experience regarding High Yield Investment

Program (HYIP) type frauds and bogus financial instrument frauds.  In my position at the Federal Reserve I

have encountered scores of these frauds, and have played a significant role in resolving them.  I have

testified before federal and state courts in criminal and civil matters related to HYIP frauds and bogus

financial instruments.  In addition, I have testified as an expert in British and Norwegian courts regarding

the Federal Reserve's role regarding these types of fraud.  A list of the cases that I testified in is attached as

Exhibit 1.


4.      Based on my review of several thousand documents relating to supposed investment

opportunities involving "prime bank", HYIPs, and similar financial instrument fraud schemes, it is clear

that there are common, general characteristics, hallmarks, or "red flags" of such scams.  They are as

follows:

- References to financial instruments issued by "prime banks", "top 100 world banks", "top 25 European banks", and similar references to categories or groups of banks that are not used in the banking industry.

- Promises of extremely high, unrealistic rates of return with little or no risk.

- Participation in an investment program often referred to as a "roll program (or programme)", "high yield investment program", or "bank debenture trading program."

- High rates of return are generated by repeatedly trading (or buying and selling) financial instruments.

- Legitimate financial instruments, such as letters of credit, guarantees, and medium term notes, are bought and sold or traded in manners that are not realistic -- for example, standby letters of credit are bought and sold.

- Transactions are overly complex and nonsensical.

- Terms that have no meaning in legitimate financial transactions are used repeatedly -- for

4

example, "conditional SWIFT", "key tested telex", "pay order", "funds of good, clean and non-criminal origin", "master commitment", and "commitment holder."

· High degree of secrecy -- for example, the trading of financial instruments takes place on a secret market, your banker or investment adviser will not know about the investment opportunity because only a few special people around the world are aware of it or participate in the secret trading, or the investor is being allowed to participate in a secret trading program and, if he or she reveals any information about the program, the investor's participation will be terminated.

· The investors' funds are absolutely safe and cannot be lost -- for example, a bank has issued a guarantee or an attorney is holding the funds in a special escrow fund.

· Involvement of a well known governmental authority, such as the Federal Reserve, World Bank, or IMF.

· Inaccurate references to the International Chamber of Commerce and its publications.

· Investor's funds will be used for "humanitarian" projects.

5.      In order to broaden my understanding of HYIP, I have frequently conducted research on current fraud characteristics, reviewing various solicitations to participate in these programs, as well as the government agency warnings to consumers to avoid these types of programs. In my further pursuit of understanding of these purported programs, I have personally spoken with U.S. and international law enforcement and banking supervisor officials about the existence of these markets. In fact, I have also met with and discussed HYIP frauds with convicted purveyors of these scams. I have also reviewed the various government press releases on these trading programs, as well as court opinions and media reports.

6.      In frauds of this nature, an individual, acting as a broker, alleges to others that he or she has access to a trading program that is unknown to the general public and has secret aspects that will provide exorbitant rates of return for the investors. The broker often will tell the investors that the program has ties the Federal Reserve, the International Monetary Fund, the World Bank, or the United Nations, and often suggests that the program has a humanitarian aspect. In addition, the forms the investor executes at the

**5**

ɷehest of the broker will be excessively complicated and include dubious banking language that will

intimidate and possibly impress most investors.  The broker aggregates the investor's funds and purports to

invest the funds in this mysterious trading program, usually located in Europe.  The promised returns for

HYIPs vary, but I have seen claims of from 100% up to 1200% on an annual basis.  The investors will be

told that their investment is not at risk, often saying that the funds are "blocked", and that the investors

retain control of their funds.  In fact, in most cases with which I am familiar, the funds are wire transferred

to an offshore jurisdiction and utilized for the personal expenses of the broker.  The investors may receive

account statements from the broker purporting to show the success of the investment, and some early

investors may even receive from the broker disbursements of funds from later investors in order to

encourage additional investors.  After a period, when investors start to clamor for payment of the promised

ɷofit, or even for return of the principal, the broker will offer complicated explanations about why the

program or disbursement was delayed.  These explanations may include wire transfer problems, bank

holidays, currency complications, incompetent bankers, "Fed" interference, or International Chamber of

Commerce rule changes.  The broker will continue to support the trading program itself, but will blame

some external factor for causing the payment delays.  Ultimately, the investors will be unable to recover

even their principal, yet alone the promised returns.  The broker commonly will exit for an offshore

jurisdiction, and personally enjoy the investors' money.  The investors are generally reluctant to complain

to authorities, partially due to their embarrassment at having been bilked.

