UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

       v.

VIOLETTE GAIL ELDRIDGE, et. al

               Defendants.
_____

05-CR-6116CJS

**GOVERNMENT RESPONSE TO DEFENDANT ELDRIDGE'S AND KNIGHT'S MOTIONS TO DISMISS COUNTS 10 THROUGH 13 CHARGING MONEY LAUNDERING RELATED OFFENSES**

**INTRODUCTION**

Defendants Knight and Eldridge have moved for dismissal, under Federal Rule of Criminal Procedure 12(b)(3), of Counts 10 through 13, charging the defendants with conspiracy to commit money laundering offenses and the use of criminal proceeds to promote the carrying on of specified unlawful activity in violation of Title 18, U.S.C. §§ 1956(h) and 1956(a)(1)(A)(i) respectively.[1]  The defendants allege that the contested counts fail to charge a crime after the Supreme Court decision in United States v. Santos, 128 S.C. 2020 (2008), holding that "criminal proceeds" can represent "profits" as opposed to "gross receipts"

---

[1] Defendant Knight has only moved for dismissal of the substantive money laundering offenses, Counts 11 through 13, and not the  money laundering conspiracy, Count 10.

depending on the specific unlawful activity (SUA) charged.  The <u>Santos</u> holding, based on a plurality decision is very narrow and limited to money laundering promotion offenses wherein the charged specified unlawful activity is the operation of an illegal gambling business.  Even utilizing the most conservative definition of criminal proceeds by limiting them to "profits," the charged money laundering counts in the present indictment remain viable and should proceed to trial.

**STATEMENT OF FACTS**

Defendants Violette Gail Eldridge ("Eldridge"), Melvin Ray Lyttle ("Lyttle"), Paul E. Knight ("Knight"), and John L. Montana ("Montana") were indicted on charges of conspiracy (18 U.S.C. 371), mail fraud (18 U.S.C. 1341), wire fraud (18 U.S.C. 1343), and all except Montana, with money laundering conspiracy (18 U.S.C. 1956(h) and money laundering promotion (18 U.S.C. §1956(a)(1)(A)(i)).  These charges are based on the defendants scheme to defraud investors of millions of dollars.

Beginning in August 1999, defendants solicited wealthy individuals regarding an investment program. In discussions with potential investors, the defendants claimed to be involved with secret trading programs with the world's largest banks. The defendants promised potential investors that after an initial investment of $1 million, they would receive a 30% return on a

weekly basis. Moreover, the defendants promised that this investment would not only be profitable but also secure — claiming that the investors' funds would be held in the form of U.S. Treasury securities purchased in the investor's name or held in segregated bank accounts in the investor's name and thereby not subject to loss.

By May 2001, defendants managed to raise more than $30 million.  In reality, there was no secret trading program, funds were always at risk, there were no weekly 30% returns, there were no Treasury bonds purchased in the investors' names and investor funds were not deposited into segregated accounts.  Once solicited, the investors transferred funds to the defendants' bank accounts, and the defendants withdrew the funds.  Defendants spent this cash on real property, automobiles, and home furnishings rather than investments to the account of any investor.

Once investors realized that they had not received any returns, some attempted to withdraw their funds from the scheme; others threatened to report the scheme to the authorities.  When investors threatened to withdraw their funds, defendants gave them partial returns to lull them into keeping their remaining funds in the program.  These partial returns were financed by the proceeds that had been received from newer investors.  When investors threatened to report the scheme to authorities,

defendants provided them a full refund of principal which was also financed by cash received from more recent investors.  In total, defendants returned approximately $20 million to investors.

## APPLICATION OF THE RULING IN UNITED STATES v. SANTOS

The general rule for ascertaining the holding of a case in which there is no majority opinion is that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."  Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)).  As the Court has recognized, however, this test is frequently "more easily stated than applied."  Grutter v. Bollinger, 539 U.S. 306, 325 (2003); accord Nichols v. United States, 511 U.S. 738, 745 (1994).  In some cases, there may be "no lowest common denominator or 'narrowest grounds' that represents the Court's holding."  Ibid. (concluding that it was "not useful to pursue the Marks inquiry" when it had "baffled and divided the lower courts" for that reason).

When there is no "one opinion [that] can meaningfully be regarded as 'narrower' than another" in the sense that it is a "logical subset of other, broader opinions," the courts of appeal have generally concluded that Marks is inapplicable.  United

States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003) (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).  See Anger Energy Corp. v. Consolidated Coal Co., 177 F.3d 161, 170 (3d Cir. 1999) ("[The Marks rule is applicable only where one opinion can be meaningfully regarded as narrower than another and can represent a common denominator of the Court's reasoning.") (internal quotation marks and citation omitted).  "In such a case, the only binding aspect of a splintered decision is its specific result."  Ibid.

