Ex A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-80123-CR-MARRA/HOPKINS

UNITED STATES OF AMERICA

v.

VIOLETTE GAIL ELDRIDGE
KATHERINE CRASE
and
PAUL D. KUHN

     Defendants.
_____/

## MOTION TO DISMISS INDICTMENT

Comes the Defendants, by counsel, pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States and respectfully request the Court dismiss the indictment in this case. The United States, by and through its agents with the Department of Justice and the Securities and Exchange Commission, has committed numerous constitutional violations and grave acts of misconduct and injustice with regard to all three defendants in this case, and specifically as to Crase. The government agents involved in the investigation and prosecution of Crase violated her rights to Due Process under the Fifth Amendment, as well as her right to be free from compelled testimony as guaranteed by the Fifth Amendment. In support of her motion to dismiss, Crase respectfully states as follows.

## STATEMENT OF FACTS

In November of 2000, Defendant Eldridge was contacted by the Federal Bureau of Investigation in Louisiana concerning her role as a signatory over the trust accounts of First National Equity. Eldridge informed the FBI that all monies which had been placed in First National's trust

accounts had been distributed pursuant to the trust. At that time, Eldridge was not informed that she was the target of a criminal investigation or that she had been the subject of numerous "sting operations" dating back as far as the early 1990's. Eldridge was led to believe that the FBI only considered her a witness to the activities of First National. Soon thereafter, the SEC office in Georgia initiated an investigation into First National Equity and identified Eldridge as a target in that investigation. Eldridge retained the legal services of Katherine Crase in that proceeding. Crase is an attorney and certified public accountant licensed by the State of Florida to conduct business. She appeared in the Georgia action with local counsel.

In May 2001, Eldridge was subpoenaed to testify regarding the activities of First National Equity. Again, Eldridge was never informed of the involvement of the Department of Justice in the SEC investigation's investigation in Georgia. She cooperated fully with the SEC and testified pursuant to the subpoena. The SEC withheld their knowledge of the DOJ's ongoing criminal investigation and suppressed documents which the two entities shared. While the Georgia case was pending, Eldridge was indicted on criminal charges in New York arising out of the same facts at issue in the Georgia SEC case.

Crase was attorney of record for Eldridge in all of these proceedings. Crase was never implicated in any wrongdoing during the course of the investigations in Louisiana, Georgia, Indiana, or New York. Crase remained counsel of record in Indiana and Georgia and was a fact and expert witness in Eldridge's New York criminal case. She filed motions to stay discovery on Eldridge's behalf in the various SEC actions to preclude the government from misusing evidence obtained in the civil enforcement actions against Eldridge in the criminal prosecution. The SEC repeatedly denied knowledge of the existence of any criminal investigation during the pendency of its proceedings, despite their apparent collaboration with the DOJ regarding these defendants over the past eight years.

Shortly after the conclusion of the Indiana SEC case, in which Crase proved Eldridge's innocence of any wrongdoing, Florida FBI agents began investigating Crase's association with Eldridge. The FBI initiated contact between Crase, Eldridge, and "John Firo", an undercover agent in an allegedly fraudulent investment opportunity. As evidenced by the indictment in this case, six of the seven counts of mail fraud against Crase are the direct result of "Firo" initiating communications with Crase. The Department of Justice and/or the FBI forged documents authenticating "Firos" credentials as an established and reputable investment broker in a further effort to convince Crase and Eldridge of his status as a legitimate businessman. Despite his seemingly reputable credentials (as fraudulently created by the government), Crase became suspicious of "Firo" and his relentless efforts to negotiate business deals with her. She attempted to discontinue communications with him. "Firo" initiated numerous telephone calls and insisted on several occasions that Crase meet with him.

Perhaps even more repugnant was the FBIs use of George Bevre, the subject of a separate FBI/DOJ investigation and a then-pending indictment, as a confidential informant. Bevre ingratiated himself with Eldridge by hiring her to assist in research for a legal matter and subsequently hired Crase to represent him in other matters. Bevre, while acting under the direction of the FBI, convinced Eldridge that her life was in danger and hired armed guards to remove Eldridge from her home. In her absence, Eldridges' home was burglarized and numerous documents were stolen. Some of these documents were transmitted the United States Secret Service who later accused Eldridge of plotting to assassinate the President of the United States. Obviously, Bevre and the FBI were responsible for the theft and transmission of documents to the Secret Service.