7.     HYIPs are quite common today.  I encounter three or four new programs every month.
Published opinions and government agency actions suggest that scores of these cases are addressed each

6

year. It will never be possible to determine how many cases go on undetected or how much investor money is lost.

8.       In all of the cases of this nature to which I have had a perspective, and despite my inquiries, I have never seen any demonstrated evidence of the actual existence of these trading programs. All of the judicial opinions that I have reviewed unanimously declare that these trading programs do not exist. In my opinion, trading programs of this nature do not exist.

9.       Throughout 2004 and into 2005, I received and reviewed numerous documents and depositions provided by the United States Securities and Exchange Commission. I was advised that the documents relate to *United States Securities and Exchange Commission v. Montana, Lyttle, Knight, et.al.* The documents included:

    Exhibit 2 - Slep 8/10/99 Letter of Exclusivity (KJS00029)

    Exhibit 3 - Worldwide T&P 8/11/99 Urgent Notice (Castellini-4)

    Exhibit 4 - Worldwide T&P 1/26/00 Urgent Notice (Petlev-13)

    Exhibit 5 – Knight 3/25/00 email to Slep (KJS000205)

    Exhibit 6 – Knight 4/13/00 email to Rick (PK00889)

    Exhibit 7 – Northfield Trust 3/7/00 letter to Knight (Petlev-15)

    Exhibit 8 – Northstar Financial Group 9/16/99 NC/ND Agreement (JM1095)

    Exhibit 9 – Slep 1/28/00 Confidentiality and Non-Disclosure Agreement (KJS000111)

    Exhibit 10 - Worldwide T&P 10/3/99 Update Notice (Castellini-10)

    Exhibit 11 – Slep notes (KJS000151)

7

Exhibit 12 – Rick Castellini 12/16/02 letter re: $1 Million USD investment (Castellini-24)

Exhibit 13 – Castellini 8/8/99 Exclusive Asset Management Agreement (Castellini-2)

Exhibit 14 – First National Equity 11/5/99 letter to Montana (Petlev-12)

Exhibit 15 – Castellini 6/16/99 letter to First National Equity (Castellini-3)

Exhibit 16 – Northfield Trust 7/9/99 letter of application to First National Equity (Petlev-3)

Exhibit 17 – Petlev 8/16/99 Exclusive Asset Management Agreement (Petlev-1)

Exhibit 18 – P.K. Trust & Holding 3/16/00 letters to Castellini (18) and Petlev (16)

Exhibit 19 – Petlev (14) and Castellini (16) Private Placement Agreements with P.K. Trust

Exhibit 20 – Slep 3/16/00 letter to the SEC (KJS0001)

Exhibit 21 – Worldwide T&P 10/27/99 Urgent Notice (Petlev-11)

Exhibit 22 – Knight 3/24/01 email to Petlev (Petlev-19)

Exhibit 23 – First National Equity 4/30/01 Promissory Note to Petlev (Petlev-20)

Exhibit 24 – Cabinet of Ministers 5/16/02 letter to Bill Kerns (Castellini-22)

Exhibit 25 – Federal Reserve Board Investment Scheme Advisory 6/11/96

I have been requested to express an opinion on whether the investment programs that are the subject of this prosecution are legitimate or exist in the financial world. The investment programs in question are outlined in documents listed in Exhibits 2 through 24, and my opinion was formed after my review of these exhibits.