Santos is a case in which no one opinion is a "logical subset" of any other opinion that can represent a "common denominator of the Court's reasoning."  Although the plurality opinion suggests that Justice Stevens' concurring opinion rests on a narrower ground, 128 S. Ct. at 2031 (plurality opinion), the rationales of the two opinions are inconsistent.  The plurality opinion is based on the rationale that "proceeds" has a single meaning for all specified unlawful activities and that meaning is "profits."  See id. at 2025, 2029-2030.  Justice Stevens' concurring opinion is based on the rationale that "proceeds" has a different meaning for different SUAs and that "proceeds" means "profits" only when there is "both a lack of legislative history speaking to the definition of 'proceeds'" for the relevant SUA and "Congress could not have intended the perverse result that would obtain" by applying a "gross receipts" definition to that

SUA.  Id. at 2033 (Stevens, J., concurring); see id. at 2031-2032 (indicating that a "gross receipts" definition would apply to SUAs involving "the sale of contraband and the operation of organized crime syndicates involving such sales"); id. at 2034 n.7 (indicating that a "gross receipts" definition would also apply for other "applications of the statute not involving" a "perverse result").

Neither rationale is a logical subset of the other or can provide a common denominator because the rationales start with conflicting premises.  The plurality opinion starts with the premise that "proceeds" must have a common meaning for all SUA's and Justice Stevens' concurring opinion starts with the inconsistent premise that "proceeds" has different meanings for different SUAs.  Likewise, Justice Stevens' rationale is irreconcilable with the rationale of the principal dissent, which also rejects his premise that "proceeds" has different meanings for different SUAs.  Id. at 2044 (Alto, J., dissenting). Accordingly, "the only binding aspect of" the "decision is its specific result." Anger Energy Corp., 177 F.3d at 170. Therefore the precedent application of the Santos decision would be limited to the same type of payments being made when the SUA charged is the operation of an illegal gambling business.

**FACTUAL BASIS FOR MONEY LAUNDERING OFFENSES CHARGED**

The facts cited in <u>Santos</u> are decidedly different from those currently before the Court, to such an extent that an expansion of the <u>Santos</u> ruling to SUAs other than operation of a gambling business is clearly unwarranted.  Unlike the illegal gambling business in <u>Santos</u>, which was an ongoing business operation that utilized and paid actual people to collect wagers and distribute winnings to clients, in the charged investment scheme, there was absolutely <u>no investment activity</u> of the type represented to investors, <u>i.e.</u>, the investors' funds were not placed into a high yield investment program.

Under the terms of the First National Equity Exclusive Asset Management Agreement and the PK Trust Private Placement Agreement, upon receipt, investor funds were to be placed into segregated accounts or treasury bills titled in the investors' names and under the investors' exclusive control.  Investors were told that there was absolutely no risk of loss.  In reality, immediately upon transfer, investors lost all oversight of their funds as the monies were deposited into bank and stock accounts under the defendants' exclusive control.  Thereafter, the defendants disbursed investor funds for their personal benefit in violation of the terms of the investment agreements and without the investors' knowledge.

As detailed in Special Agent Kassouf's expert report tracing the investment scheme's financial transactions, investor funds were immediately converted by the defendants upon their receipt and used to pay personal expenditures. Such actions demonstrate that the investment fraud was then complete, and investor funds represented "profits" available to the defendants for discretionary use. Kassouf's analysis shows that no investments were made pursuant to the terms of the investment agreements and correspondingly, no investment expenses were incurred. Applying a <u>Santos</u> "profits" analysis to the fraud charged here, there were no expenses to be deducted from gross receipts. "Profits" equal gross receipts when the specified unlawful activity is a form of generic theft which is perfected at the time funds are received and no disbursements are undertaken to fulfill any promised activity.

A finding that profits equals gross receipts when the SUA charged involves the promotion of a high yield investment program fraud is further supported by the expert report of Federal Reserve employee Leonard Zawistowski. Zawistowski states that investments such as those promoted by the defendants in the charged scheme <u>do not exist</u> and therefore *de facto*, there cannot be investment related expenses for non existent investments.

**LULLING PAYMENTS MADE IN PROMOTION OF THE SCHEME**

Moreover, in <u>Santos</u>, the plurality emphasized that "proceeds" should be viewed in terms of whether the money from the conduct was sufficient to prove *one* predicate offense. The plurality noted:

> The prosecution needs to show only that a <u>single instance</u> of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction…Contrary to the dissent's view…the fact finder will not need to consider gains, expenses, and losses attributable to other instances of specified unlawful activity, which go to the profitability of some entire criminal enterprise. What counts is whether the receipts from the charged unlawful act exceeded the costs fairly attributed to it.

<u>Santos</u>, at 2029. (Emphasis added).