Since the FBIs first contact with Eldridge in 2000, the SEC has conducted investigations into her activities in New York, Indiana, and Georgia. Furthermore, the Department of Justice pursued a criminal prosecution against Eldridge in New York and the United States Secret Service has

interrogated Eldridge regarding an alleged plot to assassinate the President on the basis of documents stolen from her home by an FBI informant. Now Crase, along with Eldridge and Kuhn, are the targets of a criminal prosecution in Florida. Numerous government agencies including the FBI, the United States Attorneys Office, and the Secret Service, have colluded with one another to harass Crase and Eldridge and to deprive all of the defendants of their constitutional rights. The simultaneous nature of the DOJ investigations and the SEC enforcement actions demonstrate collaboration between the two agencies. Due to the governments failure to disclose all relevant communications, Crase is uncertain to what extent these agencies were sharing information with one another. What is known is that the SEC, through its communications with Eldridge and Crase, denied that Crase was the target of a criminal investigation, despite their knowledge to the contrary. Such misconduct served to deprive Crase of her right to due process and the Fifth Amendment protections against self-incrimination and warrants dismissal of all charges in this case.

ARGUMENT

I. The governments misconduct in conducting the investigation of Crase warrants dismissal of the charges against her.

Governmental misconduct has long been recognized as sufficient cause for the Court to dismiss an indictment. The Eleventh Circuit has recognized that "government involvement in criminal schemes can be so outrageous that it offends due process." United States v. Mulherin, 7120 F.2d 731 (11th Cir. 1983) (citing United States v. Tobias, 662 F.2d 381 (5th Cir. 1981)). Law enforcement conduct rises to the level of a constitutional violation and thereby warrants dismissal of the indictment when the conduct is so outrageous and fundamentally unfair that they are "shocking to the universal sense of justice" as mandated by the Fifth Amendment to the United States Constitution. United States v. Russell, 411 U.S. 423, 432 (1973).

In the Mulherin case, an undercover agent with the Bureau of Alcohol Tobacco and Firearms (ATF) conspired with numerous individuals to traffick in weapons and drugs. Mulherin, 710 F.2d 731, 735-736. The agent immersed himself with the defendants through a mutual interest in boat racing and ultimately approached an unindicted member of the group to assist him in locating automatic weapons. Id. This group member referred the agent to another individual who was ultimately charged in the case. Id. Over the course of several months, the agent brought other individuals into the scheme and directed its evolution from simply a quest for weapons to a drugs-for-guns exchange. Id. Friends and relatives of the defendants were brought in to participate in the scheme. Id. In rejecting the defendants claims of entrapment and outrageous government conduct, the Court held that the agents participation in the scheme did not rise to the level of a due process violation because he was not responsible for bringing some of the defendants into the scheme but instead exploited the defendants predisposition or willingness to commit the charged criminal acts. Id.

In contrast to the Mulherin defendants, Crase never participated in any criminal scheme. She was approached by a seemingly reputable "broker" ("John Firo") who expressed interest in conducted business. As a responsible business person would, Crase investigated the brokers credentials. When his background checked out, Crase communicated with him about the possibility of putting together legitimate business deals. However, after the brokers repeated attempts to negotiate questionable deals, Crase attempted to terminate her association with him. He then pursued her relentlessly, insisting on conducting further meetings and continuing their relationship. Persistent contacts from a law enforcement agent coupled with the efforts of a target of a criminal investigation to terminate communications result in the sort of conduct that rises to the level of a due process violation.

Perhaps even more compelling in this analysis is the conduct of George Bevre, the FBI's

informant. Bevres outrageous conduct included pretending to hire Crase as legal counsel in order to gain her trust and then reporting all of their conversations to law enforcement as well as hiring armed guards to "protect" Eldridge. Bevre, acting under the authority of the FBI, then orchestrated a robbery of Eldridges' home and the theft of her personal documents, which he then provided to the FBI. These documents were later transmitted to the Secret Service who accused Eldridge of the ultimate act of treason, the plotting to assassinate the President of the United States. Meanwhile, Bevre was also providing information to the SEC regarding the alleged criminal acts and securities violations committed by Eldridge and Crase. Throughout his involvement as an informant for the FBI and a witness to the SEC, Bevre was under indictment for his own independent criminal acts, and yet the government continued to accept information and documents from him despite the obviously unlawful origin of said information. These acts are without a doubt the very outrageous and extreme conduct contemplated by the courts as sufficient to establish constitutional violations. Therefore, the defendants motion to dismiss should be granted.

II. The SEC and the DOJs collaboration with one another in this case warrants dismissal of Crase's charges.

The issue of collaboration between governmental agencies has been explored in detail by the courts. The federal courts have supervisory authority over the manner in which federal law enforcement agents exercise their power. Rea v. United States, 350 U.S. 214, 217 (1956). Numerous district courts have fully explored the issue of government collaboration between the DOJ and the SEC. In United States v. Parrott, 248 F.Supp. 196 (D.C.D.C. 1965), the court addressed an issue strikingly similar to those presented in the instant case. In Parrott, the SEC opened an investigation and subsequently initiated a civil action in which the defendants were accused of violating various SEC regulations. Soon after the civil action began, the SEC referred the case to the United States Attorneys Office and recommended criminal prosecution for the same incidents. Id. The civil action

continued to resolution, but the defendants were never informed of the criminal component of the investigation. Id. at 199. During the civil proceedings, numerous depositions were taken and extensive discovery was conducted. Id. All of the evidence collected as a result thereof was forwarded to the U.S. Attorneys Office. Id. After the defendants were indicted for their allegedly criminal conduct, they discovered and raised the collaboration between the SEC and the DOJ as grounds for dismissal. In dismissing the indictment against the defendants, the court espoused its belief that civil and criminal investigations should not be commingled due to the fact that:

> "due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him. His necessary defense in the administrative hearing may disclose his evidence long in advance of his criminal trial and prejudice his defense in that trial."