10.     As will be described in the paragraphs below, all of the attached exhibits contain words, terms, and phrases that are not used in legitimate banking or commerce but rather are commonly used in

8

raudulent financial instrument scams. In addition, claims are made in these documents that are patently

false and meant to be misleading. Below, I have listed some examples:

A.    In Exhibit 2, an investor depicts to the Asset Manager his understanding that the

High Yield Investment Program transaction into which he is entering is registered

with the Federal Reserve. In Exhibit 3 defendant Montana warns the investors that

unauthorized communications about the transactions are violations of Federal

Reserve laws, and that the perpetrator will be permanently "Blackballed" by the

Federal Reserve for transgressions. The purported involvement of the Federal

Reserve in this Trading Program is also evidenced by Exhibit 4, which relates that

the trustee is waiting for the "Fed" to announce the start of the trading. This same

exhibit asserts that the defendants were directed by the "Fed" to comply with various

requirements for entry into this trade. Again, in Exhibit 5, the defendant contends

that the trade will initiate on some action by the "Fed", and in Exhibit 6, the "Fed" is

referenced regarding the release of funds to an investor.

**The Federal Reserve System has no involvement in any transactions or trading**

**programs as described in the material I reviewed for this case.** In fact, in an

advisory issued by the Federal Reserve on June 11, 1996, the public was notified that

"The Federal Reserve ...does not sanction, authorize, license, or otherwise

administer any type of investment program or plan for the public in the United States

or abroad". Attached as Exhibit 25.    The Federal Reserve's authority only permits it

to act in a governmental capacity as the Central Bank of the United States. Except as

9

fiscal agent of the United States government in the sale of government securities, the Federal Reserve does not participate in any commercial transactions with non-governmental parties.  The claimed utilization of a reputable institution like the Federal Reserve in a program of this nature is a "red flag" which indicates that the scheme is a fraud.  The fact that the Federal Reserve does not have any role in this program completely undermines the entire purported trading program, which is built upon this fiction.

B.     In order for this trading program, and other like it, to operate without the intervention of government authorities, the operators go to extraordinary lengths to secure confidentiality and secrecy from participants.  The investors are required to execute documents that deny that there was any solicitation of them, and as in Exhibit 7, agree to keep all information received about the program strictly confidential and non-disclosable to third parties.  In Exhibit 8, the investor agrees to keep strictly confidential all of the trading program information for a period of five years, and to obtain written permission from Lyttle prior to any disclosure.  In a Confidentiality and Non-Disclosure Agreement required to be executed by Knight, Exhibit 9, the funder (investor) faces a penalty of $5 million for violation of the confidentiality provisions, which are binding for 10 years.

These confidentiality requirements attempt to preclude diligent investors from inquiring with previously successful investors, if any, about their experience with the trading program.  They are obviously an attempt by the program operators to deter prudent due diligence and contact with regulatory or law enforcement authorities.

**10**

This secrecy requirement and the obstruction of due diligence are common features of HYIP scams. Transparency dooms these schemes and investor money evaporates.

C.      Exhibits 10 through 13 deal with the rate of return promised by the various organizers of this HYIP fraud. The Exhibit 10 from defendant Montana promised a rate of return of 50% per week. In Exhibit 11, one of the investors made written notes of a conversation with Montana who claimed that returns would be 100% a week. Another investor reported in Exhibit 12 that Montana made promises of a minimum of 100% per week, and at a later time Montana informed the investor that the earnings from the program would be 360% with the investor realizing 180%. This same investor executed Exhibit 13 with defendant Lyttle that proclaimed a return of 11.875% per trade on 156 trades within 380 days. The investor calculated this to equal over $22 million on their investment of $1 million. Later, when defendant Knight became part of the scheme, this investor claimed in Exhibit 12 that Knight informed him that they were entering a program that would yield 1200% to 1600% in a four month program.

Returns of this nature are not available in legitimate financial markets. The defendants were either mum or vague as to how they would generate these purported returns, but no matter what instrument they utilized, there is no economic basis for the returns they touted. This is especially true where ones investment is protected from loss. (See section D below). One must risk principal to obtain even marginal

11

investment returns. Any claim that a trader can obtain these extraordinary returns without risk to principal is pure fantasy, but is common in HYIP frauds.