The comparison to the <u>Santos</u> expenses makes this point clearer. Employees were paid for their involvement in the illegal lottery - their payments were paid from the receipts of each lottery. In this case, the money from one illegal act was spent to lull the victims of a prior instance of fraud into a false sense of security. When money originating from one particular instance of crime is spent on controlling the consequences of a prior instance of crime, this is clearly <u>not</u> an expense of the crime from which the proceeds originate.

Payments to complaining investors threatening to report the investment scheme to authorities represent a discretionary <u>use of profits</u> made by the defendants which were necessary to "grow" the investment scheme and maintain its availability for new victims.

9

Failure to make lulling payments could have caused the scheme to collapse. Return payments to investors were not necessary to the charged mail and wire fraud as those frauds were complete as soon as investor funds were initially received and immediately converted by the defendants. Payments designed to restrict the reporting of the investment scheme to authorities demonstrates, in its purest form, the use of criminal proceeds to facilitate and promote the carrying on of specified unlawful activity. As is the case in a Ponzi scheme - payments to old investors from new investor funds are discretionary and their purpose is to expand or grow the scheme. Such payments are discretionary, made after the initial fraud is complete, are intended to lull prior investors to remain with the scheme or to stop prior investors from reporting the scheme to authorities, and represent the quintessential demonstration of payments designed to promote ongoing criminal activity.

**THERE IS NO MERGER OF THE MONEY LAUNDERING COUNTS AND THE SUA**

Finally, the biggest issue concerning both the plurality and Justice Stevens was the merger issue; that is, each was troubled by the application of the "gross receipts" definition when an essential element of an underlying crime would also qualify as an act of money laundering. However, this is not presently an issue. The crime in Santos was the operation of an illegal

lottery; one consistent aspect of a lottery is a payout to all of its winners.  Here, the underlying crimes were wire and mail fraud.  Partial reimbursement of funds is not an underlying element of mail and wire fraud; in fact, the essence of the fraud in this case is that defendants <u>never</u> intended to refund any of the money.  These payments were not an essential part of their scheme as the payout to winners were in <u>Santos</u>, nor were they an operation cost of the scheme or essential to the scheme's survival.  For this reason, the partial refunds, which were paid to investors to lull them into keeping their remaining funds with the investment program, were funded with the "proceeds" or "profit" of this fraudulent scheme.  Moreover, full reimbursement to complaining investors in order to maintain their silence also represented discretionary payments of funds by the defendants to allow continuation of the illegal scheme.  These payments were not necessary to the original mail fraud and wire fraud charged as those frauds were complete as soon as investor funds were converted by the defendants, <u>i.e.</u>, upon their receipt.  Under the present facts of the case before the Court, holding that criminal proceeds represents "gross receipts" or "profits" does not cause a perverse result, the concern of a majority of the Court in <u>Santos</u>.

**REMAINING ISSUES RAISED BY THE DEFENDANTS**

Defendant Eldridge in her motion at paragraph 12 raises numerous issues that do not relate to the recent Santos holding, have been previously ruled upon the Court, or raise issues requiring factual determination at trial.  Therefore, they are not addressed.

Defendant Knight cites the prior jury instructions submitted by the government and the definition of proceeds which accurately characterized the law as to the definition of "criminal proceeds" at the time of submission.  The government will provide amended proposed jury instructions prior to trial which correctly define "criminal proceeds" which incorporate the new definition as recently identified in the Santos.

**CONCLUSION**

Payments to Rochester investors represent discretionary personal payments by the defendants of criminal proceeds rather than expenses of the criminal scheme which were designed to lull the investors into a false sense of security and to foster the investors continued participation in the investment scheme. Therefore, Counts 11 through 13 charging payments made to promote the specified unlawful activity, mail and wire fraud, remain

viable and should proceed to trial as should Count 10 charging money laundering conspiracy.

Dated: Rochester, New York, July 14, 2008

                                TERRANCE P. FLYNN
                                United States Attorney


                     BY:   S/Bradley E. Tyler
                           BRADLEY E. TYLER
                           Assistant United States Attorney
                           United States Attorney's Office
                           100 State Street, Room 620
                           Rochester, New York  14614
                           (585) 263-6760, ext 2231
                           Bradley.E.Tyler@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                                                             05-CR-6116CJS

    v.

VIOLETTE GAIL ELDRIDGE, et al.,

        Defendants.

---

## CERTIFICATE OF SERVICE

    I hereby certify that on July 14 2008, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT ELDRIDGE'S AND KNIGHT'S MOTIONS TO DISMISS COUNTS 10 THROUGH 13 CHARGING MONEY LAUNDERING RELATED OFFENSES** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participant(s) on this case:

1. Maurice J. Verrillo, Esq.    maurice@verrillolaw.com

2. Mark D. Hosken, Esq.    Mark_Hosken@fd.org

                                                    S/Barbara Petersheim
                                                    BARBARA PETERSHEIM