Parrott, 248 F.Supp. 196, 200. Furthermore, the court held "the Government may not bring a parallel civil proceeding and avail itself of civil discovery devices to obtain evidence for subsequent criminal prosecution." Id. at 202.

Similarly, the practice of commingling civil and criminal investigations has been condemned by other district courts in this Circuit. In United States v. Scrushy, 366 F.Supp. 2d 1134 (N.D.Ala. 1995), the court relied on Parrott in reaching its decision to suppress evidence obtained during parallel civil and criminal investigations. In Scrushy, the defendant was targeted by the SEC for securities violations and was under investigation by that agency. Throughout the course of their investigation, the SEC willfully cooperated with and provided information to the U.S. Attorneys Office to advance the goal of a criminal conviction against the defendant. At some point in the investigation, the two agencies began relying heavily on one another in their pursuit of that conviction. The U.S. Attorneys Office provided "suggestions" to the SEC when assisting in the preparation of taking depositions and specified the questions and meeting location of interviews with the defendant so that "if [Scrushy] lies, he will be lying in our district." Id. at 1136. The court noted the similarities between the issue before the court and the Parrott case; specifically, the intentional

concealment of the criminal investigation by the SEC during the pendency of the civil investigation in order to obtain information. Id. The court went on to highlight the notion of the "proper administration of justice" as a guiding principle in evaluating the appropriateness of collaboration between governmental agencies in their quest to obtain incriminating evidence. Id. at 1138. (citing United States v. Teyibo, 877 F.Supp. 846 (S.D.N.Y. 1995)). Moreover, the court expressed concern that the sharing of information and evidence between government agencies involved in parallel civil and criminal investigations further heightens the risk of a deprivation of a targets constitutional rights. The court summarized that danger as follows:

> When a defendant *knows* that he has been charged with a crime, or that a criminal investigation has targeted him, he can take actions to prevent the providing of information in an administrative or civil proceeding that could later be used against him in the criminal case. When a defendant does not know about the criminal investigation, the danger of prejudice increases.

Id. at 1139. (citing United States v. Parrott, 248 F.Supp. 196 (D.C.D.C. 1965).

In the case sub judice, it is indisputable that parallel investigations were conducted. The SEC only became aware of Crase's association with Eldridge as the result of Crase's representation in the civil action. Furthermore, it was only after Crase and Eldridge prevailed in the Indiana civil case that the FBI turned its attention to Crase. Crase, in her capacity as counsel for Eldridge, communicated with the SEC on her behalf, and the information obtained as a result of that communication was then transmitted to the United States Attorneys Office. When Crase inquired about the existence of a criminal investigation, she was told that the SEC was not aware of any DOJ action on the matter. Obviously, this representation was patently false. If Crase had known she was the target of a criminal investigation, she would have had the opportunity to refuse to communicate and/or provide documents to the SEC until the outcome of the criminal action. However, the SEC strenuously resisted Crase's efforts to stay discovery in the civil proceedings after misrepresenting the extent of their knowledge regarding an ongoing criminal investigation.

The full extent of the cooperation between the SEC and the DOJ remains unknown and is the subject of a motion for additional discovery pending before this court. However, it is apparent from the timing of the New York criminal prosecution, this prosecution, the Louisiana criminal inquiry, and the nearly simultaneous civil actions in Indiana and Georgia that information was being shared by at lease these two agencies. This sort of government collaboration combined with one agency's deception regarding knowledge of other government action warrants severe sanctions against the government. Therefore, the defendants' motion to dismiss should be granted.

Respectfully submitted,

**RICHARD G. LUBIN, P.A.**
Second Floor, Flagler Plaza
1217 South Flagler Drive
West Palm Beach, Florida 33401
Telephone 561-655-2040
Facsimile: 561-655-0612
Attorney for Defendant Kuhn

By:   /s/ Michael Metz
**MICHAEL METZ**
Florida Bar No.: 0124265


**ROMINES WEIS & YOUNG PSC**
600 West Main Street
Suite 100
Louisville, Kentucky 40202
Telephone: (502) 587-8822
Facsimile: (502) 568-3600
Attorney for Defendant Crase

By:   /s/ Steven R. Romines
**STEVEN R. ROMINES**
Kentucky Bar No.: 84910
Florida Bar No.: Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 10, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing

By: /s/ Michael Metz
**MICHAEL METZ**