D.    The defendant/organizers of this scheme utilized several mechanisms to portray the investor's funds as safe and protected in order to induce their investment. In Exhibit 14, defendant Montana outlines to all of the investors precautions that have been taken to secure their investments. He claims that the funds are "inside the worlds largest Securities House" and "the largest bank in the world under a full trust agreement". In addition, according to Montana, the funds were used to purchase U.S. government T-Bills. All of this creates, Montana maintains, insurance for the client (investor) of 196% of their investment. This same exhibit notes that a "short term" program was attempted, but "at no time were the funds put at risk". The investors also assumed that their funds were protected. This is shown in Exhibit 15, where an investor writes Lyttle that it was their understanding that "our investment will always be secured by a bank responsible instrument acceptable to us". Another investor wrote to Lyttle in Exhibit 16 that he "understood that my investment will always be 'blocked' in my account, in my name". In the Exclusive Asset Management Agreement that Lyttle executed with the investors, Exhibit 17, paragraph 10, sets forth that the clients funds are held as a non-depletion Trust to prevent any loss. When defendant Knight arrives on the scene, he promises two investors in Exhibit 18 that their funds "are secure and are placed in U.S. treasury Bills for your protection". In addition, in the Private Placement Agreements

12

executed between the investors and Knight, shown as Exhibit 19, the Agreement characterizes the Asset Manager (Knight) as certifying that there is no risk to the funder/investor's Capital placement amount (invested funds).

Purportedly then, the extraordinary high rates of return, advertised in other exhibits, can be had for no risk to the investor's principal. This is another indication that this trading program is a fantasy. The legitimate financial world does not operate this way. There is risk in every investment, and the higher the promised return, the greater the risk to the original funds. Anyone who claims otherwise is a fool, and likely a fraudster. These combined claims of extremely high returns with absolute safety again prove the fallacy of this trading program.

E.     Another way to induce investors into trading programs of this nature is to characterize the program as benefiting humankind in some way. Exhibit 19 contains clauses at article 1.9 that dictate that the program be used to finance and develop humanitarian projects, and at article 3.1 to finance the development of socially sound projects. In Exhibit 20, an investor noted how the 100% per week profits that were to be earned in the trading program had to be shared with a charity, as well as with a humanitarian project. These references to humanitarian projects are a known "red flag" in HYIP frauds. They are usually mentioned as an additional inducement to get an investor to commit their funds. In this case, the humanitarian angle may have been invoked to keep investors from demanding a refund of their principal.

13

F.      A common characteristic of these fraudulent trading programs is that after they fail to
        perform, the organizers start making excuses for their non-performance, blaming an
        assortment of entities. In Exhibit 21, Montana notifies investors that their profits from a
        purported trade have been delayed due to the action of a Swiss bank. In a Knight email
        with an investor, Exhibit 22, who is demanding verification of his funds, Knight admits
        there has been "delay after delay" and says that the money is with some attorney in New
        York, whom the investor claims does not exist. And, as often happens when the
        organizers cannot perform the transaction, they make additional hollow promises to the
        investors in order to put them off. In Exhibit 23, Lyttle offers a Promissory Note to an
        investor for his principal plus $50,000. All of these efforts keep the investors from
        demanding their money back, as well as delaying any report of the fraud to the
        authorities.


G.      Reference to internationally known and respected institutions and the implication that
        they are involved in the transaction is another listed 'red flag'. In Exhibit 24, Knight
        provides a dubious certificate from The Council of the States for Protection of Life,
        Republic of Moldova, to an investor, citing an "International Financial Security Code"
        registered with the United Nations, the U.S. Federal Reserve, the FBI, and the CIA. I
        can assure you that the Federal Reserve has no place to register such security codes, and
        I strongly doubt that these other institutions are in any way involved with this
        transaction. Colorful, but usually fraudulent documents of this type are used to impress
        potential investors with the financial sophistication of the organizers.

14

11.      In my opinion, the trading program offered by the defendants is a fraudulent HYIP.  The
fraud is evidenced throughout the Exhibits, especially by the continual reference to fabricated Federal
Reserve participation in the trading program, as well as the unrealistic claims of outrageous, guaranteed
returns on investments that do not exist in the legitimate financial world.  The promoters used false claims
to induce the victims to invest in the scheme and bilked them out of their funds.


I, Leonard A. Zawistowski, Jr., do hereby declare under penalty of perjury, in accordance with 28
U.S.C. § 1746, that the foregoing is true and correct.  Executed on the 9th day of September 2005.


Leonard A. Zawistowski, Jr.
Senior Special Investigator


Attachments:
   1)      Exhibits 1-25